Tarek H. Zohdy (SBN 247775)
Tarek.Zohdy@capstonelawyers.com
Cody R. Padgett (SBN 275553)
Cody.Padgett@capstonelawyers.com
Laura E. Goolsby (SBN 321721)
Laura.Goolsby@capstonelawyers.com
CAPSTONE LAW APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone:  (310) 556-4811
Facsimile:  (310) 943-0396

Russell D. Paul (*pro hac vice* forthcoming)
rpaul@bm.net
Abigail J. Gertner (*pro hac vice* forthcoming)
agertner@bm.net
Amey J. Park (*pro hac vice* forthcoming)
apark@bm.net
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel:  (215) 875-3000
Fax:  (215) 875-4604

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| PATRICK MARANDA and ROBERT EWING, individually, and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>HYUNDAI MOTOR AMERICA., INC., a California corporation, KIA MOTORS AMERICA, INC., a California corporation, HYUNDAI MOTOR COMPANY, a South Korean corporation, and KIA MOTORS CORPORATION, a South Korean corporation,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>(1) Violations of the Minnesota Prevention of Consumer Fraud Act<br>(2) Violations of the Minnesota Deceptive Trade Practices Act<br>(3) Violations of the Minnesota False Statement in Advertising Act<br>(4) Breach of Express Warranty under Minnesota Law<br>(5) Breach of Implied Warranty under Minnesota law<br>(6) Violations of the South Carolina Unfair Trade Practices Act<br>(7)  Breach of Express Warranty under South Carolina Law<br>(8) Breach of Implied Warranty under South Carolina Law |

(9)  Breach of Express Warranty under the Magnuson-Moss Warranty Act
(10) Breach of Implied Warranty under the Magnuson-Moss Warranty Act
(11) Fraudulent Concealment/Omission
(12) Unjust Enrichment

**DEMAND FOR JURY TRIAL**

1.     Plaintiffs Patrick Maranda and Robert Ewing ("Plaintiffs"), individually and on behalf of all persons in the United States who purchased or leased any 2020-present Kia Telluride vehicle or 2020-present Hyundai Palisade vehicle ("Class Vehicles" or "Vehicles").

2.     Defendants Hyundai Motor America, Inc. ("HMA"), Hyundai Motor Company ("HMC") (together with HMA, "Hyundai"), Kia Motors America, Inc. ("KMA"), and Kia Motors Corporation ("KMC") (together with KMA, "Kia," and Kia collectively with Hyundai, "Defendants") designed, manufactured, marketed, distributed, sold, warranted, and/or serviced the Class Vehicles. Plaintiffs allege as follows:

## INTRODUCTION

3.     This is a consumer class action concerning a failure to disclose material facts and a safety concern to consumers.

4.     Defendants manufactured, marketed, distributed, and/or sold the Class Vehicles without disclosing that the Class Vehicles' headlights were defective.

5.     Specifically, Plaintiffs allege that the headlights are defective in that they are designed, manufactured, and/or installed in a manner that does not seal out moisture and humidity to a sufficient degree and/or contain defective seals which allow moisture and condensation to intrude on the headlight assembly. As a result, the light output from the headlamp assembly is dim and/or becomes progressively dimmer over time; the high beams fail to illuminate entirely (often without warning), the headlights are and/or become improperly aimed and  fail to properly illuminate ahead of the vehicle, and the headlights are and/or become extremely fogged and unfocused (the "Headlight Defect" or "Defect"). As further described below, discovery will show that improperly designed, manufactured, and/or installed headlamp assemblies, internal headlamp connections, and headlamp seals and gaskets result in these failures.

6.     The Headlight Defect presents a significant safety hazard. Drivers, including Plaintiffs Maranda and Ewing, are unable to see at a distance in front of them, are unable to see in inclement weather and while driving at night, and are unable to see potential road hazards, including people, animals, and objects. The Headlight Defect endangers drivers, pedestrians, and other vehicles because it makes accidents wherein the vehicle strikes a person, animal, or object in the roadway more likely, and sometimes entirely unavoidable, depending on the degradation of light output or level of headlight failure. For this reason, Class members have reported fear of driving their Class Vehicles at night or in inclement weather.

7.     Defendants sold the Class Vehicles with a 6-year/60,000-mile ("Kia Warranty") or 5-year/60,000-mile ("Hyundai Warranty") New Vehicle Limited Warranty ("NVLW") that purports to cover the headlights. However, owners and lessees often have complained that their Headlights fail and require repair or replacement both within and just outside the warranty period and that they are charged for repair even when within the warranty period. This is evidenced through Class Member reports to the National Highway Traffic Safety Administration ("NHTSA"), which demonstrate that Defendants' authorized dealerships are replacing and repairing Headlights both within, and just outside, the applicable express warranty periods and/or are charging Class Members for repairs within the warranty period.

8.     The Headlight Defect is inherent in each Class Vehicle and was present at the time of sale.

9.     Discovery will show that, since 2019, if not earlier, Defendants have been aware the Class Vehicles' Headlights would need frequent repair, prematurely fail, require frequent replacement, including replacements just outside of warranty, that the replacement Headlights installed would be equally as defective as the originals, and that the Headlight would cause the symptoms of the

CLASS ACTION COMPLAINT

Headlight Defect described above (poor light output from the headlamp assembly; sudden high beam failure; improper aiming; failed illumination ahead of the vehicle, and fogged or unfocused headlights) yet Defendants continued to equip the Class Vehicles with defective Headlights. Further, Defendants often claim that the warranties they provided with the vehicles do no cover the headlight diagnosis, calibration or replacement, forcing consumers to pay out of pocket.  Moreover, Defendants not only refused to disclose the alleged Defect to consumers, they also actively concealed, and continue to conceal, their knowledge concerning the Headlight Defect.

10.    Defendants undertook affirmative measures to conceal Headlight failures and other malfunctions through, among other things, Technical Service Bulletins ("TSB") issued to authorized repair facilities only, and not provided to owners or lessees.

11.    Defendants had superior and/or exclusive knowledge of material facts regarding the Headlight Defect due to their pre-production testing, design failure mode analysis, aggregate part sales, consumer complaints about the Defect to Defendants' dealers, who are their agents for vehicle repairs, customer complaints made directly to Kia and Hyundai, dealer audits, aggregate warranty information, consumer complaints to and resulting notice from NHTSA, early consumer complaints on websites and internet forums, dealership repair orders, among other internal sources of information about the problem.

12.    The Headlight Defect is material because, *inter alia,* it poses a safety concern. As attested by Class Members in complaints to the National Highway Traffic Safety Administration ("NHTSA"), and other online forums, the Headlights can suddenly fail or dim, causing inability to perceive pedestrians, animals, and other road hazards, inability to perceive and respond to safety threats, and greatly increased risk of collision.

13.    Defendants' failure to disclose the Headlight Defect has caused

Plaintiffs and putative class members to lose the use of their Vehicles' Headlights, the use of their vehicles at night or during inclement weather, and/or incur costly repairs that have conferred an unjust substantial benefit upon Defendants.

14.    Discovery will show that, in an effort to conceal the Headlight Defect, Defendants have instructed dealers to tell consumers their vehicles are "operating normally" or "operating as intended" when they are not, or to give excuses for sub-par performance such as the headlights not being pointed in the correct direction. This is a common practice in the automotive industry. By denying the existence of a defect, manufacturers can play on the consumers' lack of technical expertise and avoid implementing potentially costly fixes for years, or at least until the vehicles are out of warranty. When remedial measures are taken, they are often through the issuance of service bulletins provided to dealers only that are narrowly crafted and underinclusive, as occurred here and set forth below.

15.    Had Defendants disclosed the Headlight Defect, Plaintiffs and Class Members would not have purchased the Class Vehicles, would have paid less for them, or would have required Defendants to replace, or pay for the replacement of, the defective Headlights with a non-defective version before their warranty periods expired.

## THE PARTIES

**Plaintiff Patrick Maranda**

16.    Plaintiff Maranda is a Minnesota citizen residing in Outing, Minnesota.

17.    In or around fall 2021, Plaintiff Maranda purchased a new 2022 Hyundai Palisade from Dondelinger Hyundai, an authorized Hyundai dealership in Baxter, Minnesota.

18.    Plaintiff Maranda purchased his vehicle primarily for personal, family, or household use.

19.    Passenger safety and reliability were important factors in Plaintiff

Maranda's decision to purchase his vehicle. Before making his purchase, Plaintiff Maranda researched the 2022 Hyundai Palisade online, by "Googling" the vehicle. At the dealership, Plaintiff Maranda also reviewed the vehicle's Monroney Sticker or "window sticker," which listed official information about the vehicle. Plaintiff Maranda also discussed the safety features of the vehicle with dealership personnel, who made no reference to the Headlight Defect. Instead, the dealership salesperson told Plaintiff Maranda the Hyundai Palisade was a "very reliable vehicle." Plaintiff Maranda believed that the 2022 Hyundai Palisade would be a safe and reliable vehicle.

20.    Defendants' omissions were material to Plaintiff Maranda. Had the Hyundai Defendants disclosed their knowledge of the Headlight Defect before he purchased his vehicle, Plaintiff Maranda would have seen and been aware of the disclosures. Furthermore, had he known of the Headlight Defect, Plaintiff Maranda would not have purchased his vehicle.

21.    Shortly after purchase, Plaintiff Maranda began experiencing difficulties with his Class Vehicle's Headlights. Specifically, the Headlights do not produce sufficient light on low beam and the high beam Headlights will suddenly and unexpectedly go to low beam, for no ascertainable reason and without an approaching vehicle. Such failures have caused Plaintiff Maranda to reduce his use of the vehicle during the night and during inclement weather. Plaintiff Maranda lives in a rural area that lacks ambient lighting and thus is in fear of, and in danger from, unilluminated pedestrians, animals, and road hazards while driving at night.

22.    With approximately 15,000 miles on the odometer, Plaintiff Maranda brought his vehicle to Dondelinger Hyundai, an authorized Hyundai dealership in Baxter, Minnesota, complaining of insufficient light output and sudden and unexpected low beam and high beam shutoff. Dealership personnel informed Plaintiff Maranda they had not heard of any issues with the Headlights, they should

1    be "fine," and no repairs were done.

2        23.    Despite bringing his vehicle to a Hyundai dealership—Hyundai's

3    authorized agent for repairs—Plaintiff Maranda has not received a permanent

4    repair under warranty, and his vehicle continues to exhibit the Headlight Defect.

5        24.    As a result of the Headlight Defect, Plaintiff Maranda has lost

6    confidence in the ability of his Class Vehicle to provide safe and reliable

7    transportation for ordinary and advertised purposes, particularly at night and in

8    inclement weather. Further, Plaintiff Maranda will be unable to rely on the Class

9    Vehicles' advertising or labeling in the future, and so will not purchase or lease

10   another Class Vehicle, although he would like to do so.

11       25.    At all times, Plaintiff Maranda, like all Class Members, has driven his

12   vehicle in a manner both foreseeable and in which it was intended to be used.

13   **Plaintiff Robert Ewing**

14       26.    Plaintiff Ewing is a South Carolina citizen residing in West Union,

15   South Carolina.

16       27.    On or around July 30, 2022, Plaintiff Ewing purchased a new 2022

17   Kia Telluride from Kia of Greer, an authorized Kia dealership located in Greer,

18   South Carolina.

19       28.    Plaintiff Ewing purchased his vehicle primarily for personal, family,

20   or household use.

21       29.    Passenger safety and reliability were important factors in Plaintiff

22   Ewing's decision to purchase his vehicle. Before making his purchase, Plaintiff

23   Ewing researched the 2022 Kia Telluride online, by "Googling" the vehicle. At

24   the dealership, Plaintiff Ewing also reviewed the vehicle's Monroney Sticker or

25   "window sticker," which listed official information about the vehicle. Plaintiff

26   Ewing also test drove the vehicle and spoke with dealership personnel, who made

27   no reference to the Headlight Defect. Plaintiff Ewing believed that the 2022 Kia

28   Telluride would be a safe and reliable vehicle.

30.     Defendant's omissions were material to Plaintiff Ewing. Had the Kia Defendants disclosed their knowledge of the Headlight Defect before he purchased his vehicle, Plaintiff Ewing would have seen and been aware of the disclosures. Furthermore, had he known of the Headlight Defect, Plaintiff Ewing would not have purchased his vehicle or would not have purchased his vehicle for the price he did.

31.     Immediately after purchase, Plaintiff Ewing began experiencing difficulties with his Class Vehicle's Headlights. Specifically, the Headlights do not produce sufficient light, and therefore provide an insufficient field of vision, and using the high beam Headlights makes little difference in the insufficient illumination. Plaintiff Ewing feels particularly unsafe due to the Headlights' insufficient illumination when driving after dark because he lives in a rural area and drives more slowly to compensate for the low visibility as a consequence of the Defect.

32.     As a result, on or around September 19, 2022, Plaintiff Ewing contacted Kia's Customer Care department, complaining of insufficient light output, including the negligible difference even when the high beams are used. Despite multiple follow up requests as further detailed below, Kia has not addressed his concerns or agreed to repair the issue. Despite multiple follow up requests as further detailed below, Kia has not addressed his concerns or agreed to repair the issue.

33.     In early October 2022, Plaintiff Ewing raised the insufficient illumination issue with Cory Powell at Kia of Greer. The following week, Plaintiff Ewing also reported the insufficient light output issue to Kia of Anderson, an authorized Kia dealership in Pendleton, South Carolina and made a service appointment at Kia of Anderson, which is closer than Kia of Greer to Plaintiff Ewing's home.

34.     On November 8, 2022, with 1,916 miles on the odometer, Plaintiff

Ewing took his vehicle to Kia of Anderson. According to the service record, dealership personnel made a "small adjustment" to the Headlights, informed Plaintiff that "nothing else [was] needed at [the] time," and advised Plaintiff "to come back if issue continue[d]". Despite the alleged repair, Plaintiff Ewing did not notice a difference in the Headlights' insufficient illumination when driving home after the service visit, which Plaintiff Ewing reported to Mr. Harbin of Kia of Anderson the following day.

35.    On November 10, 2022, Plaintiff Ewing also raised these concerns with the Kia Customer Care department and spoke with a supervisor named Randy, who advised Mr. Ewing to schedule yet another service appointment at Kia of Anderson.

36.    Despite bringing his vehicle to a Kia dealership, multiple telephone calls, and at least six (6) email communications to Kia's authorized dealerships and Kia's Customer Care department, Plaintiff Ewing's vehicle continues to suffer from the Defect. Indeed, because Kia and its dealer representatives have failed to address Plaintiff Ewing's concerns despite being given numerous opportunities to do so, Plaintiff Ewing has not taken his vehicle for another service appointment. Plaintiff Ewing avoids driving after dark because he feels unsafe due to the Defect.

37.    Indeed, because Kia and its dealer representatives have failed to address Plaintiff Ewing's concerns despite being given numerous opportunities to do so, Plaintiff Ewing has not taken his vehicle for another service appointment.

38.    Despite the foregoing, Plaintiff Ewing has not received a permanent repair under warranty, and his vehicle continues to exhibit the Headlight Defect.

39.    At all times, Plaintiff Ewing, like all Class Members, has driven his vehicle in a manner both foreseeable and in which it was intended to be used.

**Defendant Hyundai Motor America, Inc.**

40.    Defendant Hyundai Motor America, Inc. is a corporation organized and in existence under the laws of the State of California and registered to do

1   business in the State of California. HMA is headquartered in Fountain Valley,
2   California and is a wholly owned subsidiary of HMC.

3        41.    HMA is responsible for sales, marketing, service, distribution, import
4   and export of Hyundai branded products, including vehicles and parts, in the
5   United States. HMA is also the warrantor and distributor of Hyundai vehicles,
6   including the Class Vehicles, throughout the United States.

7        42.    In order to sell vehicles to the general public, HMA enters into
8   agreements with authorized dealerships who engage in retail sales with consumers
9   such as Plaintiffs.  In return for the exclusive right to sell new Hyundai branded
10  vehicles, authorized dealerships are also permitted to service and repair these
11  vehicles under the warranties HMA provides directly to consumers who purchased
12  new vehicles from the authorized dealerships.  All service and repair at an
13  authorized dealership is completed according to Hyundai instructions, issued
14  through service manuals, TSBs, and other documents.  Per the agreements
15  between HMA and the authorized dealers, consumers such Plaintiffs are able to
16  receive services under HMA's issued warranty at dealer locations that are
17  convenient to them.  These agreements provide HMA with a significant amount
18  of control over the actions of the authorized dealerships.  For example, HMA
19  employees are appointed as managers for particular regions of the United States
20  and their responsibilities include managing the day-to-day operations of the
21  dealerships located within their regions.[1]

22       43.    Discovery will show that HMA also developed and disseminated the
23  owner's manual and warranty booklets, advertisements, and other promotional
24  material relating to the Hyundai Class Vehicles.

25

26

27  [1] *See, e.g.*, https://www.hyundainews.com/en-us/releases/2135 ("Hyundai Motor America
    named Kimberly Walker General Manager of the Western Region, effective March 1, 2016. In
28  her new role, Walker will lead the day-to-day operations of more than 165 Hyundai dealerships
    across the 12 Western-most states in the United States.").

CLASS ACTION COMPLAINT

**Defendant Hyundai Motor Company**

44.     Defendant Hyundai Motor Company is a corporation founded in 1967 under the laws of South Korea and headquartered in Seoul, South Korea.

45.     HMC designs, engineers, manufactures, tests, markets, supplies, sells, and distributes Hyundai-branded vehicles and parts for those vehicles worldwide, including the United States, as well as manufactures parts for Kia-branded vehicles.  HMC also receives parts manufactured by KMC for use in Hyundai-branded vehicles.

46.     HMC is the parent corporation of HMA, as well as the United States based Hyundai facilities, including manufacturing in Alabama and the technical campus in Michigan.  For all its United States subsidiaries, including HMA, HMC provides all the technical information for the purposes of manufacturing, servicing, and repairing the Class Vehicles

47.     Discovery will show the decision to found HMA in California and register it as a California corporation was made by HMC.

65.     Discovery will show that the relationship between HMA and HMC is governed by an agreement that gives HMC the right to control nearly every aspect of HMA's operations—including sales, marketing, management policies, technical information, servicing instructions, governance policies, pricing, and warranty terms.  Furthermore, HMC exercises control over the executives in charge of HMA, including appointing the President and CEO of HMA, José Muñoz. In addition to this role, Mr. Muñoz is also the Global Chief Operating Office of HMC.[2]

**Defendant Kia Motors America, Inc.**

48.      Defendant Kia Motors America, Inc. is a corporation organized and in existence under the laws of the State of California and registered to do business

---

[2] *See* https://www.hyundainews.com/en-us/bios/jose-munoz (last accessed November 10, 2022).

in the State of California. KMA is headquartered in Irvine, California and is a wholly owned subsidiary of KMC.

49.     KMA is responsible for sales, marketing, service, distribution, import and export of Kia branded products, including vehicles and parts, in the United States. KMA is also the warrantor and distributor of Kia vehicles, including the Class Vehicles, throughout the United States.

50.     In order to sell vehicles to the general public, KMA enters into agreements with authorized dealerships who engage in retail sales with consumers such as Plaintiffs. In return for the exclusive right to sell new Kia branded vehicles, authorized dealerships are also permitted to service and repair these vehicles under the warranties KMA provides directly to consumers who purchased new vehicles from the authorized dealerships.  All service and repair at an authorized dealership is completed according to Kia instructions, issued through service manuals, TSBs and other documents.  Per the agreements between KMA and the authorized dealers, consumers such as Plaintiffs are able to receive services under KMA's issued warranty at dealer locations that are convenient to them.  These agreements provide KMA with a significant amount of control over the actions of the authorized dealerships.  As with HMA, KMA also employs region managers whose responsibilities include managing the dealers within their region, including marketing and customer satisfaction initiatives.

51.     Discovery will show that KMA also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional material relating to the Kia Class Vehicles.

**Defendant Kia Motor Company**

52.     Defendant Kia Motor Company is a corporation founded in 1944 under the laws of South Korea and headquartered in Seoul, South Korea.

53.     KMC designs, engineers, manufactures, tests, markets, supplies, sells, and distributes Kia-branded vehicles and parts for those vehicles worldwide,

including the United States.  One of KMC's major suppliers for parts is HMC.  In turn, KMC is also a major supplier to HMC of parts to be used Hyundai-branded vehicles.

54.     KMC is the parent corporation of KMA, as well as the United States based Kia facilities, including manufacturing in Georgia.  For all its United States subsidiaries, including KMA, KMC provides all the technical information for the purposes of manufacturing, servicing, and repairing the Class Vehicles.

55.     Discovery will show that the decision to found KMA in California and register it as a California corporation was made by KMC.

56.     Discovery will show that the relationship between KMA and KMC is governed by an agreement that gives KMC the right to control nearly every aspect of KMA's operations—including sales, marketing, management policies, technical information, servicing instructions, governance policies, pricing, and warranty terms.

57.     Defendants, through their various entities, design, manufacture, market, distribute, service, repair, sell, and lease passenger vehicles, including the Class Vehicles, nationwide and in Minnesota and South Carolina.

58.     Defendants HMC and KMC worked together to develop, design, manufacture, test, and draft technical materials for the Class Vehicles and the Gamma engines.  In fact, HMC and KMC are controlled by the same parent, Hyundai Motor Group, and the chairman of the board of both companies is Eui-sun Chung.

59.     Defendants worked together on the drafting and distribution of all advertising materials and technical bulletins regarding the Class Vehicles to authorized dealers, as well as in training Hyundai and Kia-dealer technicians in the correct procedures to maintain, service, and repair Hyundai and Kia vehicles.

60.     At all relevant times, Defendants were and are engaged in the business of designing, manufacturing, constructing, assembling, marketing,

1  distributing, and selling automobiles and motor vehicle components in Minnesota,
2  South Carolina, and throughout the United States of America.

3  ## JURISDICTION

4  61.  This is a class action.

5  62.  Members of the proposed Class number more than 100 and at least
6  one plaintiff and one defendant are citizens of different states.

7  63.  There are at least 100 members in the proposed class, and the
8  aggregate claims of individual Class Members exceed $5,000,000.00 in value,
9  exclusive of interest and costs.

10  64.  Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d).

11  65.  This Court has personal jurisdiction over Plaintiffs because Plaintiffs
12  submit to this Court's jurisdiction. This Court has personal jurisdiction over
13  Defendants because KMA and HMA are incorporated in this District; KMC and
14  HMC conduct substantial business in this District through KMA and HMA,
15  respectively; and discovery will show that significant conduct involving
16  Defendants giving rise to the Complaint took place in this District.

17  ## VENUE

18  66.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because
19  the conduct giving rise to this lawsuit occurred here, KMA and HMA are deemed
20  to reside in this district pursuant to 28 U.S.C. § 1391(a), and KMA and HMA are
21  incorporated here, and Defendants are subject to personal jurisdiction here by
22  conducting business within the State of California.

23  ## FACTUAL ALLEGATIONS

24  67.  Defendants designed, manufactured, distributed, marketed, sold,
25  and/or leased the Class Vehicles. Defendants sold, directly or indirectly, through
26  dealers and other retail outlets, thousands of Class Vehicles in California and
27  nationwide. Defendants warrant and service the Class Vehicles through their
28  nationwide network of authorized dealers and service providers.

68. Defendants provided all purchasers or lessees of the Class Vehicles with a New Vehicle Limited Warranty ("NVLW"). The terms of these warranties are non-negotiable and Defendants exercise sole authority in determining whether and to what extent a particular repair is covered under the warranties they offers.

69. The NVLW provided by KMA includes basic warranty coverage and Power Train coverage, stated in relevant part:

**Basic Warranty Coverage**

Except as limited or excluded below, all components of your new Kia Vehicle are covered for 60 months/60,000 miles from the Date of First Service, whichever comes first (Basic Limited Warranty Coverage). This Warranty does not cover wear and maintenance items, or those items excluded elsewhere in the Manual.

**Power Train Coverage**

For Original Owners (defined below), the Power Train Limited Warranty begins upon expiration of the 60 month/60,000 mile Basic Limited Warranty Coverage, and will continue to cover the following components up to 120 months or 100,000 miles from the Date of First Service, whichever comes first. It does not cover normal wear and tear, maintenance, or those items excluded elsewhere in this manual.

**To Get Warranty Service**

You must take your Kia Vehicle, along with this manual, to an Authorized Kia Dealer in the United States during its normal service hours. While any Authorized Kia Dealer will perform warranty service, Kia recommends that when possible you return to the dealership where you purchased your Kia Vehicle in order to ensure continuity in service and maintenance.

**Other Terms**

The warranty coverage is "applicable to Kia Vehicles registered and

1    normally operated in the United States."[3]

2       70.    KMA further warrants that "it will arrange for an Authorized Kia

3    dealer at locations of its choice to provide for the repair of your vehicle if it fails

4    to function properly during normal use.  Authorized service facilities will remedy

5    such failures to function properly at Kia's expense..."[4]

6       71.    HMA provides a similar NVLW for the Class Vehicles, which states

7    in relevant part:

8    **WHAT IS COVERED**

9    Repair or replacement of any component originally manufactured or

10   installed by Hyundai Motor Company, Hyundai Motor Group, Hyundai

11   Motor Manufacturing Alabama (HMMA), Kia Manufacturing Mexico

12   (KMM), Kia Motors Manufacturing Georgia (KMMG) or Hyundai Motor

13   America (HMA) that is found to be defective in material or workmanship

14   under normal use and maintenance, expect any item specifically referred to

15   in the section "What is not Covered."  Towing expense to the nearest

16   Hyundai Dealership or Authorized Service Facility is covered when the

17   vehicle is inoperable due to a warrantable defect.  Repairs will be made

18   using new Hyundai Genuine Parts or Hyundai authorized remanufactured

19   parts.

20   **WARRANTY PERIOD**

21   The warranty period is limited to 5 years from the date or original retail

22   delivery or date of first use, or 60,000 miles, whichever occurs first.

23   **OBTAINING WARRANTY SERVICE**

24   Warranty service will be provided by an authorized Hyundai Dealership

25   without charge for parts or labor.  This warranty will not apply to warranty

26

27   _____

     [3] *Id.*

28   [4] *Id.*

1    service performed by those other than an authorized Hyundai Dealership.[5]

2        72.    Headlights are important and necessary safety equipment on all motor

3    vehicles. "Vehicle headlamps primarily satisfy two safety needs: Visibility and

4    glare prevention. Headlamps illuminate the area ahead of the vehicle and provide

5    forward visibility. . . . Visibility and glare are both related to motor vehicle safety.

6    . . . Visibility has an obvious, intuitive relation to safety: The better drivers can see

7    the road, the better they can react to road conditions and obstacles to avoid crashes.

8    . . . [e]vidence suggests that diminished visibility likely increases the risk of

9    crashes, particularly crashes at higher speeds involving pedestrians, animals,

10   trains, and parked cars."[6]

11       73.    In 2019, Kia released its all-new flagship SUV, the 2020 Kia

12   Telluride, while touting its capabilities and safety: "Telluride is engineered to be

13   capable in a variety of driving conditions and provide a driving experience that is

14   enjoyable and confidence-inspiring."[7] All Kia Telluride models LS, X, and EX,

15   through present, come standardly quipped with halogen headlights. Kia Telluride

16   LX models come standardly equipped with LED headlights. For reference, Figure

17   1 shows the Kia Telluride's headlight assembly.

18

19

20

21

22   _____

23   [5] https://www.hyundaiusa.com/content/dam/hyundai/us/com/pdf/assurance/2020_Owners_Hand
     book_Warranty_r2.pdf

24
25   [6] Federal Register. "Federal Motor Vehicle Safety Standards; Lamps, Reflective
     Devices, and Associated Equipment, Adaptive Driving Beam Headlamps" February 2, 2022,
     available    at:    https://www.federalregister.gov/documents/2022/02/22/2022-02451/federal-
26   motor-vehicle-safety-standards-lamps-reflective-devices-and-associated-equipment-
     adaptive#citation-3-p9918 (last accessed November 11, 2022).

27   [7] "All-New 2020 Kia Telluride Offers Rugged Luxury," January 4, 2019, available at:
     https://www.kiamedia.com/us/en/media/pressreleases/14874/all-new-2020-kia-telluride-
28   offers-rugged-luxury (last accessed November 11, 2022).

1

2

3

4

5

6

7

8

9

10



| Part Code | Part Description |
|---|---|
| **92102A** | **Lamp Assy-Head, RH** |
| 92197A | Bracket-H/Lamp MTG Supt, LH |
| 92198 | Bracket-H/Lamp MTG Supt, RH |
| 92197B | Bracket-H/Lamp MTG Supt, LH |
| 98681D | Tube-Rubber |
| 92101A | Lamp Assy-Head, LH |
| 92125A | Moisture Absorbent |
| 18643D | Bulb |
| 92190G | L.E.D Driver Module-Headlamp |
| 1125GA | Bolt(W/Washer) |
| 92198D | Bracket-H/Lamp MTG Supt, RH |

11    **Fig. 1. Kia Telluride Headlight Assembly**

12       74.    Also in 2019, Hyundai released its all-new flagship SUV, the 2020

13   Hyundai Palisade, while touting its capabilities and safety: "All-New 2020

14   Hyundai Palisade Flagship SUV Brings Exceptional Comfort, Technology and

15   Safety in a Bold Midsize SUV."[8]  As with Kia, all Hyundai Palisade models SE

16   and SEL, through present, come standardly equipped with halogen headlights.

17   Hyundai Palisade Limited models come standardly equipped with LED headlights.

18   For reference, Figure 2 shows the Hyundai Palisade's headlight assembly.

19

20

21

22

23

24

25

26

27       _____
       [8] "All-New 2020 Hyundai Palisade Mid-size SUV Makes its Global Debut at the 2018

28   Los Angeles Auto Show," November 28, 2018, available at https://www.hyundainews.com/en-
       us/releases/2658 (last accessed November 14, 2022).

1
2
3
4
5
6
7
8
9
10



| Part Code | Part Description |
|---|---|
| 92102A | Lamp Assy-Head, RH |
| 92170J | Bracket-Head Lamp, LH |
| 92131 | Bracket Assy-Head Lamp Mtg, LH |
| 92128C | Cartridge-Moisture Absorbent |
| 92191D | Clip-Head Lamp Mtg |
| 92125B | Moisture Absorbent |
| 92208 | Lamp Assy-Day Running Light, RH |
| 92207 | Lamp Assy-Day Running Light, LH |
| 1125GA | Bolt(W/Washer) |
| 92198 | Bracket-H/Lamp Mtg Suport, RH |
| 92197A | Bracket-H/Lamp Mtg Suport, LH |

11

**Fig. 2. Hyundai Palisade Headlight Assembly**

12   75.   All headlights and headlight assemblies are expected to absorb some
13   moisture and still operate safely. However, discovery will show that the
14   Headlights installed in the Class Vehicles have insufficient sealing and improper
15   wiring, causing the Headlight Assemblies, including the high beams, low beams,
16   daytime running lights (DRL), and fog lamps (FL), to absorb too much moisture
17   and begin to dim, become improperly aimed, and ultimately and often suddenly,
18   fail.

19   76.   The Class Vehicles Headlights are defective because they are
20   designed, manufactured, and/or installed in a manner that does not seal out
21   moisture and humidity to a sufficient degree, which causes the Headlight
22   assemblies' internal components, including the wiring and wiring connections, to
23   fail, thereby causing a drastic reduction in light output, an unintentional change to
24   aim calibration, and an inability to operate or function at all. Figure 3 shows a
25   Class Vehicle headlight with improper water moisture and humidity intrusion that
26   will require replacement.

27
28

CLASS ACTION COMPLAINT



**Fig. 3. Class Vehicle Headlight Assembly with Improper Moisture Intrusion**

77.     The wiring and wiring connections are housed inside the headlight assembly and are vulnerable to improper moisture and humidity intrusion, which can cause the wiring and wiring connections to quickly degrade, thereby causing the Headlights, including the low beams, to not operate. For reference, Figures 4.1 through 4.3 show the location of the wiring and connections inside the headlight assembly of the Class Vehicles.



**Fig. 4.1. Class Vehicle Headlight Assembly**

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Fig. 4.2. Inside of Headlight Assembly with Circular Seal in Upper Right Corner**



**Fig. 4.3. Wiring and Headlight Connections Inside Circular Seal within Headlight Assembly**

78.     The aim of the Class Vehicle's Headlights is also controlled by internal components of the Headlight assembly. Discovery will show that the aiming components are also degraded by abnormal moisture and humidity intrusion, causing the Headlights' output to be mis-aimed and mis-directed, resulting in a failure to illuminate in front of the vehicle. For reference, Figure 5 shows the low beam and high beam aim adjusters' location inside the Class Vehicles' headlight assembly.



**Fig. 5. Low and High-Beam Aim Adjusters Inside Class Vehicle Headlight Assembly**

79.     Discovery will show that all Class Vehicles' Headlights and Headlight Assemblies are designed, manufactured, and installed by Defendants in substantially the same manner.

80.     Discovery will confirm that the Headlight Defect in all Class Vehicles is caused by improperly designed, manufactured, and/or installed headlight assemblies in the Class Vehicles.

81.     The Headlight Defect alleged is inherent in, and the same for, all Class Vehicles.

82.     Discovery will show that Defendants was aware of material facts regarding the Headlight Defect, particular as a result of pre-production testing, manufacturing quality control audits, and the early post-sale complaints by

consumers who purchased the Class Vehicles and experienced the Defect. Despite this knowledge, Defendants failed to disclose the Defect and its associated safety risk to consumers. As a result of this failure, Plaintiffs and Class Members have been damaged.

**The Headlight Defect Poses an Unreasonable Safety Hazard**

83.    The Headlight Defect poses an unreasonable safety hazard. The Defect causes drivers to have low or no visibility in the front of their Class Vehicles, which in turn increases the likelihood of collision with pedestrians, animals, inanimate objects, and road hazards.[9] For this reason, functioning headlights are required safety devices in all passenger automobiles. *See* 49 CFR § 238.443 (2018).

84.    Federal law requires automakers like Defendants to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See TREAD Act,* Pub. L. No. 106-414, 114 Stat.1800 (2000).

85.    Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.* Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including those which are safety related. *Id.* Discovery will show that HMA and KMA are the agents of HMC and KMC respectively for the purpose of monitoring the NHTSA complaint database and for communication

---

[9] *See* Federal Register. "Federal Motor Vehicle Safety Standards; Lamps, Reflective Devices, and Associated Equipment, Adaptive Driving Beam Headlamps" February 2, 2022, available at: https://www.federalregister.gov/documents/2022/02/22/2022-02451/federal-motor-vehicle-safety-standards-lamps-reflective-devices-and-associated-equipment-adaptive#citation-3-p9918 (last accessed November 11, 2022).

CLASS ACTION COMPLAINT

with NHTSA regarding safety defects, as manufacturers are required to do by federal law.   Thus, Defendants knew or should have known of the many complaints about the Headlight Defect logged by NHTSA Office of Defects Investigation (ODI). The content, consistency, and disproportionate number of those complaints alerted, or should have alerted, Defendants to the Headlight Defect.

86.   With respect solely to the Class Vehicles, the following are but a few examples of the many complaints concerning the Headlight Defect which are available through NHTSA's website, www.safercar.gov. Many of the complaints reveal that Defendants, through their network of dealers and repair technicians, have been made aware of the Headlight Defect. In addition, the complaints indicate that despite having knowledge of the Headlight Defect and even armed with knowledge of the exact vehicles affected, Defendants often refused to diagnose the defect or otherwise attempt to repair it while Class Vehicles were still under warranty.

**<u>2020 Kia Telluride</u>**

a.  **DATE OF INCIDENT:** September 14, 2019
**DATE COMPLAINT FILED:** September 16, 2019
**NHTSA/ODI ID:** 11255716
**SUMMARY:** THE HEADLIGHTS AT NIGHT ARE POOR. THEY DO NOT ILLUMINATE TRAFFIC SIGNS SUCH AS: SPEED LIMIT, STOP, STREET/HIGHWAY INFO, YIELD, WARNING, ETC. WHEN YOU APPROACH A THE UPSIDE OF A HILL, VISIBILITY IS LIMITED TO 30-50 FEET. SIDE VISION WHEN TURNING IS NON-EXISTENT. THIS OCCURS AT NIGHT WHEN IN MOTION AND STOPPED.

b.  **DATE OF INCIDENT:** November 10, 2019
**DATE COMPLAINT FILED:** November 14, 2019
**NHTSA/ODI ID:** 11280024
**SUMMARY:** THE TELLURIDE EX HAS AN ISSUE WITH IT'S HEADLIGHTS, ESPECIALLY IN A DIMLY LIT AREA. WHEN THE HEADLIGHTS ARE IN NORMAL MODE (NOT HIGH

BEAM) ON A STREET THAT DOES NOT HAVE STREETLIGHTS (NO AMBIENT LIGHTS) OR YOU ARE GOING AROUND A TURN, OR YOU ARE GOING SLIGHTLY UPHILL, THERE IS VERY LITTLE VISIBILITY ON THE ROAD. YOU CAN SEE A DISTINCT CUT OFF OF THE HEAD LIGHT AND YOU CANNOT SEE BEYOND IT. THIS MAKES IT VERY VERY DIFFICULT TO DRIVE IN A LOW LIGHT ENVIRONMENT. IF I AM ON A HIGHWAY OR A WELL LIT ROAD, THERE IS NO ISSUE. MY OTHER CAR 2010 AUDI A4 DOES NOT HAVE THIS ISSUE AND THE HEADLIGHTS ILLUMINATE THE ROAD ADEQUATELY IN ANY CONDITION

c.  **DATE OF INCIDENT:** November 19, 2019
**DATE COMPLAINT FILED:**    November 20, 2019
**NHTSA/ODI ID:**     11281250
**SUMMARY:** HALOGEN HEADLAMPS ON THE EX MODEL DO A POOR JOB OF ILLUMINATING THE ROAD AHEAD WHEN IN LOW BEAM MODE. I CAN HARDLY SEE A FEW FEET. I ALSO DRIVE A LEXUS WHOSE HEADLAMPS DO A FANTASTIC JOB OF ILLUMINATION IN LOW BEAM. I AM HAVING TO PERIODICALLY ALTERNATE BETWEEN HIGH BEAM AND LOW BEAM MODES (TO AVOID BLINDING OPPOSITE TRAFFIC) WHEN DRIVING THE TELLURIDE ON UNLIT ROADS OR POORLY LIT ROADS. WHY DIDN'T KIA PROVIDE LED HEADLIGHTS FOR ALL TRIM LEVELS? THIS IS A SERIOUS SAFETY ISSUE.

d.  **DATE OF INCIDENT:** August 3, 2019
**DATE COMPLAINT FILED:** November 21, 2019
**NHTSA/ODI ID:** 11281548
**SUMMARY:** THIS IS A NEW VEHICLE, PURCHASED 8/2019. IT IS MY BELIEF THAT THE HEADLIGHTS (BOTH HIGH AND LOW BEAM), AS EQUIPPED, ARE DANGEROUSLY DEFICIENT AND DO NOT PROVIDE NEARLY ADEQUATE ILLUMINATION. I AM HESITANT TO DRIVE THE VEHICLE AT NIGHT. I CONSIDER THIS HAZARDOUS AND WORTHY OF CORRECTION BY THE MANUFACTURER. KIA TELLURIDE EX AWD.

e.  **DATE OF INCIDENT:** October 1, 2019
**DATE COMPLAINT FILED:** December 29, 2019
**NHTSA/ODI ID:** 11291891

**SUMMARY:** I HAVE A 2020 TELLURIDE AND THE HEADLIGHTS PROVIDE SO LITTLE LIGHT THAT IT'S DANGEROUS TO DRIVE AT NIGHT. THE NORMAL BEAMS ARE SO DIFFUSE THEY PROVIDE INSUFFICIENT LIGHT FORWARD TO SEE THE ROAD CLEARLY AND PROVIDE NO LIGHT TO THE SIDES, SO YOU CAN'T SEE WHAT YOU ARE TURNING INTO WHEN YOU TURN. I CALLED KIA AND TWO LOCAL KIA DEALERS; THEY ARE AWARE OF THE PROBLEM BUT SAY THEY HAVE NO WAY TO FIX IT. GOOD HEADLIGHTS ARE FUNDAMENTAL AND, REALLY, AFTER 100 YEARS OF CARS WITH HEADLIGHTS, YOU'D THINK THEY COULD GET THIS RIGHT. PLEASE FORCE KIA TO RECALL THE CARS AND FIX THE HEADLIGHTS AS SOON AS POSSIBLE. THANK YOU. SANDRA THANK YOU. SANDRA

f.   **DATE OF INCIDENT:** November 26, 2019
**DATE COMPLAINT FILED:** January 24, 2020
**NHTSA/ODI ID:** 11301584
**SUMMARY:** THIS IS AN ONGOING ISSUE. THE HEADLIGHTS ON MY EX MODEL ARE SERIOUSLY DEFICIENT AND DANGEROUS, ESPECIALLY DURING DRIVING IN LOW LIGHT AREA DURING TURNS. AT MY OWN EXPENSE I'VE PURCHASED LED BULBS, WHICH HAVE IMPROVED VISIBILITY AHEAD OF ME, INCLUDING BEING, NOW, ABLE TO SEE THE SIDES OF THE ROAD, HOWEVER, VISIBILITY DURING TURNS IS NON-EXISTENT. AFTER 30 + YEARS OF DRIVING I HAVE NEVER BEEN SO UNCOMFORTABLE DRIVING AT NIGHT.

g.   **DATE OF INCIDENT:** January 26, 2020
**DATE COMPLAINT FILED:** January 27, 2020
**NHTSA/ODI ID:** 11302348
**SUMMARY:** THE HEADLIGHTS ON THIS CAR ARE DANGEROUS AT NIGHT ON STREETS WITH NO LIGHTING AND ESPECIALLY DANGEROUS WHEN ITS RAINING. THE LIGHTS DO NO ILLUMINATE SPEED LIMIT SIGNS, STOP SIGNS, CAUTION SIGNS, YIELD SIGNS ETC. THEY DO NOT ILLUMINATE OVERHEAD INTERSTATE SIGNS. I HAVE TAKEN THE CAR TO THE DEALER AND THEY SAID THE LIGHTS ARE WORKING AS DESIGNED. THE INSURANCE INSTITUTE FOR HIGHWAY SAFETY ALSO GIVES A POOR RATING TO THESE LIGHTS. SOMETHING NEEDS TO BE

CLASS ACTION COMPLAINT

DONE BEFORE SOMEONE GETS KILLED.

h.  **DATE OF INCIDENT:** January 24, 2020
**DATE COMPLAINT FILED:** January 27, 2020
**NHTSA/ODI ID:** 11302241
**SUMMARY:** HEADLIGHTS ON LX TRIM ARE EXTREMELY DIM. INSUFFICIENT FOR NIGHT DRIVING, CURVY/HILLY ROADS, RAINY CONDITIONS. LANE MARKERS ARE NEARLY IMPOSSIBLE TO SEE.

i.  **DATE OF INCIDENT:** January 10, 2020
**DATE COMPLAINT FILED:** February 5, 2020
**NHTSA/ODI ID:** 11307230
**SUMMARY:** HALOGEN BULBS IN HEADLIGHTS ON S TRIM ARE SUBOPTIMAL FOR ROADWAY ILLUMINATION DURING NIGHTTIME DRIVING REGARDLESS OF TERRAIN, ENVIRONMENT, OR DIRECRION. UPGRADE TO LED BULBS SHOULD RESULT IN IMPROVED VISIBILITY.

j.  **DATE OF INCIDENT:** April 26, 2019
**DATE COMPLAINT FILED:** February 4, 2020
**NHTSA/ODI ID:** 11306967
**SUMMARY:** THE HEADLIGHTS ON THIS CAR ARE DANGEROUS AT NIGHT AND ARE ESPECIALLY DANGEROUS WHEN IT'S RAINING. THE LIGHTS DO NO ILLUMINATE SPEED LIMIT SIGNS, STOP SIGNS, CAUTION SIGNS, YIELD SIGNS ETC... THE HEADLIGHTS DO NOT ILLUMINATE FAR ENOUGH AHEAD ON THE ROADS. IF YOUR GOING UP OR DOWN A HILL TO SEE A SAFE DRIVING DISTANCE AHEAD.

k.  **DATE OF INCIDENT:** November 30, 2019
**DATE COMPLAINT FILED:** February 4, 2020
**NHTSA/ODI ID:** 11306971
**SUMMARY:** THE HEADLIGHTS ON MY EX MODEL ARE SERIOUSLY DEFICIENT AND DANGEROUS, ESPECIALLY DURING DRIVING IN LOW LIGHT AREA DURING TURNS. AT MY OWN EXPENSE I'VE PURCHASED LED BULBS, WHICH HAVE IMPROVED VISIBILITY AHEAD OF ME. HOWEVER, THE LIGHT IS BLOCKED BY THE PROJECTOR TYPE HOUSING FROM ILLUMINATING THE LEFT AND RIGHT SIDES OF THE FRONT OF THE VEHICLE. VISIBILITY DURING

CLASS ACTION COMPLAINT

TURNS IS NON-EXISTENT. THIS NEEDS TO BE ADDRESSED ASAP.

l.   **DATE OF INCIDENT:** February 3, 2020
**DATE COMPLAINT FILED:** February 4, 2020
**NHTSA/ODI ID:** 11307078
**SUMMARY:** EXTERIOR LIGHTING (HEADLIGHTS) IS TERRIBLE ON MY EX MODEL. STANDARD OE HEADLIGHTS ARE FAR TOO INADEQUATE FOR SAFE DRIVING AT NIGHT. SIDE CUTOFF OF THE HEADLIGHTS MAKES READING STREET SIGNS DIFFICULT WHEN THERE IS NO SUPPLEMENTAL LIGHT OUTSIDE OF THE CAR HEADLIGHTS. THESE HEADLIGHTS SHOULD BE LED (IT?S 2020 FOR [XXX] SAKE) AND NOT SO CONCENTRATED LIKE A SPOT LIGHT. INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6). *TR.

m. **DATE OF INCIDENT:** February 2, 2020
**DATE COMPLAINT FILED:** February 2, 2020
**NHTSA/ODI ID:** 11306611
**SUMMARY:** WHEN DRIVING AT NIGHT IN THE EX TRIM, THE HALOGEN LIGHTBULBS ARE INEFFECTIVE FOR LIGHTING THE ROADWAY AHEAD. OUTSIDE OF CITY DRIVING WHERE OUTSIDE LIGHTING IS MINIMAL, IT IS NEARLY IMPOSSIBLE TO SEE A SAFE DISTANCE AHEAD OF THE VEHICLE. IN ADDITION, BECAUSE OF THE CUTOFF DESIGN OF THE PROJECTOR HOUSING, STREET SIGNS SUCH AS STOP SIGNS AND SPEED LIMIT SIGNS ARE BARELY ILLUMINATED AT ALL.

n.   **DATE OF INCIDENT:** May 14, 2020
**DATE COMPLAINT FILED:** May 19, 2020
**NHTSA/ODI ID:** 11325091
**SUMMARY:** THE HEADLIGHTS IN THE KIA TELLURIDE ARE SIGNIFICANTLY DEFICIENT IN ILLUMINATING THE FRONT CORNERS OF THE VEHICLE DURING TURNS IN LOW OR NON-LIT AREAS. DRIVING IN MY NEIGHBORHOOD AND ON THE ROADS THAT GET ME THERE FEELS EXTREMELY DANGEROUS WHILE DRIVING AT NIGHT. VISIBILITY WHEN TURNING CORNERS IS DANGEROUSLY LOW. THIS SCARES ME NOT ONLY AS A TELLURIDE OWNER BUT AS A

PEDESTRIAN AND A PARENT WITH TWO SMALL CHILDREN. AS THE TELLURIDE'S POPULARITY CONTINUES TO GROW SO DOES THE SAFETY HAZARD THESE POORLY DESIGNED HEADLIGHTS POSE. CORRECTIVE ACTION TO ADEQUATELY AND SAFELY ILLUMINATE THE ROAD WHILE MAKING TURNS IS ESSENTIAL AND NEEDS TO BE ADDRESSED IMMEDIATELY. PLEASE DO THE RESPONSIBLE THING AND PROTECT FAMILIES AND COMMUNITIES BY RECALLING THE TELLURIDE AND MAKE A SIMPLE DESIGN CHANGE THAT WOULD NOT ONLY IMPROVE OWNER SATISFACTION, BUT ALSO PROTECT A POTENTIALLY UNSEEN PEDESTRIAN, JOGGER, BICYCLIST OR PET. A VEHICLE'S SAFETY SHOULD BE PARAMOUNT BOTH DAY AND NIGHT. IF NOTHING ELSE, PLEASE PROVIDE THE OPTION FOR TELLURIDE OWNERS TO WIDEN THE HEADLIGHT BEAM AT OUR OWN EXPENSE SO WE CAN CHOOSE TO PROTECT OURSELVES AND OUR NEIGHBORS BY PAYING FOR IT OUT-OF-POCKET. *TR.

o. **DATE OF INCIDENT:** March 1, 2020
**DATE COMPLAINT FILED:** March 3, 2020
**NHTSA/ODI ID:** 11315912
**SUMMARY:** NIGHT DRIVING IS HORRIBLE ON THE EX TRIM WHERE VISIBILITY ON EITHER SIDE IS DANGEROUS. I ALMOST HIT A PEDESTRIAN BECAUSE THE VISIBILITY IS SO POOR. THIS NEEDS TO BE ADDRESSED. PLEASE DON'T WAIT FOR SOMEONE TO BE FATALLY INJURED. THIS IS UNACCEPTABLE!

p. **DATE OF INCIDENT:** February 29, 2020
**DATE COMPLAINT FILED:** March 2, 2020
**NHTSA/ODI ID:** 11315718
**SUMMARY:** LIGHTING FAILS TO ILLUMINATE TO THE SIDES OF THE VEHICLE ON THE EX TRIM SO THAT THERE ARE SPOTS OF NO LIGHTING. THIS IS EXTREMELY DANGEROUS WHEN DRIVING AT NIGHT AND PARTICULARLY WHEN TURNING CORNERS. THIS SHOULD BE REMEDIED AND A RECALL ISSUED TO CORRECT THE CONCERN AS IT IS A SERIOUS SAFETY HAZARD.

q. **DATE OF INCIDENT:** March 1, 2020
**DATE COMPLAINT FILED:** February 26, 2020

CLASS ACTION COMPLAINT

**NHTSA/ODI ID:** 11311596
**SUMMARY:** BLIND SPOT COLLISION WARNING SYSTEM IS MALFUNCTIONS WHENEVER IT RAINS. VEHICLE HAS 3000 MILES ON IT AND FOR THE 5TH TIME IN 2 MONTHS THE BLIND SPOT SYSTEM ALARM SYSTEM GOES OFF WHILE DRIVING IN THE RAIN. DEALERSHIPS REFUSING TO LOOK AT THE PROBLEM UNLESS THE ENGINE LIGHT IS ON, WHICH IT TURNS OFF ONCE THE SENSORS DRY OFF LOW BEAM LIGHTS ARE TOO BRIGHT... POLICE HAVE STOPPED ME TWICE THINKING THEY ARE HIGH BEAMS.. ALSO ONCOMING TRAFFIC CONTINUES TO BLAST THERE HIGH BEAMS AT OUR VEHICLE THINKING OUR HIGH BEAMS ARE ON CAUSING A DANGEROUS DRIVING SITUATION.. LOCAL DEALERSHIPS REFUSE TO FIX WARRANTY PROBLEMS BECAUSE CAR WAS NOT PURCHSAED FROM THEM

r.  **DATE OF INCIDENT:** February 15, 2020
**DATE COMPLAINT FILED:** February 17, 2020
**NHTSA/ODI ID:** 11309673
**SUMMARY:** THE HEADLIGHTS HAVE BLIND SPOTS ON THE SIDES. WHEN GOING AROUND CURVES YOU LOOSE THE SIDE OF THE ROAD. NO VISIBILITY AT ALL AT NIGHT. THIS IS VERY DANGEROUS. I HAVE TALKED TO COMPANYS THAT INSTALLS HEADLIGHTS AND OTHER MECHANICAL PARTS TO VEHICLES AND WAS TOLD THAT ADDING FOG LIGHTS WILL NOT HELP BECAUSE THE HEADLIGHTS ARE ONLY PROJECTING FORWARD LIGHTS. WAS TOLD THAT ADDING FOG LIGHTS WOULD ONLY PROJECT FORWARD ALSO BECAUSE OF THE WAY THEY WOULD HAVE TO SET. THIS NEEDS TO BE CORRECTED!!!

**2021 Kia Telluride**

s.  **DATE OF INCIDENT:** January 3, 2022
**DATE COMPLAINT FILED:** January 11, 2022
**NHTSA/ODI ID:** 11447121
**SUMMARY:** Optional LED headlight buckets fog up and will not dry out. Kia has a service bulletin out regarding this issue, it was performed and the situation has not improved. Recently, in minus 20-30 degree F weather, the condensation inside the housing frosted up the entire inside of the housing. The LED headlights do not generate enough heat to adequately melt the frost creating decreased headlight

performance. The vehicle has been into the dealer multiple times and the service bulletin was performed once and the desiccant packs were replaced the second time. The frost issue occurred after both had been done. Kia states that this is normal operation for their LED headlight bucket and the dealership, claiming to be under orders from Kia will not dedicate any more time to the investigation of my issue.

t.  **DATE OF INCIDENT:** December 8, 2020
**DATE COMPLAINT FILED:** December 8, 2021
**NHTSA/ODI ID:** 11443178
**SUMMARY:** Kia has been on notice of the Telluride's deficient headlights with the ES model since at least 2019 and have done nothing. The highest end model has LED lights so Kia is more than capable of fixing this problem. I know that dozens of consumers like myself have filed complaints with the NHTSA and other organizations and nothing has been done. I have called Kia headquarters at least 3 times to complain. The headlights do not provide enough light to safely drive at night. I'm not an engineer (I'm a lawyer) but I know that the design is faulty. Now that it's wintertime and dark at 5:00, I am unable to drive the car at night for fear of killing myself, my family, a pedestrian, or pet. Why hasn't NHTSA done anything to investigate these numerous complaints? Why have years gone on with resolution or recall? Is Kia (or the NHSTA) waiting for someone to actually die before they do something? (It seems so based on the below questions). I guess it's not enough that consumers like myself can't use our cars at night. I CAN'T BE ANY CLEARER: SOMEONE IS GOING TO GET KILLED. YOU ARE ON NOTICE. Please let me know the results of your investigation into this matter because this has gone on long enough. Conduct an investigation and get to the bottom on this please.

u.  **DATE OF INCIDENT:** July 1, 2021
**DATE COMPLAINT FILED:** July 20, 2021
**NHTSA/ODI ID:** 11425646
**SUMMARY:** This car is very dangerous to drive at night particularly when making turns. There is a total blackout when turning on darker roads. Obviously test drives are done during the day so you wouldn't notice this problem. After reviewing a Telluride Forum this was apparently a problem on the 2020 vehicles that has not been addressed by Kia. Some members of forum have suggested switching front headlights out to LED but that is not a good option as I live in an area where visibility can be made worse with LED when snowing. Had I been aware of this problem never would have purchased this car. Very

scary to drive at night.

v. **DATE OF INCIDENT:** October 15, 2020
**DATE COMPLAINT FILED:** November 19, 2020
**NHTSA/ODI ID:** 11315912
**SUMMARY:** I RECENTLY DROVE MY NEW 2021 TELLURIDE
SX TO MY CABIN IN GA. AND FOUND A MAJOR ISSUE WITH
THE HEADLIGHTS WHILE DRIVING THROUGH THE
BACKWOODS. THE VISIBILITY USING THE LED
HEADLIGHTS AND HIGH BEAMS ARE TERRIBLE AND POSE
A DANGER. IF YOU ARE DRIVING DOWNHILL AND THE
ROAD GOES UP OR TURNS YOU HAVE ZERO VISIBILITY, IT
ACTUALLY CREATES A LINE AS IN MY PICTURE. I
BROUGHT IT INTO MY KIA DEALER AND THEY SAID
CORPORATE IS AWARE OF IT BUT THERE IS NO FIX AS OF
YET SO THEY ADJUSTED THEM AS BEST THEY COULD. THIS
IS EXTREMELY DANGEROUS AND PEOPLE WILL DIE IF
THEY DO NOT GET A A FIX FOR THIS ISSUE.

**2022 Kia Telluride**

w. **DATE OF INCIDENT:** May 20, 2022
**DATE COMPLAINT FILED:** November 2, 2022
**NHTSA/ODI ID:** 11491918
**SUMMARY:** Headlights are NOT bright enough for night driving.

**2021 Hyundai Palisade**

x. **DATE OF INCIDENT:** July 13, 2020
**DATE COMPLAINT FILED:** August 2, 2022
**NHTSA/ODI ID:** 11477157
**SUMMARY:** Head lights -When driving in mountains (curves and
going up and down hills) at night the head lights produced a shadow
effect, which gave the impression it was on the windshield sight line.
This shadow effect varied from 1/3 to 2/3 of the windshield which
caused a distorted view of the road ahead. There were 4 adults in the
car and all agreed that it was making the road dangerous to drive on.
We had to slow down well below the actual speed limit which would
cause cars coming around a curve behind us to quickly slow down or
run into us. - Took car to Bronco Motors in Boise Id and explained the
headlight issue they told us that one other person had come in
complaining about this same issue. Their mechanic told us that there

is no way to adjust the headlights. -No warnings

y.  **DATE OF INCIDENT:** December 22, 2021
**DATE COMPLAINT FILED:** March 2, 2021
**NHTSA/ODI ID:** 11444720
**SUMMARY:** The low beam headlights are too bright causing vehicles in the opposite direction to flash their high beams thinking that my high beams are on. This is a safety factor as I am often blinded by other drivers who flash their high beams and in many cases keep their high beams on. I've visited Palisade chat rooms and have found that other drivers have the same complaint. I have contacted Hyundai headquarters and reported the problem and have taken it to dealers three times to have the low beams lowered. I have been told that the low beam adjustment is correct and nothing can be done to fix my problem. I believe this low beam problem is a design defect and should be corrected. My vehicle is available for examination if necessary.

### Customer Complaints on Third-Party Websites

87.    Similarly, complaints posted by consumers in internet forums demonstrate that the defect is widespread and dangerous and that it can manifest without warning and/or suitable repair. The complaints also indicate Defendants' awareness of the problems with the Headlight and how potentially dangerous the defect is for consumers, not only to the extent such complaints reference contact with authorized dealerships and Defendants themselves, but also because HMA and KMA employ staff to monitor the perception of the brand. The following are a sample of consumer complaints (spelling and grammar mistakes remain as found in the original):

88.    On tellurideforum.org, a consumer of a 2021 Kia Telluride posted the following:

I have had my Telluride S 2021 since August and I am very frustrated with the headlights at night. #1 I don't think the main headlights beam high enough. When I go up a hill I must have my brights on to adequately see in front of me. #2 I noticed a complete blind spot when turning...At night if someone walked

1       in front of my car while I am turning I could never see them.

2       This is quite scary to me. Thought perhaps it is because I am

3       short but now I am reading that this is a common complaint with

4       this car. Now I read that the "fog lights" can help illuminate the

5       car when turning. Of course now I found out I don't have fog

6       lights in this car style. I hate to say this but if I had any inkling

7       of this problem would never have bought this car. It is very

8       dangerous.

9       89.    On tellurideforum.org.com, a consumer of a 2020 Kia Telluride

10 posted the following:

11       Hi. My telluride is less than a year old. I noticed the other night

12       that when I switch to high beams nothing changes. Low beams

13       work like they always have. Are they separate bulbs? Is this a

14       warranty issue? How hard is it to upgrade the lights. The

15       original sucks. It's a LX if that matters.

16       90.    On tellurideforum.org.com, a consumer of a 2020 Kia Telluride

17 posted the following:

18       We just got a Telluride EX a couple of weeks ago. We hadn't

19       driven it at night on dark roads until last night. It was dangerous

20       in our opinion. The light had a definite line that almost appeared

21       like a dark screen on the windshield. Upon stopping and looking

22       at the headlamps, I discovered that there is some kind of black

23       deflector on the bottom and top of the headlamp bulb. This

24       creates a "border" at the top of the light being shone on the road

25       and surroundings. Normal headlamps allow some light to shine

26       above this artificial border. I find this current lighting

27       dangerous.

28       91.    On tellurideforum.org.com, a consumer of a 2020 Kia Telluride

CLASS ACTION COMPLAINT

consumer posted the following:

> High beam headlights on Kia Telluride stopped working, plus when on low beam light projection is only about 20 yards. Safety issue. Suggest contacting NHSTA for this issue. Kia dealership cannot schedule appointment for a month.

92.    On carproblemzoo.com, a 2020 Kia Telluride consumer posted the following:

> High beams will not function. Replaced light bulbs. Did not fix the problm. Replaced relay and fuse. Did not fix the problem. Took to dealer. Service tech appeared to be befuddled. His only suggestion was to replace both headlight assemblies at a cost of over $2000. 00 or just wait until kia announced a recall as he could not determine exact cause of problem.

93.    On carproblemzoo.com, another consumer posted the following:

> I love this car. I replaced my 2016 Lexus gl 460 with the 2020 Telluride ex v6, a low milage previously owned car I found at a dealership because I felt it compared favorably in every way with the Lexus, which I had bought new. Unfortunately, like others who have complained about the same lighting issue, I did not do a night time test drive of this car, but when I did finally drive it at night - wow! the headlights on this vehicle are the absolute worst I have ever experienced as a driver. My first experience driving this kia after dark on a city street proved to be dangerous and scary. Lighting was so poor- especially the peripheral lighting and low beam height range - that I could not find my destination because the house numbers on the mailboxes as well as the street sign were not lit well enough to read. But what was worse is that I very nearly hit a pedestrian

who was walking on the side of the road. By the way, my vision is 20/20 and night driving has not preiously been a problem. I knew there had to be something wrong with the lighting system so the next day I took the car straight to the dealer who checked the bulbs and their placement; he found no problem. I am a widow so I drive myself everywhere I go, including at night. Bright, safe illumination is a must! I am not driving much at night these days because I feel it is way too risky considering the poor visibility after dark. I can tell you that kia will have a law suit (or multiple suits) on their hands when this poor headlight situation is the cause of a serious accident!

94.     On carproblemzoo.com, a 2021 Kia Telluride consumer posted the following:

I recently drove my new 2021 Telluride sx to my cabin in GA. And found a major issue with the headlights while driving through the backwoods. The visibility using the led headlights and high beams are terrible and pose a danger. If you are driving downhill and the road goes up or turns you have zero visibility, it actually creates a line as in my picture. I brought it into my kia dealer and they said corporate is aware of it but there is no fix as of yet so they adjusted them as best they could. This is extremely dangerous and people will die if they do not get a a fix for this issue.

95.     On carproblemzoo.com, a Hyundai Palisade consumer posted the following:

head lights -when driving in mountains (curves and going up and down hills) at night the head lights produced a shadow effect, which gave the impression it was on the windshield sight

line. This shadow effect varied from 1/3 to 2/3 of the windshield which caused a distorted view of the road ahead. There were 4 adults in the car and all agreed that it was making the road dangerous to drive on. We had to slow down well below the actual speed limit which would cause cars coming around a curve behind us to quickly slow down or run into us. - took car to bronco motors in boise id and explained the headlight issue they told us that one other person had come in complaining about this same issue. Their mechanic told us that there is no way to adjust the headlights.

96.    On carproblemzoo.com, a Hyundai Palisade consumer posted the following:

The low beam headlights are too bright causing vehicles in the opposite direction to flash their high beams thinking that my high beams are on. This is a safety factor as I am often blinded by other drivers who flash their high beams and in many cases keep their high beams on. I've visited Palisade chat rooms and have found that other drivers have the same complaint. I have contacted Hyundai headquarters and reported the problem and have taken it to dealers three times to have the low beams lowered. I have been told that the low beam adjustment is correct and nothing can be done to fix my problem. I believe this low beam problem is a design defect and should be corrected. My vehicle is available for examination if necessary.

97.    On palisadeforums.org, a 2021 Hyundai Palisade consumer posted the following:

The headlights on the 2021 Palisade are very dangerous at night! You have a black blob on the road at all times and can

1    not see in the oncoming lane!

2    Very Dangerous and a law suit waiting to happen. Sad Hyundai

3    knows about this issue and has not changed their lighting!

4  **Defendants Had Superior and Exclusive Knowledge of the Headlight Defect**

5    98.    Defendants had superior and exclusive knowledge of the Headlight

6  Defect and knew or should have known that the defect was not known or

7  reasonably discoverable by Plaintiffs and Class Members before they purchased

8  or leased the Class Vehicles.

9    99.    Discovery will show that before Plaintiffs purchased his Class

10 Vehicle, and since at least 2019, Defendants knew about the Headlight Defect

11 through sources not available to consumers, including pre-release testing data,

12 early consumer complaints to Defendants and its dealers who are their agents for

13 vehicle repairs, consumer complaints regarding earlier model years equipped with

14 the same Headlight, testing conducted in response to those complaints, high failure

15 rates and replacement part sales data, consumer complaints to NHTSA (which

16 Defendants monitors), by developing TSBs in an effort to address the Headlight

17 Defect, and through other aggregate data from Defendants dealers about the

18 problem. TSBs are issued exclusively to Defendants' dealerships and service

19 providers and are not disseminated to consumers, even if their vehicles receive

20 services as outlined in the bulletins.

21    100.    Defendants are experienced in the design and manufacture of

22 consumer vehicles. As an experienced manufacturer, Defendants conducts tests,

23 including pre-sale durability testing, on incoming components, including the

24 Headlight and Headlight Assembly, to verify the parts are free from defect and

25 align with Defendants' specifications. Thus, Defendants knew or should have

26 known the Headlight was defective and prone to putting drivers in a dangerous

27 position due to the inherent risks of the Headlight Defect.

28    101.    Additionally, discovery will show that Defendants knew of the impact

of this defect from the sheer number of reports received from dealerships. Defendants' customer relations department, which interacts with individual dealerships to identify potential common defects, has received numerous reports regarding the defect, which led to the release of TSBs and dealer communications. Defendants' customer relations department also collects and analyzes field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data.

102. Defendants' warranty department similarly analyzes and collects data submitted by its dealerships to identify warranty trends in its vehicles. It is Defendants' policy that when a repair is made under warranty the dealership must provide Defendants with detailed documentation of the problem and a complete disclosure of the repairs employed to correct it. Dealerships have an incentive to provide detailed information to Defendants, because they will not be reimbursed for any repairs unless the justification for reimbursement is sufficiently detailed.

103. Well before the first Class Vehicle was sold, as early as March 2010, Defendants knew or should have known that the Headlights were defective in design and/or manufacture and that the Defect would adversely affect the drivability of the Class Vehicles and cause safety hazards, including collisions. Defendants first began using Headlight Assembly components that were vulnerable to improper moisture and humidity intrusion in its 2010 model year vehicles.[10]

104. Indeed, beginning in March 2010, Kia first issued TSB No. BOD055 for all Kia models, ostensibly providing "Information for Headlamp Condensation and Moisture." The TSB advises that "Headlamp assembly replacement WILL NOT be necessary in most cases." However, it directs authorized dealership

---

[10] "Headlight Condensation TSB," March 12, 2010, available at: https://www.kia-forums.com/threads/headlight-condensation-tsb.57749/ (last accessed November 14, 2022).

1   personnel to replace the headlamp assembly where there is improper "water
2   intrusion."

3       105.   In January 2019, Kia began "a Product Improvement Campaign to
4   adjust the headlamp aim" for certain Class Vehicles. This product improvement
5   campaign was conducted "to more precisely focus the headlamps on the correct
6   position on the roadway and reduce the glare from the headlamps to oncoming
7   traffic." The communication to "All Kia Dealer Principals" regarding the product
8   improvement campaign states "The Insurance Institute for Highway Safety (IIHS)
9   is a well-known organization that conducts supplemental testing to evaluate
10  certain aspects of vehicle performance. As a result of such testing, Kia and IIHS
11  have determined that improvements could be made to adjust the headlamp aim to
12  improve the focus and reduce glare from the headlamps to oncoming traffic." The
13  campaign was updated in January 2020. Discovery will show that the problem
14  persists despite this product improvement campaign and is a result of the Defect
15  as described herein.

16      106.   In April 2019, Kia issued a service action, TSB No. SA380, for
17  "Telluride Headlamp Inspection." The service action was issued to address
18  "intermittent or inoperative Daytime Running Lamp (DRL) at the headlamps due
19  to an internal connection fault." The service action describes the headlight
20  inspection procedure and states "Leave the DRLs on for twenty minutes. If one or
21  both DRL(s) is/are not operating as designed, proceed to the Headlamp
22  Replacement Procedure below." Discovery will show that the problem persists
23  despite headlight and headlight assembly replacement and is a result of the Defect
24  as described herein.

25      107.   In June 2021, Kia issued TSB No. ELE242, regarding "Headlamp
26  Soft Connection Inspection." The service action was issued to address
27  "inoperative/intermittently inoperative. . . low/sub-low beam on Telluride." The
28  service action describes the headlight inspection procedure and states "If headlamp

1   does NOT operate normally (low beam or sub-low beam), replace the headlamp
2   with a new part." Discovery will show that the problem persists despite headlight
3   and headlight assembly replacement and is a result of the Defect as described
4   herein.

5       108.   In September 2021, Kia issued a significantly revised TSB No.
6   BOD055 (Rev 1) for certain Class Vehicles. The TSB was still titled "Information
7   for Headlamp Condensation and Moisture." Specifically, the TSB was issued to
8   correct "failed headlamp assembly seals or gaskets," resulting in excessive "water
9   intrusion." The TSB directs dealership personnel to "locate the area of failure and
10  determine if it is repairable. In some cases, headlamp replacement will be
11  necessary." Discovery will show that the problem persists despite headlight and
12  headlight assembly replacement and is a result of the Defect as described herein.

13      109.   Similarly, in July 2017, Hyundai first issued a TSB for all Hyundai
14  models, ostensibly providing "Information for Lamp Condensation." TSB No. 17-
15  BD-01 provided "information regarding headlamp and rear combination lamp
16  condensation related to moisture accumulation in the lens assembly." The TSB
17  advises that, if moisture remains inside the headlight assembly after the directed
18  drying procedures, "further repairs need to be performed on the lamp to address
19  the condition."

20      110.   In July 2019, Hyundai superseded TSB No. 17-BD-01 with TSB No.
21  19-BD-003H for certain Class Vehicles. The TSB was titled "Information for
22  Headlamp and Rear Combination Lamp Condensation." Specifically, the TSB was
23  issued to correct headlight problems caused by "water leak[s]."  The TSB stated
24  that, "If water is collecting at the bottom of the headlamp assembly or the
25  condensation remains after the headlamps have been on for 30 minutes or more,
26  there may be a water leak in the assembly. The leak may be caused by a poor seal
27  between the headlamp housing and lens, cracks in the headlamp assembly, or poor
28  fitment. The condition should be diagnosed and repaired as necessary." The only

repair procedure prescribed by the TSB for this condition was "replacement of the head lamp assembly." Discovery will show that the problem persisted despite the advised repairs and TSB No. 20-BD-014H, issued in July 2020 for certain Class Vehicles, updated this TSB with additional service information, and is a result of the Defect as described herein.

111.   Discovery will show that each TSB, product improvement campaign, and service action issued by Defendants was approved by managers, directors, and/or executives at Kia and Hyundai. Therefore, discovery will show that Defendants' managers, directors, and/or executives knew, or should have known, about the Headlight Defect, but refused to disclose the Headlight Defect to prospective purchasers and owners, and/or actively concealed the Headlight Defect.

112.   The existence of the Headlight Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle. Had Plaintiffs and other Class Members known of the Headlight Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

113.   Reasonable consumers, like Plaintiffs, expect that a vehicle's Headlights are safe, will function in a manner that will not pose a safety risk and will illuminate the area in front of the vehicle adequately, and are free from defects. Plaintiffs and Class Members further reasonably expect that Defendants will not sell or lease vehicles with known safety defects, such as the Headlight Defect, and will disclose any such defects to its consumers when it learns of them. They did not expect Defendants to conceal and fail to disclose the Headlight Defect to them, and to then continually deny its existence.

### Defendants Have Actively Concealed the Headlight Defect

114.   Despite their knowledge of the Headlight Defect in the Class Vehicles, Defendants actively concealed the existence and nature of the defect

from Plaintiffs and Class Members. Specifically, Defendants failed to disclose or actively concealed at and after the time of purchase, lease, or repair:

(a)    any and all known material defects or material nonconformity of the Class Vehicles, including the defects pertaining to the Headlights;

(b)    that the Class Vehicles, including the Headlight, were not in good working order, were defective, and were not fit for their intended purposes; and

(c)    that the Class Vehicles and their Headlights were defective, despite the fact that Defendants learned of such defects as early as 2019, if not earlier.

115.    Discovery will show that when consumers present their Class Vehicles to an authorized Defendants' dealer for Headlight repairs, rather than repair the problem under warranty, Defendants' dealers either inform consumers that their vehicles are functioning properly or conduct repairs that merely mask the Headlight Defect such as attempting to reposition the lights even when the headlights are dim rather than out of position.  This includes Kia's Product Improvement Campaign in 2019, which attempted to deflect from the root causes of the Defect, namely defective seals which allow moisture and condensation to intrude on the headlight assembly causing dim and failed headlights.

116.    Defendants have caused Plaintiffs and Class Members to expend money and/or time at their dealerships to diagnose, repair or replace the Class Vehicles' Headlights and/or related components, despite Defendants' knowledge of the Headlight Defect.

**Defendants Have Unjustly Retained a Substantial Benefit**

117.    Discovery will show that Defendants unlawfully failed to disclose the alleged defect to induce Plaintiffs and other putative Class Members to purchase or lease the Class Vehicles.

118.    Plaintiffs further allege that Defendants thus engaged in deceptive

acts or practices pertaining to all transactions involving the Class Vehicles, including Plaintiffs'.

119.   As discussed above, therefore, Plaintiffs alleges that Defendants unlawfully induced his to purchase his Class Vehicle by concealing a material fact (the defective Headlight) and that he would have paid less for the Class Vehicle, or not purchased it at all, had he known of the defect.

120.   Accordingly, Defendants' ill-gotten gains, benefits accrued in the form of increased sales and profits resulting from the material omissions that did - and likely will continue to - deceive consumers, should be disgorged.

### The Agency Relationship regarding the Vehicle Warranties Between Defendants HMA and KMA and their Authorized Dealers

121.   In order to sell vehicles to the general public, Defendants HMA and KMA enter into agreements with their networks of authorized dealerships to engage in retail sales with consumers such as Plaintiffs while also advertising the warranties provided by HMA and KMA directly to consumers when they purchase a Kia or Hyundai-branded vehicle from the authorized dealership.   These agreements specifically authorize the dealerships to act in HMA and KMA's stead to provide repairs under the warranties HMA and KMA provide directly to consumers.   Accordingly, discovery will show, particularly the dealership agreements between Defendant HMA and KMA and third-party dealerships, that Defendants HMA and KMA have authorized these dealerships to be their agents for the purposes of warranty repairs, including diagnosis of whether warranty repairs are required, and as such, the consumers are third-party beneficiaries of these dealership agreements because they benefit from being able to purchase and receive warranty repairs locally.   Discovery will show that because Plaintiffs and members of the Class are third-party beneficiaries of the dealership agreement which create an implied warranty of merchantability of the goods being sold by

1  these authorized dealerships, they may avail themselves of the implied warranty

2  against Defendants.  This is true because third-party beneficiaries to contracts

3  between other parties that create an implied warranty of merchantability may avail

4  themselves of the implied warranty. *See In re Toyota Motor Corp. Unintended*

5  *Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145,

6  1185 (C.D. Cal. 2010).

7      122.  Further, Plaintiffs and each of the members of the Class are the

8  intended beneficiaries of the express and implied warranties which accompany

9  each Class Vehicle.  The dealers were not intended to be the ultimate consumers of

10  the Class Vehicles, and they have no rights under the warranty agreements provided

11  by HMA or KMA.  These warranties were designed for and intended to benefit the

12  consumers only.  The consumers are the true intended beneficiaries of the express

13  and implied warranties, and the consumers may therefore avail themselves of those

14  warranties.

15      123.  HMA and KMA issued the express warranty to Plaintiffs and the

16  Class members.  HMA and KMA also developed and disseminated the owner's

17  manuals and warranty booklets which direct consumers to take their vehicles to

18  authorized dealerships for diagnosis and repair.  HMA and KMA also developed

19  and disseminated the advertisements such as vehicle brochures and television

20  commercials, and other promotional materials relating to the Class Vehicles and

21  promoting the terms of the warranties that they issue with the sale of each Class

22  Vehicle.  HMA and KMA are also responsible for the content of the Monroney

23  Stickers on their vehicles.  Because they issue the express warranties directly to the

24  consumers, the consumers are in direct privity with HMA and KMA with respect

25  to the warranties.

26      124.  In promoting, selling, and repairing their defective vehicles,

27  Defendants act through numerous authorized dealers who act as, and represent

28  themselves to the public as exclusive Kia and Hyundai representatives and agents,

1   particularly for the purpose of providing repairs that are the responsibility of HMA
2   and KMA to provide under their respective warranties. That the dealers act as
3   Defendants' agents for this purpose is demonstrated by the following facts:

4           (a)     The authorized dealerships complete all service and repair
5   according to instructions disseminated directly to them by HMA and/or
6   KMA, including service manuals, technical service bulletins ("TSBs"),
7   technical tips ("TT"), and other documents drafted by HMC and/or KMC;

8           (b)     Technicians at Defendants dealerships are required to go to at
9   least yearly KMA and HMA-given trainings in order to remain certified to
10  work on Kia and Hyundai-branded vehicles, at which they receive training
11  on proprietary systems, which provides guided, step-by-step instructions on
12  diagnosing and repairing Kia and Hyundai-branded vehicles;

13          (c)     Consumers are able to receive services under Kia and
14  Hyundai's issued New Vehicle Limited Warranties only at authorized
15  dealerships, and they are able to receive these services because of the
16  agreements between HMA and KMA and the authorized dealers. These
17  agreements provide HMA and/or KMA with a significant amount of control
18  over the actions of the authorized dealerships;

19          (d)     The warranties provided by HMA and/or KMA for the
20  defective vehicles direct consumers to take their vehicles to authorized
21  dealerships for repairs or services;      (e)     HMA and KMA control the
22  way in which their authorized dealers can respond to complaints and
23  inquiries concerning defective vehicles, and the dealerships are able to
24  perform repairs under warranty only with HMA or KMA's authorization;

25          (f)     HMA and KMA have entered into agreements and
26  understandings with their authorized dealers pursuant to which they
27  authorize and exercise substantial control over the operations of their
28  dealers and the dealers' interaction with the public, particularly the

advertising of the Class Vehicles, specifically the terms and conditions of the express warranties, as well as how consumers may avail themselves of the remedies under those express warranties; and

(g)   HMA and KMA implemented their express and implied warranties as they relate to the defects alleged herein by instructing authorized Kia and Hyundai dealerships to address complaints of the Defect by prescribing and implementing the relevant TSBs cited herein.

125.   Indeed, HMA's and KMA's warranty booklets make it abundantly clear that only their authorized dealerships are their agents for warranty service. The booklets, which are plainly written for the consumers, not the dealerships, tell consumers that to obtain warranty service, "You must take your Kia Vehicle, along with this manual, to an Authorized Kia Dealer in the United States during its normal service hours.," (Kia Warranty); and "[w]arranty service will be provided by an authorized Hyundai Dealership without charge for parts or labor." (Hyundai Warranty).

126.   Accordingly, as the above paragraphs demonstrate, the authorized dealerships are agents of Defendants for the purposes of the warranties, which are direct contracts between HMA, KMA, and the purchasers of their branded vehicles. Plaintiffs and each of the members of the Class have had sufficient direct dealings with either HMA, KMA, or their agent dealerships to establish privity of contract between HMA or KMA, on one hand, and Plaintiffs and each of the members of the Class, on the other hand. This establishes privity with respect to the express and implied warranty between Plaintiffs and Defendants. It also establishes that Plaintiffs were dealing with Defendants through their authorized agent dealerships when they were given the New Vehicle Limited Warranty associated with their vehicles, without any ability to negotiate the terms of that Warranty.

**Defendants' Warranties were Unconscionable**

127.   Plaintiffs signed contracts for sale with Defendants' authorized

dealers, and with that sale, was presented with a separate Warranty as drafted by KMA and/or HMA. While Plaintiffs have some ability to negotiate price of the vehicle, they have no ability to negotiate the terms of the Warranty. Plaintiffs had no bargaining power with respect to the Warranty, were presented with it as a *fait accompli*, and had to accept it in the exact form in which it was presented to them, which occurred after the vehicle purchase transaction was completed. Plaintiffs had no meaningful choice regarding any aspect of the Warranty or its terms, including durational limitations of time and mileage. The terms of the warranty unreasonably favored HMA or KMA over Plaintiffs and the members of the Class; a gross disparity in bargaining power existed as between HMA and KMA and Class members; and HMA and KMA knew or should have known that the Headlight Defect would manifest in the Class Vehicles both before and after the Warranty, thereby rendering the time and mileage limitations insufficient, inadequate, and unconscionable.

128.   HMA and KMA drafted the terms of the Warranty in part by using their exclusive, superior knowledge of the existence and likely manifestation of the Defect. Plaintiffs and Class Members were entirely ignorant of the Defect when purchasing their Vehicles and when presented with the Warranty. Plaintiffs' acceptance of the Warranty and its terms, including any disclaimers or durational limits, was neither knowing nor voluntary. HMA and KMA knew or should have known at the time of sale that the Class Vehicles were defective and would fail prematurely solely because of a defect in design, materials, and workmanship, to wit, the Headlight Defect. Plaintiffs and Class Members, on the other hand, had no notice of or ability to detect the Defect prior to purchasing the Class Vehicles. For this reason, the terms of the Warranty unreasonably favored HMA and KMA over Plaintiffs and Class Members, and Plaintiffs' and Class Members' acceptance of the Warranty's durational limitations, to the extent they are found to apply so as to exclude instances where the Defect manifested outside of them, was neither

1    knowing nor voluntary, thereby rendering such limitation unconscionable and
2    ineffective.

3         129.   Defendants' exclusive superior knowledge of the existence of the
4    Defect and when it would manifest influenced its analysis of the Defect and
5    whether it should pay for a recall (*i.e.,* if a defect is more likely to manifest within
6    the durational limits, a recall is only fractionally more expensive than warranty
7    repairs; if it is more likely to manifest outside those limits, a recall is exponentially
8    more expensive than warranty repairs.)

9         130.   Plaintiffs were also not aware and could not have been aware that
10   HMA and KMA would willfully not inform them of the Defect which affects the
11   safety of their vehicles and that the Defect could manifest outside of the durational
12   limit of the Warranty, despite Defendants' knowledge of this. *See Carlson v. Gen.*
13   *Motors Corp.*, 883 F.2d 287 (4th Cir. 1989), cert. denied, 495 U.S. 904 (1990)
14   (""proof that GM knew of and failed to disclose major, inherent product defects
15   would obviously suggest that its imposition of the challenged 'durational
16   limitations' on implied warranties constituted 'overreaching,' and that the
17   disclaimers themselves were therefore 'unconscionable.'")

**TOLLING OF THE STATUTES OF LIMITATIONS**

19        131.   Any applicable statute of limitations has been tolled by Defendants'
20   knowing and active concealment of the Headlight Defect and misrepresentations
21   and omissions alleged herein. Through no fault or lack of diligence, Plaintiffs and
22   members of the Class were deceived regarding the Class Vehicles and could not
23   reasonably discover the Defect or Defendants' deception with respect to the Defect.
24   Defendants and its agents continue to deny the existence and extent of the Defect,
25   even when questioned by Plaintiffs and members of the Class.

26        132.   Plaintiffs and members of the Class did not discover and did not know
27   of any facts that would have caused a reasonable person to suspect that Defendants
28   were concealing a defect and/or the Class Vehicles contained the Headlight Defect

and the corresponding safety risk. As alleged herein, the existence of the Headlight Defect was material to Plaintiffs and members of the Class at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiffs and members of the Class could not have discovered through the exercise of reasonable diligence the existence of the Defect or that the Defendants were concealing the Defect.

133.   At all times, Defendants are and were under a continuous duty to disclose to Plaintiffs and members of the Class the true standard, quality, and grade of the Class Vehicles and to disclose the Headlight Defect and corresponding safety risk due to their exclusive and superior knowledge of the existence and extent of the Headlight in Class Vehicles.

134.   Defendants knowingly, actively, and affirmatively concealed the facts alleged herein. Plaintiffs and members of the Class reasonably relied on Defendants' knowing, active, and affirmative concealment.

135.   For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendants' fraudulent concealment, and Defendants are estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

136.   Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

137.   The Class and Sub-Classes are defined as:

> **Class**:  All persons and entities in the United States who purchased or leased a Class Vehicle (the "Nationwide Class" or "Class").

1
2
3
4

**Minnesota Sub-Class**:  All persons and entities who purchased or leased a Class Vehicle in the State of Minnesota.

**South Carolina Sub-Class**:  All persons and entities who purchased or leased a Class Vehicle in the State of South Carolina.

5   138.   Excluded from the Class and Sub-Classes are:  (1) Defendants, any
6   entity or division in which Defendants have a controlling interest, and their legal
7   representatives, officers, directors, assigns, and successors; (2) the Judge to whom
8   this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding
9   state and/or federal court system who may hear an appeal of any judgment entered;
10  and (4) those persons who have suffered personal injuries as a result of the facts
11  alleged herein. Plaintiffs reserves the right to amend the Class and Sub-Class
12  definitions if discovery and further investigation reveal that the Class and Sub-
13  Classes should be expanded or otherwise modified.

14  139.   Numerosity:   Although the exact number of Class Members is
15  uncertain, and can only be ascertained through appropriate discovery, the number
16  is significant enough such that joinder is impracticable. The disposition of the
17  claims of these Class Members in a single action will provide substantial benefits
18  to all parties and to the Court. The Class Members are readily identifiable from
19  information and records in Defendants' possession, custody, or control, as well as
20  from records kept by the Department of Motor Vehicles.

21  140.   Typicality:  Plaintiffs' claims are typical of the claims of the Class in
22  that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle
23  designed, manufactured, and distributed by Defendants. The representative
24  Plaintiffs, like all Class Members, has been damaged by Defendants' misconduct
25  in that they have incurred or will incur the cost of repairing or replacing the
26  defective Headlight and/or its components. Furthermore, the factual bases of
27  Defendants' misconduct are common to all Class Members and represent a
28  common thread resulting in injury to the Class.

CLASS ACTION COMPLAINT

1    141.  <u>Commonality</u>:   There are numerous questions of law and fact
2 common to Plaintiffs and the Class that predominate over any question affecting
3 Class Members individually. These common legal and factual issues include the
4 following:

5          (a)    Whether Class Vehicles suffer from defects relating to the
6          Headlight;

7          (b)    Whether the defects relating to the Headlight constitute an
8          unreasonable safety risk;

9          (c)    Whether Defendants knew about the defects pertaining to the
10         Headlight and, if so, how long Defendants have known of the defect;

11         (d)    Whether the defective nature of the Headlight constitutes a
12         material fact;

13         (e)    Whether Defendants have had an ongoing duty to disclose the
14         defective nature of the Headlight to Plaintiffs and Class Members;

15         (f)    Whether Plaintiffs and the other Class Members are entitled to
16         equitable relief, including a preliminary and/or a permanent
17         injunction;

18         (g)    Whether Defendants knew or reasonably should have known of
19         the defects pertaining to the Headlight before they sold and leased
20         Class Vehicles to Class Members;

21         (h)    Whether Defendants should be declared financially responsible
22         for notifying the Class Members of problems with the Class Vehicles
23         and for the costs and expenses of repairing and replacing the
24         defective Headlight and/or its components;

25         (i)    Whether Defendants are obligated to inform Class Members of
26         their right to seek reimbursement for having paid to diagnose, repair,
27         or replace their defective Headlight and/or its components;

28         (j)    Whether Defendants breached the implied warranty of

merchantability pursuant to the Magnuson-Moss Warranty Act;

(k)   Whether Defendants breached the implied warranty of merchantability under Minnesota law;

(l)   Whether Defendants breached their express warranties under Minnesota Law; and

(m)  Whether Defendants breached express warranties pursuant to the Magnuson-Moss Warranty Act.

142.   Adequate Representation:   Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs has retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intends to vigorously prosecute this action.

143.   Predominance and Superiority:   Plaintiffs and Class Members have all suffered, and will continue to suffer, harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue unabated without remedy or relief. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that it will conserve the resources of the courts and the litigants and promote consistency and efficiency of adjudication.

**FIRST CAUSE OF ACTION**

**Violations of the Minnesota Prevention of Consumer Fraud Act,**

**Minn. Stat. § 325F.68,** *et seq.*

**(On Behalf of the Minnesota Sub-Class)**

144.   Plaintiffs incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

145.   Plaintiff Maranda ("Minnesota Plaintiff") brings this cause of action individually and on behalf of the Minnesota Sub-Class.

146.   The Class Vehicles constitute "merchandise" within the meaning of Minn. Stat. § 325F.68.

147.   The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby …." Minn. Stat. § 3 25F.69(1). Defendants engaged in unfair and deceptive practices that violated the Minnesota CFA as described above.

148.   Defendants participated in and engaged in deceptive business or trade practices prohibited by the Minnesota CFA by failing to disclose and actively concealing that the Class Vehicles contained the Headlight Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as reputable manufacturers that valued safety and stood behind their vehicles after they were sold.

149.   Defendants knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles by, among other things, failing to disclose the Headlight Defect; concealing the Headlight Defect; promoting and selling or leasing Class Vehicles they knew were defective, including by marketing their vehicles as safe, reliable, easily operable, efficient,

and of high quality; presenting themselves as reputable manufacturers that valued safety, reliability, performance and efficiency, and stood behind their vehicles after they were sold; failing to make repairs or making repairs and providing replacements that caused Minnesota Plaintiff and the Minnesota Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and minimizing the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers. Defendants misrepresented and omitted such material facts with the intent to mislead Minnesota Plaintiff and the Minnesota Sub-Class Members about the true nature of the Class Vehicles.

150.   Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Headlight Defect in the course of their business.

151.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

152.   Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

153.   Defendants knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

154.   Defendants knew or should have known that their conduct violated the Minnesota CFA.

155.   Minnesota Plaintiff and the Minnesota Sub-Class Members

reasonably relied on Defendants' misrepresentations and omissions of material facts in their advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

156.   Minnesota Plaintiff and the Minnesota Sub-Class Members had no way of discerning that Defendants' misrepresentations were false and misleading when they acquired their Class Vehicles because Minnesota Plaintiff and the Minnesota Sub-Class Members did not have access to Defendants' exclusive and superior knowledge about the Class Vehicles' design and the Headlight Defect.

157.   Had Minnesota Plaintiff and the Minnesota Sub-Class Members known that the Class Vehicles would contain and/or exhibit the Headlight Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

158.   Defendants owed Minnesota Plaintiff and the Minnesota Sub-Class Members a duty to disclose the truth about the Headlight Defect because Defendants:

   a.   possessed exclusive and superior knowledge of the design and manufacture of the Class Vehicles and the Headlight Defect;

   b.   intentionally concealed the foregoing from Minnesota Plaintiff and the Minnesota Sub-Class Members; and/or

   c.   made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Minnesota Plaintiff and the Minnesota Sub-Class Members that contradicted these representations.

159.   Due to Defendants' specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Headlight Defect, their false representations regarding the increased durability of the Class Vehicles, and reliance by Minnesota Plaintiff and the Minnesota Sub-Class Members on these

material representations, Defendants had a duty to disclose to Class members that the Headlight Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Minnesota Plaintiff and the Minnesota Sub-Class Members, Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Minnesota Plaintiff and the Minnesota Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Defendants consumers. Defendants represented to Minnesota Plaintiff and the Minnesota Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Headlight Defect.

160.   Minnesota Plaintiff and the Minnesota Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Defendants' conduct, Minnesota Plaintiff and the Minnesota Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

161.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Minnesota Plaintiff and the Minnesota Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

162.   Defendants' violations present a continuing risk to Minnesota Plaintiff and the Minnesota Sub-Class Members as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public

1  interest.

2      163.   As a proximate and direct result of Defendants' unfair and deceptive

3  trade practices, Minnesota Plaintiff and members of the Minnesota Sub-Class

4  purchased or leased Class Vehicles and suffered an ascertainable loss and financial

5  harm. These ascertainable losses include, among other things, overpayment at the

6  time of purchase or lease, the cost to repair the Headlight Defect, replacement of

7  the damaged related system components, diminution of Class Vehicle resale value,

8  increased repair and maintenance costs, and other substantial monetary damages

9  and inconvenience.

10      164.   As a direct and proximate result of Defendants' unfair or deceptive

11  acts or practices alleged herein, Minnesota Plaintiff and other members of the

12  Minnesota Sub-Class suffered and will continue to suffer actual damages and are

13  entitled to recover actual damages to the extent permitted by law, including class

14  action rules, in an amount to be proven at trial. In addition, Minnesota Plaintiff

15  and the putative Class seek equitable and injunctive relief against Defendants on

16  terms that the Court considers reasonable, and reasonable attorneys' fees.

17      165.   Minnesota Plaintiff provided notice of his claims by letter dated

18  December 1, 2022.

19      166.  Pursuant to Minn. Stat. § 8.31(3a), Minnesota Plaintiff and the

20  Minnesota Sub-Class Members seek damages in an amount to be proven at trial,

21  including but not limited to actual damages and attorneys' fees, under the

22  Minnesota CFA.

23      167.   Minnesota Plaintiff and the Minnesota Sub-Class Members also seek

24  punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing

25  evidence that Defendants' acts show deliberate disregard for the rights or safety

26  of others.

27

28

**SECOND CAUSE OF ACTION**

**Violations of the Minnesota Deceptive Trade Practices Act,**

**Minn. Stat. § 325D.43-48,** *et seq.*

**(On Behalf of the Minnesota Sub-Class)**

168.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

169.   Minnesota Plaintiff brings this cause of action individually and on behalf of the Minnesota Sub-Class.

170.   The Class Vehicles constitute "merchandise" within the meaning of Minn. Stat. § 325F.68.

171.   The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices, which occur when a person "(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "(7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and "(9) advertises goods or services with intent not to sell them as advertised." Minn. Stat. § 325D.44. Defendants engaged in unfair and deceptive practices that violated the Minnesota DTPA as described above.

172.   Defendants participated in and engaged in deceptive business or trade practices prohibited by the Minnesota DTPA by failing to disclose and actively concealing that the Class Vehicles contained the Headlight Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as reputable manufacturers that valued safety and stood behind their vehicles after they were sold.

173.   Defendants knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles by, among

other things, failing to disclose the Headlight Defect; concealing the Headlight Defect; promoting and selling or leasing Class Vehicles they knew were defective, including by marketing their vehicles as safe, reliable, easily operable, efficient, and of high quality; presenting themselves as reputable manufacturers that valued safety, reliability, performance and efficiency, and stood behind their vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Minnesota Plaintiff and the Minnesota Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and minimizing the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers. Defendants misrepresented and omitted such material facts with the intent to mislead Minnesota Plaintiff and the Minnesota Sub-Class Members about the true nature of the Class Vehicles.

174.   Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Headlight Defect in the course of their business.

175.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

176.   Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

177.   Defendants knew that the Class Vehicles and their Headlights suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

178.   Defendants knew or should have known that their conduct violated the Minnesota DTPA.

179.   Minnesota Plaintiff and the Minnesota Sub-Class Members reasonably relied on Defendants' misrepresentations and omissions of material facts in their advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

180.   Minnesota Plaintiff and the Minnesota Sub-Class Members had no way of discerning that Defendants' misrepresentations were false and misleading when they acquired their Class Vehicles because Minnesota Plaintiff and the Minnesota Sub-Class Members did not have access to Defendants' exclusive and superior knowledge about the Class Vehicles' design and the Headlight Defect.

181.   Had Minnesota Plaintiff and the Minnesota Sub-Class Members known that the Class Vehicles would contain and/or exhibit the Headlight Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

182.   Defendants owed Minnesota Plaintiff and the Minnesota Sub-Class Members a duty to disclose the truth about the Headlight Defect because Defendants:

    a. possessed exclusive and superior knowledge of the design and manufacture of the Class Vehicles and the Headlight Defect;

    b. intentionally concealed the foregoing from Minnesota Plaintiff and the Minnesota Sub-Class Members; and/or

    c. made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Minnesota Plaintiff and the Minnesota Sub-Class Members that contradicted these representations.

183.   Due to Defendants' specific and superior knowledge that the

Headlights in the Class Vehicles will fail due to the Headlight Defect, their false representations regarding the increased durability and safety of the Class Vehicles, and reliance by Minnesota Plaintiff and the Minnesota Sub-Class Members on these material representations, Defendants had a duty to disclose to Class members that the Headlight Defect will cause Headlight failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles, that failure of the Headlights will cause damage to Class Vehicles, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Minnesota Plaintiff and the Minnesota Sub-Class Members, Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Minnesota Plaintiff and the Minnesota Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Defendants consumers. Defendants represented to Minnesota Plaintiff and the Minnesota Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, and of high quality as alleged throughout this Complaint, when in fact it is only a matter of time before the Headlights fail due to the Headlight Defect.

184. Minnesota Plaintiff and the Minnesota Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Defendants' conduct, Minnesota Plaintiff and the Minnesota Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

185. As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Minnesota Plaintiff and the Minnesota Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

186. Defendants' violations present a continuing risk to Minnesota

1   Plaintiff and the Minnesota Sub-Class Members as well as to the general public.

2   Defendants' unlawful acts and practices complained of herein affect the public

3   interest.

4          187.   As a proximate and direct result of Defendants' unfair and deceptive

5   trade practices, Minnesota Plaintiff and members of the Minnesota Sub-Class

6   purchased or leased Class Vehicles and suffered an ascertainable loss and financial

7   harm. These ascertainable losses include, among other things, overpayment at the

8   time of purchase or lease, the cost to attempt to repair the Headlight Defect,

9   replacement of the damaged related system components, diminution of Class

10  Vehicle resale value, increased repair and maintenance costs, and other substantial

11  monetary damages and inconvenience.

12         188.   Minnesota Plaintiff provided notice of his claims by letter dated

13  December 1, 2022.

14         189.   Pursuant to Minn. Stat. §§ 8.31(3a) and 325D.45, Minnesota Plaintiff

15  and the Minnesota Sub-Class Members seek damages in an amount to be proven

16  at trial, including but not limited to actual damages and attorneys' fees, under the

17  Minnesota DTPA.

18         190.   Minnesota Plaintiff and the Minnesota Sub-Class Members also seek

19  punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing

20  evidence that Defendants' acts show deliberate disregard for the rights or safety

21  of others.

22                        **THIRD CAUSE OF ACTION**

23      **Violations of the Minnesota False Statement in Advertising Act,**

24             **Minn. Stat. § 325F.67, *et seq.***

25             **(On Behalf of the Minnesota Sub-Class)**

26         191.   Plaintiffs incorporates by reference the allegations contained in the

27  preceding paragraphs of this Complaint.

28         192.   Minnesota Plaintiff brings this cause of action individually and on

behalf of the Minnesota Sub-Class.

193.   The Minnesota False Statement in Advertising Act ("Minnesota FSAA") prohibits "any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading" in connection with the disposition of merchandise or services. Minn. Stat. Ann. § 325F.67. Defendants engaged in unfair and deceptive practices that violated the Minnesota FSAA as described above.

194.   Defendants participated in and engaged in deceptive business or trade practices prohibited by the Minnesota FSAA by failing to disclose and actively concealing that the Class Vehicles contained the Headlight Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind their vehicles after they were sold.

195.   Defendants knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles by, among other things, failing to disclose the Headlight Defect; concealing the Headlight Defect; promoting and selling or leasing Class Vehicles it knew were defective, including by marketing their vehicles as safe, reliable, easily operable, efficient, and of high quality; presenting themselves as reputable manufacturers that valued safety, reliability, performance and efficiency, and stood behind their vehicles after they were sold; failing to make repairs or making repairs and providing replacements that caused Minnesota Plaintiff and the Minnesota Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and minimizing the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers. Defendants misrepresented and omitted such material facts with the intent to mislead Minnesota Plaintiff and the Minnesota Sub-Class Members about the true nature of the Class Vehicles.

196. Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Headlight Defect in the course of their business.

197. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

198. Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

199. Defendants knew that the Class Vehicles and their Headlights suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

200. Defendants knew or should have known that their conduct violated the Minnesota FSAA.

201. Minnesota Plaintiff and the Minnesota Sub-Class Members reasonably relied on Defendants' misrepresentations and omissions of material facts in their advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

202. Minnesota Plaintiff and the Minnesota Sub-Class Members had no way of discerning that Defendants' misrepresentations were false and misleading when they acquired their Class Vehicles because Minnesota Plaintiff and the Minnesota Sub-Class Members did not have access to Defendants' exclusive and superior knowledge about the Class Vehicles' design and the Headlight Defect.

203. Had Minnesota Plaintiff and the Minnesota Sub-Class Members known that the Class Vehicles would contain and/or exhibit the Headlight Defect,

they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

204.   Defendants owed Minnesota Plaintiff and the Minnesota Sub-Class Members a duty to disclose the truth about the Headlight Defect because Defendants:

    a.    possessed exclusive and superior knowledge of the design and manufacture of the Class Vehicles and the Headlight Defect;

    b.    intentionally concealed the foregoing from Minnesota Plaintiff and the Minnesota Sub-Class Members; and/or

    c.    made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Minnesota Plaintiff and the Minnesota Sub-Class Members that contradicted these representations.

205. Due to Defendants' specific and superior knowledge that the Headlights in the Class Vehicles will fail due to the Headlight Defect, their false representations regarding the increased durability of the Class Vehicles, and reliance by Minnesota Plaintiff and the Minnesota Sub-Class Members on these material representations, Defendants had a duty to disclose to Class members that the Headlight Defect will cause Headlight failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor Headlights, that failure of the Headlights will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Minnesota Plaintiff and the Minnesota Sub-Class Members, Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Minnesota Plaintiff and the

Minnesota Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Defendants consumers. Defendants represented to Minnesota Plaintiff and the Minnesota Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, and of high quality, when in fact it is only a matter of time before the Headlights fail due to the Headlight Defect.

206. Minnesota Plaintiff and the Minnesota Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Defendants' conduct, Minnesota Plaintiff and the Minnesota Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

207. As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Minnesota Plaintiff and the Minnesota Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

208. Defendant's violations present a continuing risk to Minnesota Plaintiff and the Minnesota Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

209. As a proximate and direct result of Defendants' unfair and deceptive trade practices, Minnesota Plaintiff and members of the Minnesota Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. These ascertainable losses include, among other things, overpayment at the time of purchase or lease, the cost to repair the Headlight Defect, replacement of the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

210. As a direct and proximate result of Defendants' unfair or deceptive acts or practices alleged herein, Minnesota Plaintiff and other members of the

1 Minnesota Sub-Class suffered and will continue to suffer actual damages and are
2 entitled to recover actual damages to the extent permitted by law, including class
3 action rules, in an amount to be proven at trial. In addition, Minnesota Plaintiff
4 and the putative Class seek equitable and injunctive relief against Defendants on
5 terms that the Court considers reasonable, and reasonable attorneys' fees.

6 211. Minnesota Plaintiff provided notice of his claims by letter dated
7 December 1, 2022.

8 212. Pursuant to Minn. Stat. § 8.31(3a), Minnesota Plaintiff and the
9 Minnesota Sub-Class Members seek damages in an amount to be proven at trial,
10 including but not limited to actual damages and attorneys' fees, under the
11 Minnesota CFA.

12 213. Minnesota Plaintiff and the Minnesota Sub-Class Members also seek
13 punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing
14 evidence that Defendants' acts show deliberate disregard for the rights or safety
15 of others.

16 **<u>FOURTH CAUSE OF ACTION</u>**
17 **Breach of Express Warranty**
18 **Minn. Stat. §§ 336.2-313 and 336.2A-210**
19 **(On behalf of the Minnesota Sub-Class Against KMA and HMA)**

20 214. Plaintiffs incorporates by reference the allegations contained in the
21 preceding paragraphs of this Complaint.

22 215. Minnesota Plaintiff brings this cause of action individually and on
23 behalf of the members of the Minnesota Sub-Class against Defendants KMA and
24 HMA (for the purposes of this claim, "Defendants").

25 216. Defendants are and were at all relevant times "merchants" with
26 respect to motor vehicles under Minn. Stat. §§ 336.2-104(1) and "sellers" of motor
27 vehicles under § 336.2-103(1)(d).

28 217. With respect to leases, Defendants are and were at all relevant times

1    "lessors" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

2        218.   The Class Vehicles are and were at all relevant times "goods" within

3    the meaning of Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

4        219.   Defendants provided all purchasers and lessees of the Class Vehicles

5    with the express warranty described herein, which became a material part of the

6    bargain.

7        220.   Defendants provided all purchasers and lessees of Kia-branded Class

8    Vehicles with the Kia Warranty and all purchasers and lessees of Hyundai-branded

9    Class Vehicles with the Hyundai Warranty.

10       221.   Defendants sold and leased the Class Vehicles with a written express

11   warranty covering the Vehicles for six years or 60,000 miles, whichever comes

12   first (Kia Warranty), or five years or 60,000 miles, whichever comes first

13   (Hyundai Warranty).

14       222.   Kia's New Vehicle Limited Warranty expressly states that Kia

15   "warrants that it will arrange for an Authorized Kia dealer at locations of its choice

16   to provide for the repair of your vehicle if it fails to function properly during

17   normal use." The warranty further provides that "Authorized service facilities will

18   remedy such failures to function properly at Kia's expense[.]" (Kia Warranty).

19       223.   Hyundai's New Vehicle Limited Warranty expressly states that

20   Hyundai covers "repair or replacement of any component originally manufactured

21   or installed by Hyundai Motor Company, Hyundai Motor Group, Hyundai Motor

22   Manufacturing Alabama, Kia Manufacturing Mexico, Kia Motors Manufacturing

23   Georgia or Hyundai Motor America that is found to be defective in material or

24   workmanship, under normal use and maintenance[.]" The warranty further

25   provides that "Warranty service will be provided by an authorized Hyundai

26   dealership without charge for parts or labor." (Hyundai Warranty).

27       224.   Defendants designed, manufactured and/or installed the Headlights

28   and the Headlights' component parts in the Class Vehicles, and the Headlights and

their component parts are covered by the express Warranties.

225.   The Headlight Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Minnesota Plaintiff and the Minnesota Sub-Class Members.

226.   Minnesota Plaintiff and the Minnesota Sub-Class Members relied on Defendants' express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

227.   Under the express Warranties, Defendants were obligated to correct the Headlight Defect in the vehicles owned or leased by Minnesota Plaintiff and the Minnesota Sub-Class Members.

228.   Although Defendants were obligated to correct the Headlight Defect, none of the attempted fixes to the Headlights are adequate under the terms of the Warranties, as they did not cure the defect.

229.   Defendants breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Defendants falsely informed Minnesota Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures, and/or replaced defective components in the Headlights with equally defective components, without actually repairing the Class Vehicles.

230.   Defendants and their agent dealers have failed and refused to conform the Headlights to the express Warranties. Defendants' conduct, as discussed throughout this Complaint, has voided any attempt on their part to disclaim liability for their actions.

231.   Moreover, Defendants' attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Defendants' warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

232.   The time limits contained in Defendants' warranty period were also unconscionable and inadequate to protect Minnesota Plaintiff and the Minnesota Sub-Class Members. Among other things, Minnesota Plaintiff and the Minnesota Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendants and the Class members, and Defendants knew or should have known that the Class Vehicles were defective at the time of sale.

233.   Minnesota Plaintiff and the Minnesota Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

234.   Minnesota Plaintiff and the Minnesota Sub-Class Members were not required to notify Defendants of the breach because affording Defendants a reasonable opportunity to cure their breach of written warranty would have been futile. Defendants were also on notice of the Headlight Defect from the complaints and service requests they received from Plaintiffs and the Class Members, from repairs and/or replacements of the Headlights or components thereof, and through other internal and external sources.

235.   Because Defendants, through their conduct and exemplified by their own service bulletins, have covered repairs of the Headlight Defect if Defendants determine the repairs are appropriately covered under the Warranties, Defendants cannot now deny that the Warranties cover the Headlight Defect.

236.   Because Defendants have not been able to remedy the Headlight Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

237.   As a direct and proximate cause of Defendants' breach, Minnesota Plaintiff and the Minnesota Sub-Class Members suffered damages and continue to

suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Minnesota Plaintiff and the Minnesota Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

238.   As a direct and proximate result of Defendants' breach of express warranties, Minnesota Plaintiff and the Minnesota Sub-Class Members have been damaged in an amount to be determined at trial.

<u>**FIFTH CAUSE OF ACTION**</u>

**Breach of the Implied Warranty of Merchantability**

**Minn. Stat. §§ 336.2-314 and 336.2A-212**

**(On behalf of the Minnesota Sub-Class)**

239.   Plaintiffs incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

240.   Minnesota Plaintiff brings this cause of action individually and on behalf of the members of the Minnesota Sub-Class.

241.   Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Minn. Stat. §§ 336.2-104(1) and "sellers" of motor vehicles under § 336.2-103(1)(d).

242.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

243.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

244.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Minn. Stat. §§ 336.2-314 and 336.2A-212.

245.   Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Defendants directly sold and marketed vehicles equipped with the Headlights to customers through authorized

dealers, like those from whom Minnesota Plaintiff and the Minnesota Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing or leasing the vehicles. Defendants knew that the Class Vehicles would and did pass unchanged from Defendants to the authorized dealers to Minnesota Plaintiff and the Minnesota Sub-Class Members, with no modification to the defective Headlights.

246. Defendants provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

247. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their Headlights that were manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their Headlights would be fit for their intended use while the Class Vehicles were being operated.

248. Contrary to the applicable implied warranties, the Class Vehicles and their Headlights, at the time of sale and thereafter, were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design, installation, and manufacture of their Headlights and the existence of the Headlight Defect at the time of sale or lease and thereafter. Defendants knew of this defect at the time these sale or lease transactions occurred.

249. As a result of Defendants' breach of the applicable implied warranties, Minnesota Plaintiff and the Minnesota Sub-Class Members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Headlight Defect, Minnesota Plaintiff and the Minnesota Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' Headlight components are substantially certain to fail before

their expected useful life has run.

250.   Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Minn. Stat. §§ 336.2-314 and 336.2A-212.

251.   Minnesota Plaintiff and the Minnesota Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

252.   Minnesota Plaintiff and the Minnesota Sub-Class Members were not required to notify Defendants of the breach because affording Defendants a reasonable opportunity to cure their breach of implied warranty would have been futile. Defendants were also on notice of the Headlight Defect from the complaints and service requests they received from Plaintiffs and the Class Members, from repairs and/or replacements of the Headlights or components thereof, and through other internal sources.

253.   In addition, on or about December 1, 2022, Minnesota Plaintiff gave notice to Defendants that he intended to pursue his warranty claims on behalf of a class of similarly situated consumers.

254.   Because Minnesota Plaintiff purchased his vehicle from an authorized Defendants dealer, he is in privity with Defendants since, (1) an agency relationship establishes privity for purposes of the breach of implied warranty claims, and (2) privity is not required where plaintiffs are intended third-party beneficiaries of a defendant's implied warranties and the contracts between Defendants and their authorized dealers.

255.   As a direct and proximate cause of Defendants' breach, Minnesota Plaintiff and the Minnesota Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Minnesota Plaintiff and

the Minnesota Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

256.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Minnesota Plaintiff and the Minnesota Sub-Class Members have been damaged in an amount to be proven at trial.

**SIXTH CAUSE OF ACTION**

**Violation Of The South Carolina Unfair Trade Practices Act**

**S.C. Code Ann. § 39-5-10,** *et seq.*

**(On behalf of the South Carolina Sub-Class)**

257.   Plaintiffs incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

258.   Plaintiff Robert Ewing ("South Carolina Plaintiff") brings this cause of action on his own behalf and on behalf of the members of the South Carolina Sub-Class.

259.   Defendants are "persons" under S.C. Code Ann. § 39-5-10.

260.   The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code Ann. § § 39-5-20(a). Defendants' conduct and acts were offensive to public policy or immoral, unethical, or oppressive, thus unfair; indeed, to manufacture, distribute, and promote the Class Vehicles with a Defect known to cause failure while the Class Vehicle is in motion is surely detrimental to the public at large. Defendants' unfair or deceptive acts or practices were prohibited by the South Carolina UTPA.

261.   Defendants participated in unfair or deceptive trade practices that violated the South Carolina UTPA as described below and alleged throughout the Complaint. By failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as reputable manufacturers that valued safety,

cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, Defendants knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Defect in the course of its business.

262.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

263.   Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

264.   Defendants knew that the Class Vehicles and their Headlights suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

265.   Defendants knew or should have known that their conduct violated the South Carolina UTPA.

266.   South Carolina Plaintiff and the South Carolina Sub-Class Members reasonably relied on Defendants' misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

267.   Had South Carolina Plaintiff and the South Carolina Sub-Class Members known that the Class Vehicles would exhibit the Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Defendants'

1    misconduct.

2        268.   Defendants owed South Carolina Plaintiff and the South Carolina

3    Sub-Class Members a duty to disclose the truth about the Defect because

4    Defendants: (a) possessed exclusive knowledge of the design of the Class Vehicles

5    and the Defect; (b) intentionally concealed the foregoing from South Carolina

6    Plaintiff and the South Carolina Sub-Class Members; and/or (c) made incomplete

7    representations regarding the quality and durability of the Class Vehicles, while

8    purposefully withholding material facts from South Carolina Plaintiff and the

9    South Carolina Sub-Class Members that contradicted these representations.

10       269.   Due to Defendants' specific and superior knowledge that the

11   Headlights in the Class Vehicles will fail due to the Defect, its false representations

12   regarding the increased durability of the Class Vehicles, and reliance by South

13   Carolina Plaintiff and the South Carolina Sub-Class Members on these material

14   representations, Defendants had a duty to disclose to Class members that the Class

15   Vehicles' Headlights will fail, that Class Vehicles do not have the expected

16   durability, reliability, and/or safety over other vehicles, and that Class members

17   would be required to bear the cost of the Defect in their vehicles. Having

18   volunteered to provide information to South Carolina Plaintiff and the South

19   Carolina Sub-Class Members, Defendants had the duty to disclose not just the

20   partial truth, but the entire truth. These omitted and concealed facts were material

21   because they directly impact the value of the Class Vehicles purchased or leased

22   by South Carolina Plaintiff and the South Carolina Sub-Class Members.

23   Longevity, durability, performance, and safety are material concerns to

24   Defendants' consumers. Defendants represented to South Carolina Plaintiff and

25   the South Carolina Sub-Class Members that they were purchasing or leasing

26   vehicles that were durable, reliable, safe, efficient, of high quality, and containing

27   safe Headlights as alleged throughout this Complaint, when in fact it is only a

28   matter of time before the Headlights fail due to the Defect.

270.   South Carolina Plaintiff and the South Carolina Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Defendants' conduct, South Carolina Plaintiff and the South Carolina Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

271.   As a result of Defendants' conduct, South Carolina Plaintiff and the South Carolina Sub-Class Members were harmed and suffered actual damages as a result of Defendants' misrepresentations and omissions with regard to their Class Vehicles' Headlights because they purchased vehicles which do not perform as advertised.

272.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices, South Carolina Plaintiff and the South Carolina Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

273.   Defendants' violations present a continuing risk to South Carolina Plaintiff and the South Carolina Sub-Class Members as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest. Specifically: (1) the number of consumers affected by Defendants' deceptive practices are in the hundreds of thousands nation-wide; (2) Defendants have significantly high sophistication and bargaining power with respect to the manufacture and sale of the Class Vehicles to Plaintiffs and individual Class members; and (3) so long as the Class Vehicles continue to be sold and distributed with the defective Headlights, the likelihood of continued impact on other consumers is significant.

274.   Pursuant to S.C. Code Ann. § 39-5-140(a), South Carolina Plaintiff and the South Carolina Sub-Class Members seek monetary relief against Defendant to recover for economic losses, reasonable attorney's fees, and costs. Because Defendants' actions were willful and knowing, Plaintiffs' damages should be trebled.

275.   South Carolina Plaintiff and the South Carolina Sub-Class Members further allege that Defendant's malicious and deliberate conduct warrants an assessment of punitive damages because Defendant carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs and the Class to cruel and unjust hardship as a result.

**SEVENTH CAUSE OF ACTION**

**Breach of Express Warranty**

**S.C. Code Ann. §§ 36-2-313 and 36-2A-210**

**(On Behalf of the South Carolina Sub-Class)**

276.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

277.   South Carolina Plaintiff brings this cause of action on his own behalf and on behalf of the members of the South Carolina Sub-Class.

278.   Defendants are and were at all relevant times "merchants" with respect to motor vehicles under S.C. Code Ann. §§ 36-2-104(1) and 36-2A-103(1)(t), and "sellers" of motor vehicles under § 36-2-103(1)(d).

279.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under S.C. Code Ann. § § 36-2A-103(1)(p).

280.   The Class Vehicles are and were at all relevant times "goods" within the meaning of S.C. Code Ann. § §§ 36-2-105(1) and 36-2A-103(1)(h).

281.   Defendants provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

282.   Defendants provided all purchasers and lessees of Kia-branded Class Vehicles with the Kia Warranty and all purchasers and lessees of Hyundai-branded Class Vehicles with the Hyundai Warranty.

283.   Defendants sold and leased the Class Vehicles with a written express warranty covering the Vehicles for six years or 60,000 miles, whichever comes

CLASS ACTION COMPLAINT

1 first (Kia Warranty), or five years or 60,000 miles, whichever comes first
2 (Hyundai Warranty).

3       284.  Kia's New Vehicle Limited Warranty expressly states that Kia
4 "warrants that it will arrange for an Authorized Kia dealer at locations of its choice
5 to provide for the repair of your vehicle if it fails to function properly during
6 normal use." The warranty further provides that "Authorized service facilities will
7 remedy such failures to function properly at Kia's expense[.]" (Kia Warranty).

8       285.  Hyundai's New Vehicle Limited Warranty expressly states that
9 Hyundai covers "repair or replacement of any component originally manufactured
10 or installed by Hyundai Motor Company, Hyundai Motor Group, Hyundai Motor
11 Manufacturing Alabama, Kia Manufacturing Mexico, Kia Motors Manufacturing
12 Georgia or Hyundai Motor America that is found to be defective in material or
13 workmanship, under normal use and maintenance[.]" The warranty further
14 provides that "Warranty service will be provided by an authorized Hyundai
15 dealership without charge for parts or labor." (Hyundai Warranty).

16       286.  Defendants designed, manufactured and/or installed the Headlights
17 and the Headlights' component parts in the Class Vehicles, and the Headlights and
18 their component parts are covered by the express Warranties.

19       287.  The Defect at issue in this litigation was present at the time the Class
20 Vehicles were sold or leased to South Carolina Plaintiff and the South Carolina
21 Sub-Class Members.

22       288.  Plaintiffs relied on Defendants' express warranties, which were a
23 material part of the bargain, when purchasing or leasing their Class Vehicles.

24       289.  Under the express Warranties, Defendants were obligated to correct
25 the Defect in the vehicles owned or leased by South Carolina Plaintiff and the
26 South Carolina Sub-Class Members.

27       290.  Although Defendants were obligated to correct the Defect, none of
28 the attempted fixes to the Headlights are adequate under the terms of the

1    Warranties, as they did not cure the defect.

2        291.  Defendants breached the express Warranties by performing illusory

3    repairs. Rather than repairing the vehicles pursuant to the express Warranties,

4    Defendants falsely informed South Carolina Sub-Class Members that there was no

5    problem with their Class Vehicles, performed ineffective procedures, and/or

6    replaced defective components in the Headlight Assembly with equally defective

7    components, without actually repairing the Class Vehicles.

8        292.  Defendants and their agent dealers have failed and refused to conform

9    the Headlights to the express Warranties. Defendants' conduct, as discussed

10   throughout this Complaint, has voided any attempt on its part to disclaim liability

11   for their actions.

12       293.  Moreover, Defendants' attempt to disclaim or limit these express

13   Warranties vis-à-vis consumers is unconscionable and unenforceable under the

14   circumstances here. Specifically, Defendants' warranty limitation is

15   unenforceable because it knowingly sold a defective product without informing

16   consumers about the defect.

17       294.  The time limits contained in Defendants' warranty period were also

18   unconscionable and inadequate to protect South Carolina Plaintiff and the South

19   Carolina Sub-Class Members. Among other things, South Carolina Plaintiff and

20   the South Carolina Sub-Class Members had no meaningful choice in determining

21   these time limitations, the terms of which unreasonably favored Defendants. A

22   gross disparity in bargaining power existed between Defendants and the Class

23   members, and Defendants knew or should have known that the Class Vehicles

24   were defective at the time of sale.

25       295.  South Carolina Plaintiff and the South Carolina Sub-Class Members

26   have complied with all obligations under the Warranties, or otherwise have been

27   excused from performance of said obligations as a result of Defendants' conduct

28   described herein.

296.    South Carolina Plaintiff and the South Carolina Sub-Class Members were not required to notify Defendants of the breach because affording Defendants a reasonable opportunity to cure their breach of written warranty would have been futile. Defendants were also on notice of the Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the Headlights or components thereof, and through other internal and external sources.

297.    Because Defendants, through their conduct and exemplified by their own service bulletins, have covered repairs of the Defect if Defendants determines the repairs are appropriately covered under the Warranties, Defendants cannot now deny that the Warranties cover the Defect.

298.    Because Defendants have not been able to remedy the Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

299.    As a direct and proximate cause of Defendants' breach, South Carolina Plaintiff and the South Carolina Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, South Carolina Plaintiff and the South Carolina Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

300.    As a direct and proximate result of Defendants' breach of express warranties, South Carolina Plaintiff and the South Carolina Sub-Class Members have been damaged in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION

### Breach of The Implied Warranty Of Merchantability

### S.C. Code Ann. §§ 36-2-314 and 36-2A-212

### (On Behalf of the South Carolina Sub-Class)

301.    Plaintiffs incorporate by reference the preceding paragraphs of this

1   Complaint.

2   302.   South Carolina Plaintiff brings this cause of action on his own behalf

3   and on behalf of the members of the South Carolina Sub-Class.

4   303.   Defendants are and were at all relevant times "merchants" with

5   respect to motor vehicles under S.C. Code Ann. § §§ 36-2-104(1) and 36-2A-

6   103(1)(t), and "sellers" of motor vehicles under § 36-2-103(1)(d).

7   304.   With respect to leases, Defendants are and were at all relevant times

8   "lessors" of motor vehicles under S.C. Code Ann. § § 36-2A-103(1)(p).

9   305.   The Class Vehicles are and were at all relevant times "goods" within

10   the meaning of S.C. Code Ann. § §§ 36-2-105(1) and 36-2A-103(1)(h).

11   306.   A warranty that the Class Vehicles were in merchantable condition

12   and fit for the ordinary purpose for which vehicles are used is implied by law under

13   S.C. Code Ann. § §§ 36-2-314 and 36-2A-212.

14   307.   Defendants knew or had reason to know of the specific use for which

15   the Class Vehicles were purchased or leased. Defendants directly sold and

16   marketed vehicles equipped with Headlights to customers through authorized

17   dealers, like those from whom South Carolina Plaintiff and the South Carolina

18   Sub-Class Members bought or leased their vehicles, for the intended purpose of

19   consumers purchasing the vehicles. Defendants knew that the Class Vehicles

20   would and did pass unchanged from the authorized dealers to South Carolina

21   Plaintiff and the South Carolina Sub-Class Members, with no modification to the

22   defective Headlights.

23   308.   Defendants provided Plaintiffs and Class Members with an implied

24   warranty that the Class Vehicles and their components and parts are merchantable

25   and fit for the ordinary purposes for which they were sold.

26   309.   This implied warranty included, among other things: (i) a warranty

27   that the Class Vehicles and their Headlights that were manufactured, supplied,

28   distributed, and/or sold by Defendants were safe and reliable for providing

1    transportation; and (ii) a warranty that the Class Vehicles and their Headlights
2    would be fit for their intended use while the Class Vehicles were being operated.

3         310.   Contrary to the applicable implied warranties, the Class Vehicles and
4    their Headlights at the time of sale and thereafter were not fit for their ordinary
5    and intended purpose of providing Plaintiffs and Class Members with reliable,
6    durable, and safe transportation. Instead, the Class Vehicles are defective,
7    including, but not limited to, the defective design and manufacture of their
8    Headlights and the existence of the Defect at the time of sale or lease and
9    thereafter. Defendants knew of this defect at the time these sale or lease
10   transactions occurred.

11        311.   As a result of Defendants' breach of the applicable implied
12   warranties, South Carolina Plaintiff and the South Carolina Sub-Class Members
13   of the Class Vehicles suffered an ascertainable loss of money, property, and/or
14   value of their Class Vehicles. Additionally, as a result of the Defect, South
15   Carolina Plaintiff and the South Carolina Sub-Class Members were harmed and
16   suffered actual damages in that the Class Vehicles' Headlights are substantially
17   certain to fail before their expected useful life has run.

18        312.   Defendants' actions, as complained of herein, breached the implied
19   warranty that the Class Vehicles were of merchantable quality and fit for such use
20   in violation of S.C. Code Ann. § §§ 36-2-314 and 36-2A-212.

21        313.   South Carolina Plaintiff and the South Carolina Sub-Class Members
22   have complied with all obligations under the warranty, or otherwise have been
23   excused from performance of said obligations as a result of Defendants' conduct
24   described herein.

25        314.   South Carolina Plaintiff and the South Carolina Sub-Class Members
26   were not required to notify Defendants of the breach because affording Defendants
27   a reasonable opportunity to cure their breach of written warranty would have been
28   futile. Defendants were also on notice of the Defect from the complaints and

CLASS ACTION COMPLAINT

service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the Headlights or components thereof, and through other internal sources.

315. As a direct and proximate cause of Defendants' breach, South Carolina Plaintiff and the South Carolina Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, South Carolina Plaintiff and the South Carolina Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

316. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, South Carolina Plaintiff and the South Carolina Sub-Class Members have been damaged in an amount to be proven at trial.

## NINTH CAUSE OF ACTION

**(Breach of Express Warranty under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2303 *et seq*.)**

**(On Behalf of the Nationwide Class, or, in the Alternative, on Behalf of All Sub-Classes Against Defendants)**

317. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

318. Plaintiffs bring this cause of action on behalf of himself and on behalf of the Class against Defendants.

319. Defendants provided all purchasers and lessees of the Class Vehicles with an express warranty described *infra*, which became a material part of the bargain.

320. The Headlight assembly and its component parts were manufactured and/or installed in the Class Vehicles by Defendants and are covered by the express warranty.

321. In a section entitled "New Vehicle Limited Warranty," Kia's express

warranty provides, in relevant part, that Kia "warrants that it will arrange for an Authorized Kia dealer at locations of its choice to provide for the repair of your vehicle if it fails to function properly during normal use." The warranty further provides that "Authorized service facilities will remedy such failures to function properly at Kia's expense[.]" (Kia Warranty).

322. In a section entitled "New Vehicle Limited Warranty," Hyundai's express warranty provides, in relevant part, that Hyundai covers "repair or replacement of any component originally manufactured or installed by Hyundai Motor Company, Hyundai Motor Group, Hyundai Motor Manufacturing Alabama, Kia Manufacturing Mexico, Kia Motors Manufacturing Georgia or Hyundai Motor America that is found to be defective in material or workmanship, under normal use and maintenance[.]" The warranty further provides that "Warranty service will be provided by an authorized Hyundai dealership without charge for parts or labor." (Hyundai Warranty).

323. Defendants breached the express warranties by selling and leasing Class Vehicles with Headlights that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the Headlight and its component parts. Defendants have failed to "repair" the defects as alleged herein.

324. Plaintiffs was not required to notify Defendants of the breach or was not required to do so because affording Defendants a reasonable opportunity to cure its breach of written warranty would have been futile. Defendants were also on notice of the defect from complaints and service requests they received from Class Members, from repairs and/or replacements of the Headlight, and from other internal sources.

325. Plaintiffs also provided notice to Defendants of their breach of warranty claims under the MMWA by letters dated December 1, 2022 (Plaintiff Maranda) and December 2, 2022 (Plaintiff Ewing).

326.   As a direct and proximate cause of Defendants' breach, Plaintiffs and the other Class members have suffered, and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, Plaintiffs and the other Class members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

327.   Plaintiffs and the other Class members are entitled to legal and equitable relief against Defendants, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

## TENTH  CAUSE OF ACTION

**(Breach of Implied Warranty under the Magnuson-Moss Warranty Act,**

**15 U.S.C. § 2303 *et seq.*)**

**(On Behalf of the Nationwide Class, or, in the Alternative, on Behalf of All**

**Sub-Classes Against Defendants)**

328.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

329.   Plaintiffs bring this cause of action on behalf of themselves and the Class against Defendants.

330.   The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

331.   Plaintiffs and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

332.   Defendants are "suppliers" and "warrantors" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

333.   Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their Headlights manufactured, supplied, distributed, and/or sold by Defendants would provide safe and reliable

1  transportation; and (ii) a warranty that the Class Vehicles and their Headlights

2  would be fit for their intended use while the Class Vehicles were being operated.

3      334.    Contrary to the applicable implied warranties, the Class Vehicles and

4  their Headlights at the time of sale and thereafter were not fit for their ordinary

5  and intended purpose of providing Plaintiffs and Class members with reliable,

6  durable, and safe transportation. Instead, the Class Vehicles are defective,

7  including the defective design and materials of their Headlights.

8      335.    Defendants' breach of implied warranties has deprived Plaintiffs and

9  Class members of the benefit of their bargain.

10      336.    The amount in controversy of Plaintiffs' individual claims meets or

11  exceeds the sum or value of $25,000. In addition, the amount in controversy meets

12  or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed

13  on the basis of all claims to be determined in this suit.

14      337.    Defendants have been afforded a reasonable opportunity to cure their

15  breach, including when Plaintiffs and Class members brought their vehicles in for

16  diagnoses and Headlight repair.

17      338.    As a direct and proximate cause of Defendants' breach of implied

18  warranties, Plaintiffs and Class members sustained and incurred damages and

19  other losses in an amount to be determined at trial. Defendants' conduct damaged

20  Plaintiffs and Class members, who are entitled to recover actual damages,

21  consequential damages, specific performance, diminution in value, costs,

22  attorneys' fees, and/or other relief as appropriate.

23      339.    As a result of Defendants' violations of the Magnuson-Moss

24  Warranty Act as alleged herein, Plaintiffs and Class members have incurred

25  damages.

26      340.    Plaintiffs also provided notice to Defendants of its breach of warranty

27  claims under the MMWA by letters dated December 1, 2022 (Plaintiff Maranda)

28  and December 2, 2022 (Plaintiff Ewing).

**ELEVENTH  CAUSE OF ACTION**

**(For Fraud by Omission or Fraudulent Concealment)**

**(On Behalf of the Nationwide Class, or, in the Alternative, on Behalf of All Sub-Classes Against Defendants)**

341.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

342.    Plaintiffs bring this cause of action on behalf of themselves and the Class or, alternatively, on behalf of all Sub-Classes against Defendants.

343.    Defendants knew that the Class Vehicles suffered from an inherent Headlight Defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

344.    Defendants concealed from and failed to disclose to Plaintiffs and Class Members the defective nature of the Class Vehicles.

345.    Defendants were under a duty to Plaintiffs and Class Members to disclose the defective nature of the Class Vehicles because:

        a.  Defendants were in a superior position to know the true state of facts about the safety defect contained in the Class Vehicles;

        b.  The omitted facts were material because they directly impact the safety of the Class Vehicles;

        c.  Defendants knew the omitted facts regarding the Headlight Defect were not known to or reasonably discoverable by Plaintiffs and Class Members;

        d.  Defendants made partial disclosures about the quality of the Class Vehicles without revealing their true defective nature; and,

        e.  Defendants actively concealed the defective nature of the Class Vehicles from Plaintiffs and Class Members.

346.    The facts concealed or not disclosed by Defendants to Plaintiffs and the other Class Members are material in that a reasonable person would have

considered them to be important in deciding whether to purchase or lease Defendants' Class Vehicles or pay a lesser price for them. Whether a vehicle's Headlight is defective, which can suddenly cause lights to fail, dim, or malfunction during night driving or inclement weather, thereby causing the inability to see pedestrians, animals, and road hazards, is a material safety concern. Had Plaintiffs and Class Members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them.

347.    Defendants concealed or failed to disclose the true nature of the design and/or manufacturing defects contained in the Class Vehicles to induce Plaintiffs and Class Members to act thereon. Plaintiffs and the other Class Members justifiably relied on Defendant's omissions to their detriment. This detriment is evident from Plaintiffs and Class Members' purchase or lease of Defendants' defective Class Vehicles.

348.    Defendants continued to conceal the defective nature of the Class Vehicles even after Class Members began to report the problems. Indeed, Defendants continue to cover up and conceal the true nature of the problem today.

349.    As a direct and proximate result of Defendants' misconduct, Plaintiffs and Class Members have suffered and will continue to suffer actual damages. Plaintiffs and the Class reserve their right to elect either to (a) rescind their purchase or lease of the defective Vehicles and obtain restitution or (b) affirm their purchase or lease of the defective Vehicles and recover damages.

350.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof

CLASS ACTION COMPLAINT

## **TWELFTH CAUSE OF ACTION**

### **(For Unjust Enrichment)**

### **(On Behalf of the Nationwide Class, or, in the Alternative, on Behalf of All Sub-Classes Against Defendants)**

351.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

352.   Plaintiffs bring this cause of action on behalf of themselves and the Class or, alternatively, on behalf of all Sub-Classes against Defendants.

353.   Defendants have received and retained a benefit from Plaintiffs and the members of the Class, and inequity has resulted.

354.   As a direct and proximate result of Defendants' failure to disclose known defects, Defendants have profited through the sale and lease of the Class Vehicles, the value of which was artificially inflated by Defendants' concealment of and omissions regarding the Headlight Defect. Defendants charged higher prices for the vehicles than the vehicles' true value, and Plaintiffs and Class Members thus overpaid for the Class Vehicles. Although these vehicles are purchased through Defendants' authorized dealers and distributors, the money from the vehicle sales flows directly back to Defendants.

355.   Additionally, as a direct and proximate result of Defendants' failure to disclose known defects in the Class Vehicles, Plaintiffs and Class Members have vehicles that require repeated, high-cost repairs that can and therefore have conferred an unjust substantial benefit upon Defendants.

356.   Defendants have been unjustly enriched due to the known defects in the Class Vehicles through the use of money paid that earned interest or otherwise added to Defendants' profits when said money should have remained with Plaintiffs and Class Members.

357.   Plaintiffs and Class Members were not aware of the true facts regarding the Defect in the Class Vehicles and did not benefit from Defendants'

1  unjust conduct.

2      358.   As a result of the Defendants' unjust enrichment, Plaintiffs and Class
3  Members have suffered damages.

4      359.   Plaintiffs do not seek restitution under their unjust enrichment claim.
5  Rather, Plaintiffs and Class Members seek non-restitutionary disgorgement of the
6  financial profits that Defendants obtained as a result of its unjust conduct.

7      360.   Additionally, Plaintiffs seek injunctive relief to compel Defendants
8  to offer, under warranty, remediation solutions that Defendant identifies. Plaintiffs
9  also seek injunctive relief enjoining Defendants from further deceptive
10 distribution, sales, and lease practices with respect to Class Vehicles, enjoining
11 Defendants from selling the Class Vehicles with the misleading information;
12 compelling Defendants to provide Class members with a replacement components
13 that do not contain the defects alleged herein; and/or compelling Defendants to
14 reform their warranties, in a manner deemed to be appropriate by the Court, to
15 cover the injury alleged and to notify all Class Members that such warranties have
16 been reformed. Money damages are not an adequate remedy for the above
17 requested non-monetary injunctive relief.

18                    **RELIEF REQUESTED**

19     361.   Plaintiffs, on behalf of themselves and all others similarly situated,
20 request the Court enter judgment against Defendants, as follows:

21          (a) An order certifying the proposed Class and Sub-Classes,
22              designating Plaintiffs as named representatives of the Class, and
23              designating the undersigned as Class Counsel;

24          (b) A declaration that Defendants are financially responsible for
25              notifying all Class Members about the defective nature of the
26              Headlight, including the need for periodic maintenance;

27          (c) An order enjoining Defendants from further deceptive
28              distribution, sales, and lease practices with respect to Class

CLASS ACTION COMPLAINT

1                Vehicles; compelling Defendants to issue a voluntary recall for

2                the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling

3                Defendants to repair and eliminate the Headlight Defect from

4                every Class Vehicle; enjoining Defendants from selling the Class

5                Vehicles with the misleading information; and/or compelling

6                Defendants to reform its warranty, in a manner deemed to be

7                appropriate by the Court, to cover the injury alleged and to notify

8                all Class Members that such warranty has been reformed;

9     (d) An award to Plaintiffs and the Class for compensatory,

10         exemplary, and statutory damages, including interest, in an

11         amount to be proven at trial;

12     (e) Any and all remedies provided pursuant to the Magnuson-Moss

13         Warranty Act;

14     (f) A declaration that Defendants must disgorge, for the benefit of

15         the Class, all or part of the ill-gotten profits it received from the

16         sale or lease of the Class Vehicles or make full restitution to

17         Plaintiffs and Class Members;

18     (g) An award of attorneys' fees and costs, as allowed by law;

19     (h) An award of pre-judgment and post-judgment interest, as

20         provided by law;

21     (i) Leave to amend the Complaint to conform to the evidence

22         produced at trial; and

23     (j) Such other relief as may be appropriate under the circumstances.

24                   **DEMAND FOR JURY TRIAL**

25       362.   Pursuant to Federal Rule of Civil Procedure 38(b) and Central District

26 of California Local Rule 38-1, Plaintiffs hereby demand a trial by jury of all issues

27 in this action so triable.

28

CLASS ACTION COMPLAINT

1

Dated:  December 6, 2022

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

**Capstone Law APC**


By: /s/ Tarek H. Zohdy
Tarek H. Zohdy
Cody R. Padgett
Laura E. Goolsby

**BERGER MONTAGUE PC**
Russell D. Paul
(*pro hac vice forthcoming*)
Amey J. Park
(*pro hac vice forthcoming*)
Abigail J. Gertner
(*pro hac vice forthcoming*)
1818 Market Street
Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
rpaul@bm.net
apark@bm.net
agertner@bm.net

Attorneys for Plaintiffs

CLASS ACTION COMPLAINT