Tarek H. Zohdy (SBN 247775)
Tarek.Zohdy@capstonelawyers.com
Cody R. Padgett (SBN 275553)
Cody.Padgett@capstonelawyers.com
Laura E. Goolsby (SBN 321721)
Laura.Goolsby@capstonelawyers.com
CAPSTONE LAW APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone:   (310) 556-4811
Facsimile:   (310) 943-0396

Russell D. Paul (*pro hac vice*)
rpaul@bm.net
Abigail J. Gertner (*pro hac vice*)
agertner@bm.net
Amey J. Park (*pro hac vice*)
apark@bm.net
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel:  (215) 875-3000
Fax:  (215) 875-4604

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICK MARANDA, ROBERT EWING, TERRI SUE HOLLIDAY, and ALMA JONES, individually, and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>HYUNDAI MOTOR AMERICA., INC., a California corporation, KIA MOTORS AMERICA, INC., a California corporation, HYUNDAI MOTOR COMPANY, a South Korean corporation, and KIA MOTORS CORPORATION, a South Korean corporation,<br><br>Defendants. | Case No.: 8:22-cv-02193-JVS-JDE<br>Assigned to Hon. James V. Selna<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>(1) Breach of Express Warranty under Illinois Law<br>(2) Breach of Implied Warranty under Illinois law<br>(3) Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act<br>(4) Breach of Express Warranty under Maryland Law<br>(5) Breach of Implied Warranty under Maryland law<br>(6) Violations of the Maryland Consumer Protection Act<br>(7) Violations of the Minnesota Prevention of Consumer Fraud Act |



(8)  Violations of the Minnesota Deceptive Trade Practices Act
(9)  Violations of the Minnesota False Statement in Advertising Act
(10) Breach of Express Warranty under Minnesota Law
(11) Breach of Implied Warranty under Minnesota law
(12) Violations of the South Carolina Unfair Trade Practices Act
(13) Breach of Express Warranty under South Carolina Law
(14) Breach of Implied Warranty under South Carolina Law
(15) Breach of Express Warranty under the Magnuson-Moss Warranty Act
(16) Breach of Implied Warranty under the Magnuson-Moss Warranty Act
(17) Fraudulent Concealment/Omission
(18) Unjust Enrichment

**DEMAND FOR JURY TRIAL**

1.     Plaintiffs Patrick Maranda, Robert Ewing, Terri Sue Holliday, and Alma Jones ("Plaintiffs"), individually and on behalf of all persons in the United States who purchased or leased any 2020-present Kia Telluride vehicle or 2020-present Hyundai Palisade vehicle ("Class Vehicles" or "Vehicles").

2.     Defendants Hyundai Motor America, Inc. ("HMA"), Hyundai Motor Company ("HMC") (together with HMA, "Hyundai"), Kia Motors America, Inc. ("KMA"), and Kia Motors Corporation ("KMC") (together with KMA, "Kia," and Kia collectively with Hyundai, "Defendants") designed, manufactured, marketed, distributed, sold, warranted, and/or serviced the Class Vehicles. Plaintiffs allege as follows:

## INTRODUCTION

3.     This is a consumer class action concerning a failure to disclose material facts and a safety concern to consumers.

4.     Defendants manufactured, marketed, distributed, and/or sold the Class Vehicles without disclosing that the Class Vehicles' headlights were defective.

5.     Specifically, Plaintiffs allege that the headlights are defective in that they are designed, manufactured, and/or installed in a manner that does not seal out moisture and humidity to a sufficient degree and/or contain defective seals which allow moisture and condensation to intrude on the headlight assembly. As a result, the light output from the headlamp assembly is dim and/or becomes progressively dimmer over time; the high beams fail to illuminate entirely (often without warning), the headlights are and/or become improperly aimed and fail to properly illuminate ahead of the vehicle, and the headlights are and/or become extremely fogged and unfocused (the "Headlight Defect" or "Defect"). As further described below, discovery will show that improperly designed, manufactured, and/or installed headlamp assemblies, internal headlamp connections, and headlamp seals and gaskets result in these failures.

6.      The Headlight Defect presents a significant safety hazard. Drivers, including Plaintiffs, are unable to see at a distance in front of them, are unable to see in inclement weather and while driving at night, and are unable to see potential road hazards, including people, animals, and objects. The Headlight Defect endangers drivers, pedestrians, and other vehicles because it makes accidents wherein the vehicle strikes a person, animal, or object in the roadway more likely, and sometimes entirely unavoidable, depending on the degradation of light output or level of headlight failure. For this reason, Class members have reported fear of driving their Class Vehicles at night or in inclement weather.

7.      Defendants sold the Class Vehicles with a 6-year/60,000-mile ("Kia Warranty") or 5-year/60,000-mile ("Hyundai Warranty") New Vehicle Limited Warranty ("NVLW") that purports to cover the headlights. However, owners and lessees often have complained that their Headlights fail and require repair or replacement both within and just outside the warranty period and that they are charged for repair even when within the warranty period. This is evidenced through Class Member reports to the National Highway Traffic Safety Administration ("NHTSA"), which demonstrate that Defendants' authorized dealerships are replacing and repairing Headlights both within, and just outside, the applicable express warranty periods and/or are charging Class Members for repairs within the warranty period.

8.      The Headlight Defect is inherent in each Class Vehicle and was present at the time of sale.

9.      Discovery will show that, since 2019, if not earlier, Defendants have been aware the Class Vehicles' Headlights would need frequent repair, prematurely fail, require frequent replacement, including replacements just outside of warranty, that the replacement Headlights installed would be equally as defective as the originals, and that the Headlight would cause the symptoms of the Headlight Defect described above (poor light output from the headlamp

FIRST AMENDED CLASS ACTION COMPLAINT

assembly; sudden high beam failure; improper aiming; failed illumination ahead of the vehicle, and fogged or unfocused headlights) yet HMC and KMC continued to equip the Class Vehicles with defective Headlights. Further, Defendants often claim that the warranties they provided with the vehicles do no cover the headlight diagnosis, calibration or replacement, forcing consumers to pay out of pocket. Moreover, Defendants not only refused to disclose the alleged Defect to consumers, they also actively concealed, and continue to conceal, their knowledge concerning the Headlight Defect.

10. Defendants undertook affirmative measures to conceal Headlight failures and other malfunctions through, among other things, Technical Service Bulletins ("TSB") issued to authorized repair facilities only, and not provided to owners or lessees.

11. Defendants had superior and/or exclusive knowledge of material facts regarding the Headlight Defect due to their pre-production testing, design failure mode analysis, aggregate part sales, consumer complaints about the Defect to Defendants' dealers, who are their agents for vehicle repairs, customer complaints made directly to Kia and Hyundai, dealer audits, aggregate warranty information, consumer complaints to and resulting notice from NHTSA, early consumer complaints on websites and internet forums, dealership repair orders, among other internal sources of information about the problem.

12. The Headlight Defect is material because, *inter alia,* it poses a safety concern. As attested by Class Members in complaints to the National Highway Traffic Safety Administration ("NHTSA"), and other online forums, the Headlights can suddenly fail or dim, causing inability to perceive pedestrians, animals, and other road hazards, inability to perceive and respond to safety threats, and greatly increased risk of collision.

13. Defendants' failure to disclose the Headlight Defect has caused Plaintiffs and putative class members to lose the use of their Vehicles'

Headlights, the use of their vehicles at night or during inclement weather, and/or incur costly repairs that have conferred an unjust substantial benefit upon Defendants.

14. Discovery will show that, in an effort to conceal the Headlight Defect, Defendants have instructed dealers to tell consumers their vehicles are "operating normally" or "operating as intended" when they are not, or to give excuses for sub-par performance such as the headlights not being pointed in the correct direction. This is a common practice in the automotive industry. By denying the existence of a defect, manufacturers can play on the consumers' lack of technical expertise and avoid implementing potentially costly fixes for years, or at least until the vehicles are out of warranty. When remedial measures are taken, they are often through the issuance of service bulletins provided to dealers only that are narrowly crafted and underinclusive, as occurred here and set forth below.

15. Had Defendants disclosed the Headlight Defect, Plaintiffs and Class Members would not have purchased the Class Vehicles, would have paid less for them, or would have required Defendants to replace, or pay for the replacement of, the defective Headlights with a non-defective version before their warranty periods expired.

## THE PARTIES

**Plaintiff Patrick Maranda**

16. Plaintiff Maranda is a Minnesota citizen residing in Outing, Minnesota.

17. In or around fall 2021, Plaintiff Maranda purchased a new 2022 Hyundai Palisade from Dondelinger Hyundai, an authorized Hyundai dealership in Baxter, Minnesota.

18. Plaintiff Maranda purchased his vehicle primarily for personal, family, or household use.

19.     Passenger safety and reliability were important factors in Plaintiff Maranda's decision to purchase his vehicle. Before making his purchase, Plaintiff Maranda researched the 2022 Hyundai Palisade online, by "Googling" the vehicle. At the dealership, Plaintiff Maranda also reviewed the vehicle's Monroney Sticker or "window sticker," which listed official information about the vehicle. Plaintiff Maranda also discussed the safety features of the vehicle with dealership personnel, who made no reference to the Headlight Defect. Instead, the dealership salesperson told Plaintiff Maranda the Hyundai Palisade was a "very reliable vehicle." Plaintiff Maranda believed that the 2022 Hyundai Palisade would be a safe and reliable vehicle.

20.     Defendants' omissions were material to Plaintiff Maranda. Had the Hyundai Defendants disclosed their knowledge of the Headlight Defect before he purchased his vehicle, Plaintiff Maranda would have seen and been aware of the disclosures. Furthermore, had he known of the Headlight Defect, Plaintiff Maranda would not have purchased his vehicle.

21.     Shortly after purchase, Plaintiff Maranda began experiencing difficulties with his Class Vehicle's Headlights. Specifically, the Headlights do not produce sufficient light on low beam and the high beam Headlights will suddenly and unexpectedly go to low beam, for no ascertainable reason and without an approaching vehicle. Such failures have caused Plaintiff Maranda to reduce his use of the vehicle during the night and during inclement weather. Plaintiff Maranda lives in a rural area that lacks ambient lighting and thus is in fear of, and in danger from, unilluminated pedestrians, animals, and road hazards while driving at night.

22.     With approximately 15,000 miles on the odometer, Plaintiff Maranda brought his vehicle to Dondelinger Hyundai, an authorized Hyundai dealership in Baxter, Minnesota, complaining of insufficient light output and sudden and unexpected low beam and high beam shutoff. Dealership personnel

1   informed Plaintiff Maranda they had not heard of any issues with the Headlights,
2   they should be "fine," and no repairs were done.

3      23.    Despite bringing his vehicle to a Hyundai dealership—Hyundai's
4   authorized agent for repairs—Plaintiff Maranda has not received a permanent
5   repair under warranty, and his vehicle continues to exhibit the Headlight Defect.

6      24.    As a result of the Headlight Defect, Plaintiff Maranda has lost
7   confidence in the ability of his Class Vehicle to provide safe and reliable
8   transportation for ordinary and advertised purposes, particularly at night and in
9   inclement weather. Further, Plaintiff Maranda will be unable to rely on the Class
10  Vehicles' advertising or labeling in the future, and so will not purchase or lease
11  another Class Vehicle, although he would like to do so.

12     25.    At all times, Plaintiff Maranda, like all Class Members, has driven
13  his vehicle in a manner both foreseeable and in which it was intended to be used.

14  **Plaintiff Robert Ewing**

15     26.    Plaintiff Ewing is a South Carolina citizen residing in West Union,
16  South Carolina.

17     27.    On or around July 30, 2022, Plaintiff Ewing purchased a new 2022
18  Kia Telluride from Kia of Greer, an authorized Kia dealership located in Greer,
19  South Carolina.

20     28.    Plaintiff Ewing purchased his vehicle primarily for personal, family,
21  or household use.

22     29.    Passenger safety and reliability were important factors in Plaintiff
23  Ewing's decision to purchase his vehicle. Before making his purchase, Plaintiff
24  Ewing researched the 2022 Kia Telluride online, by "Googling" the vehicle. At
25  the dealership, Plaintiff Ewing also reviewed the vehicle's Monroney Sticker or
26  "window sticker," which listed official information about the vehicle. Plaintiff
27  Ewing also test drove the vehicle and spoke with dealership personnel, who
28  made no reference to the Headlight Defect. Plaintiff Ewing believed that the

FIRST AMENDED CLASS ACTION COMPLAINT

1  2022 Kia Telluride would be a safe and reliable vehicle.

2        30.     Defendant's omissions were material to Plaintiff Ewing. Had the

3  Kia Defendants disclosed their knowledge of the Headlight Defect before he

4  purchased his vehicle, Plaintiff Ewing would have seen and been aware of the

5  disclosures. Furthermore, had he known of the Headlight Defect, Plaintiff Ewing

6  would not have purchased his vehicle or would not have purchased his vehicle

7  for the price he did.

8        31.     Immediately after purchase, Plaintiff Ewing began experiencing

9  difficulties with his Class Vehicle's Headlights. Specifically, the Headlights do

10  not produce sufficient light, and therefore provide an insufficient field of vision,

11  and using the high beam Headlights makes little difference in the insufficient

12  illumination. Plaintiff Ewing feels particularly unsafe due to the Headlights'

13  insufficient illumination when driving after dark because he lives in a rural area

14  and drives more slowly to compensate for the low visibility as a consequence of

15  the Defect.

16        32.     As a result, on or around September 19, 2022, Plaintiff Ewing

17  contacted Kia's Customer Care department, complaining of insufficient light

18  output, including the negligible difference even when the high beams are used.

19  Despite multiple follow up requests as further detailed below, Kia has not

20  addressed his concerns or agreed to repair the issue. Despite multiple follow up

21  requests as further detailed below, Kia has not addressed his concerns or agreed

22  to repair the issue.

23        33.     In early October 2022, Plaintiff Ewing raised the insufficient

24  illumination issue with Cory Powell at Kia of Greer. The following week,

25  Plaintiff Ewing also reported the insufficient light output issue to Kia of

26  Anderson, an authorized Kia dealership in Pendleton, South Carolina and made a

27  service appointment at Kia of Anderson, which is closer than Kia of Greer to

28  Plaintiff Ewing's home.

34.    On November 8, 2022, with 1,916 miles on the odometer, Plaintiff Ewing took his vehicle to Kia of Anderson. According to the service record, dealership personnel made a "small adjustment" to the Headlights, informed Plaintiff that "nothing else [was] needed at [the] time," and advised Plaintiff "to come back if issue continue[d]." Despite the alleged repair, Plaintiff Ewing did not notice a difference in the Headlights' insufficient illumination when driving home after the service visit, which Plaintiff Ewing reported to Mr. Harbin of Kia of Anderson the following day.

35.    On November 10, 2022, Plaintiff Ewing also raised these concerns with the Kia Customer Care department and spoke with a supervisor named Randy, who advised Mr. Ewing to schedule yet another service appointment at Kia of Anderson.

36.    Despite bringing his vehicle to a Kia dealership, multiple telephone calls, and at least six (6) email communications to Kia's authorized dealerships and Kia's Customer Care department, Plaintiff Ewing's vehicle continues to suffer from the Defect. Indeed, because Kia and its dealer representatives have failed to address Plaintiff Ewing's concerns despite being given numerous opportunities to do so, Plaintiff Ewing has not taken his vehicle for another service appointment. Plaintiff Ewing avoids driving after dark because he feels unsafe due to the Defect.

37.    Indeed, because Kia and its dealer representatives have failed to address Plaintiff Ewing's concerns despite being given numerous opportunities to do so, Plaintiff Ewing has not taken his vehicle for another service appointment.

38.    Despite the foregoing, Plaintiff Ewing has not received a permanent repair under warranty, and his vehicle continues to exhibit the Headlight Defect.

39.    At all times, Plaintiff Ewing, like all Class Members, has driven his vehicle in a manner both foreseeable and in which it was intended to be used.

**Plaintiff Terri Sue Holliday**

40.     Plaintiff Holliday is an Illinois citizen residing in McLean, Illinois.

41.     On or around May 17, 2019, Plaintiff Holliday purchased a new 2020 Kia Telluride from O'Brien Kia, an authorized Kia dealership in Bloomington, Illinois.

42.     Plaintiff Holliday purchased her vehicle primarily for personal, family, or household use.

43.     Passenger safety and reliability were important factors in Plaintiff Holliday's decision to purchase her vehicle. Before making her purchase, Plaintiff Holliday researched the 2020 Kia Telluride by test driving the vehicle and discussing the vehicle's safety and reliability with the Kia dealer's salesperson, who unreservedly recommended the vehicle to Plaintiff Holliday and made no reference to the Headlight Defect. At the dealership, Plaintiff Holliday also reviewed the vehicle's Monroney Sticker or "window sticker," which listed official information about the vehicle. Plaintiff Holliday believed that the 2020 Kia Telluride would be a safe and reliable vehicle.

44.     Defendants' omissions were material to Plaintiff Holliday. Had the Kia Defendants disclosed their knowledge of the Headlight Defect before she purchased her vehicle, Plaintiff Holliday would have seen and been aware of the disclosures. Furthermore, had she known of the Headlight Defect, Plaintiff Holliday would not have purchased her vehicle.

45.     Within one (1) month after purchase, Plaintiff Holliday began experiencing difficulties with her Class Vehicle's Headlights. Specifically, the Headlights do not produce sufficient light and, therefore, provide an insufficient field of vision, particularly on the passenger side of the vehicle. Plaintiff Holliday feels particularly unsafe due to the Headlights' insufficient illumination when driving after dark because she lives in a rural area and drives with high beams to compensate for the low visibility as a consequence of the Defect. She is

particularly worried about striking a child, which nearly occurred once due to the poor illumination on the passenger side of the vehicle.

46.     Plaintiff Holliday informed O'Brien Kia about her experience with the Headlight Defect within two (2) months of her purchase in 2019, but at no time has the dealership addressed her concerns or agreed to repair the issue. Plaintiff Holliday independently attempted to remedy the Defect by replacing the bulbs, but that attempt was unsuccessful.

47.     Despite bringing her vehicle's Headlight Defect to the Kia dealership's attention—Kia's authorized agent for repairs—Plaintiff Holliday has not received a permanent repair under warranty, and her vehicle continues to exhibit the Headlight Defect.

48.     As a result of the Headlight Defect, Plaintiff Holliday has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, particularly at night and in inclement weather. Further, Plaintiff Holliday will be unable to rely on the Class Vehicles' advertising or labeling in the future, and so will not purchase or lease another Class Vehicle, although she would like to do so.

49.     At all times, Plaintiff Holliday, like all Class Members, has driven her vehicle in a manner both foreseeable and in which it was intended to be used.

**Plaintiff Alma Jones**

50.     Plaintiff Jones is a Virginia citizen residing in Midlothian, Virginia.

51.     On or around July 7, 2022, Plaintiff Jones purchased a new 2022 Hyundai Palisade from Ourisman Hyundai, an authorized Hyundai dealership in Bowie, Maryland.

52.     Plaintiff Jones purchased her vehicle primarily for personal, family, or household use.

53.     Passenger safety and reliability were important factors in Plaintiff Jones's decision to purchase her vehicle. Before making her purchase, Plaintiff

Jones researched the 2022 Hyundai Palisade online, by "Googling" the vehicle, as well as by visiting Hyundai's website. At the dealership, Plaintiff Jones also reviewed the vehicle's Monroney Sticker or "window sticker," which listed official information about the vehicle, and took the vehicle for a test drive. Plaintiff Jones also discussed the safety features of the vehicle with dealership personnel, who made no reference to the Headlight Defect. Instead, Plaintiff Jones was informed the vehicle was "one of the most reliable on the market." Plaintiff Jones believed that the 2022 Hyundai Palisade would be a safe and reliable vehicle.

54. Defendants' omissions were material to Plaintiff Jones. Had the Hyundai Defendants disclosed their knowledge of the Headlight Defect before she purchased her vehicle, Plaintiff Jones would have seen and been aware of the disclosures. Furthermore, had she known of the Headlight Defect, Plaintiff Jones would not have purchased her vehicle.

55. Immediately after purchase, Plaintiff Jones began experiencing difficulties with her Class Vehicle's Headlights. Specifically, the Headlights do not produce sufficient light on low beam and Plaintiff is unable to see objects in her vehicle's path clearly at night and in inclement weather.

56. With approximately 7,500 miles on the odometer, Plaintiff Jones brought her vehicle to Pearson Hyundai, an authorized Hyundai dealership in Midlothian, Virginia, and complained of insufficient light and her resulting safety concerns. Dealership personnel informed Plaintiff Jones that's "just how the lights are set" and no repairs were done.

57. Despite bringing her vehicle to a Hyundai dealership—Hyundai's authorized agent for repairs—Plaintiff Jones has not received a permanent repair under warranty, and her vehicle continues to exhibit the Headlight Defect.

58. As a result of the Headlight Defect, Plaintiff Jones has lost confidence in the ability of her Class Vehicle to provide safe and reliable

transportation for ordinary and advertised purposes, particularly at night and in inclement weather. Further, Plaintiff Jones will be unable to rely on the Class Vehicles' advertising or labeling in the future, and so will not purchase or lease another Class Vehicle, although she would like to do so.

59. At all times, Plaintiff Jones, like all Class Members, has driven her vehicle in a manner both foreseeable and in which it was intended to be used.

**Defendant Hyundai Motor America, Inc.**

60. Defendant Hyundai Motor America, Inc. is a corporation organized and in existence under the laws of the State of California and registered to do business in the State of California. HMA is headquartered in Fountain Valley, California and is a wholly owned subsidiary of HMC.

61. HMA is responsible for sales, marketing, service, distribution, import and export of Hyundai branded products, including vehicles and parts, in the United States. HMA is also the warrantor and distributor of Hyundai vehicles, including the Class Vehicles, throughout the United States.

62. In order to sell vehicles to the general public, HMA enters into agreements with authorized dealerships who engage in retail sales with consumers such as Plaintiffs. In return for the exclusive right to sell new Hyundai branded vehicles, authorized dealerships are also permitted to service and repair these vehicles under the warranties HMA provides directly to consumers who purchased new vehicles from the authorized dealerships. All service and repair at an authorized dealership is completed according to HMA instructions, issued through service manuals, TSBs, and other documents, written in conjunction with HMC. Per the agreements between HMA and the authorized dealers, consumers are able to receive services under HMA's issued warranty at dealer locations that are convenient to them. These agreements provide HMA with a significant amount of control over the actions of the authorized dealerships. For example, HMA employees are appointed as managers for

particular regions of the United States and their responsibilities include managing the day-to-day operations of the dealerships located within their regions.[1]

63.    Discovery will show that HMA also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional material relating to the Hyundai Class Vehicles in conjunction with HMC.

HMA is also HMC's designated liaison to fulfill its motor vehicles safety monitoring duties under federal law in the United States. As such, HMA communicates with NHTSA on HMC's behalf and holds itself out to be the manufacturer of Hyundai-branded vehicles in those communications such as safety reports and recalls. Specifically, HMA maintains a department within itself called the North American Safety Office ("NASO"), whose primary responsibility is monitoring Hyundai-branded vehicles for defects and communicating with affiliated companies regarding the existence, remedies, and communication to the public about those safety defects. NASO reviews reports from the field, including Speak Up for Safety ("SUFS") reports and maintains a Data Analysis team, a Data Review Committee, and a Technical Review Committee as part of its mandate. NASO works with the Hyundai America Technical Center (with which it has established the Safety Test and Investigation Laboratory), HMC, and Hyundai Auto Canada Corporation when investigating defects and drafting materials related to those defects. It also works with KMA and KMC, as well as other Kia affiliated companies, when the components involved are also installed in Kia-branded vehicles.

**Defendant Hyundai Motor Company**

64.    Defendant Hyundai Motor Company is a corporation founded in

---

[1] *See, e.g.*, https://www.hyundainews.com/en-us/releases/2135 ("Hyundai Motor America named Kimberly Walker General Manager of the Western Region, effective March 1, 2016. In her new role, Walker will lead the day-to-day operations of more than 165 Hyundai dealerships across the 12 Western-most states in the United States.").

1967 under the laws of South Korea and headquartered in Seoul, South Korea.

65.    HMC designs, engineers, manufactures, tests, markets, supplies, sells, and distributes Hyundai-branded vehicles and parts for those vehicles worldwide, including the United States, as well as manufactures parts for Kia-branded vehicles. HMC also receives parts manufactured by KMC for use in Hyundai-branded vehicles.

66.    HMC is the parent corporation of HMA, as well as the United States based Hyundai facilities, including manufacturing in Alabama and the technical campus in Michigan. For all its United States subsidiaries, including HMA, HMC provides all the technical information for the purposes of manufacturing, servicing, and repairing the Class Vehicles

67.    Discovery will show the decision to found HMA in California and register it as a California corporation was made by HMC.

68.    HMC provides all technical information to HMA for use its in operations and works in conjunction with HMC to draft technical materials, including submissions to NHTSA, bulletins, technical service manuals, and recall information. HMC also works in conjunction and has final approval of all marketing materials produced by HMA as part of its work in monitoring and control the global Hyundai brand.

69.    Discovery will show that the relationship between HMA and HMC is governed by an agreement that gives HMC the right to control nearly every aspect of HMA's operations—including sales, marketing, management policies, technical information, servicing instructions, governance policies, pricing, and warranty terms.  Furthermore, HMC exercises control over the executives in charge of HMA, including appointing the President and CEO of HMA, José Muñoz. In addition to this role, Mr. Muñoz is also the Global Chief

1    Operating Office of HMC.[2]

2    **Defendant Kia Motors America, Inc.**

3        70.    Defendant Kia Motors America, Inc. d/b/a Kia America Inc. is a

4    corporation organized and in existence under the laws of the State of California

5    and registered to do business in the State of California. KMA is headquartered in

6    Irvine, California and is a wholly owned subsidiary of KMC.

7        71.    KMA is responsible for sales, marketing, service, distribution,

8    import and export of Kia branded products, including vehicles and parts, in the

9    United States. KMA is also the warrantor and distributor of Kia vehicles,

10   including the Class Vehicles, throughout the United States.

11       72.    In order to sell vehicles to the general public, KMA enters into

12   agreements with authorized dealerships who engage in retail sales with

13   consumers such as Plaintiffs. In return for the exclusive right to sell new Kia

14   branded vehicles, authorized dealerships are also permitted to service and repair

15   these vehicles under the warranties KMA provides directly to consumers who

16   purchased new vehicles from the authorized dealerships. All service and repair at

17   an authorized dealership is completed according to KMA instructions, issued

18   through service manuals, TSBs and other documents, written in conjunction with

19   KMC. Per the agreements between KMA and the authorized dealers, consumers

20   such as Plaintiffs are able to receive services under KMA's issued warranty at

21   dealer locations that are convenient to them. These agreements provide KMA

22   with a significant amount of control over the actions of the authorized

23   dealerships. As with HMA, KMA also employs region managers whose

24   responsibilities include managing the dealers within their region, including

25   marketing and customer satisfaction initiatives.

26

27   ───────────────
     [2] *See* https://www.hyundainews.com/en-us/bios/jose-munoz (last accessed November
28   10, 2022).

73.     Discovery will show that KMA also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional material relating to the Kia Class Vehicles.

74.     KMA is also KMC's designated liaison to fulfill its motor vehicles safety monitoring duties under federal law in the United States. As such, KMA communicates with NHTSA on KMC's behalf and holds itself out to be the manufacturer of Kia-branded vehicles in those communications such as safety reports and recalls. KMA is part of "Kia North America," working in conjunction with other KMC subsidiaries to monitor safety issues in Kia-branded products in North America. Kia North America includes manufacturing facilities in Georgia and Mexico, the Kia Design Center America in California, and various research and development facilities in the United States including the Kia Design Center in Irvine, California, which is a part of the Hyundai America Technical Center Incorporated. It also works with HMA and HMC, as well as other Hyundai affiliated companies, when the components involved are also installed in Hyundai-branded vehicles.

**Defendant Kia Motor Company**

75.     Defendant Kia Motor Company is a corporation founded in 1944 under the laws of South Korea and headquartered in Seoul, South Korea.

76.     KMC designs, engineers, manufactures, tests, markets, supplies, sells, and distributes Kia-branded vehicles and parts for those vehicles worldwide, including the United States. One of KMC's major suppliers for parts is HMC. In turn, KMC is also a major supplier to HMC of parts to be used Hyundai-branded vehicles.

77.     KMC is the parent corporation of KMA, as well as the United States based Kia facilities, including manufacturing in Georgia. For all its United States subsidiaries, including KMA, KMC provides all the technical information for the purposes of manufacturing, servicing, and repairing the Class Vehicles.

78.   Discovery will show that the decision to found KMA in California and register it as a California corporation was made by KMC.

79.   KMC provides all technical information to KMA for use its in operations and works in conjunction with KMC to draft technical materials, including submissions to NHTSA, bulletins, technical service manuals, and recall information. KMC also works in conjunction and has final approval of all marketing materials produced by KMA as part of its work in monitoring and control the global Kia brand.

80.   Discovery will show that the relationship between KMA and KMC is governed by an agreement that gives KMC the right to control nearly every aspect of KMA's operations—including sales, marketing, management policies, technical information, servicing instructions, governance policies, pricing, and warranty terms.

81.   Defendants, through their various entities, design, manufacture, market, distribute, service, repair, sell, and lease passenger vehicles, including the Class Vehicles, nationwide and in Minnesota and South Carolina.

82.   Defendants HMC and KMC worked together to develop, design, manufacture, test, and draft technical materials for the Class Vehicles and the Gamma engines. In fact, HMC and KMC are controlled by the same parent, Hyundai Motor Group, and the chairman of the board of both companies is Eui-sun Chung. HMC and KMC have joint research and development facilities, specifically in Korea, and consult with each other on all technical matters.

83.   Defendants worked together on the drafting and distribution of all advertising materials and technical bulletins regarding the Class Vehicles to authorized dealers, as well as in training Hyundai and Kia-dealer technicians in the correct procedures to maintain, service, and repair Hyundai and Kia vehicles.

84.   At all relevant times, Defendants were and are engaged in the business of designing, manufacturing, constructing, assembling, marketing,

1 distributing, and selling automobiles and motor vehicle components in
2 Minnesota, South Carolina, and throughout the United States of America.

3 **JURISDICTION**

4 85.   This is a class action.

5 86.   Members of the proposed Class number more than 100 and at least
6 one plaintiff and one defendant are citizens of different states.

7 87.   There are at least 100 members in the proposed class, and the
8 aggregate claims of individual Class Members exceed $5,000,000.00 in value,
9 exclusive of interest and costs.

10 88.   Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d).

11 89.   This Court has personal jurisdiction over Plaintiffs because
12 Plaintiffs submit to this Court's jurisdiction. This Court has personal jurisdiction
13 over Defendants because KMA and HMA are incorporated in this District; KMC
14 and HMC conduct substantial business in this District through KMA and HMA,
15 respectively; and discovery will show that significant conduct involving
16 Defendants giving rise to the Complaint took place in this District.

17 **VENUE**

18 90.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because
19 the conduct giving rise to this lawsuit occurred here, KMA and HMA are
20 deemed to reside in this district pursuant to 28 U.S.C. § 1391(a), and KMA and
21 HMA are incorporated here, and Defendants are subject to personal jurisdiction
22 here by conducting business within the State of California.

23 **FACTUAL ALLEGATIONS**

24 91.   Defendants designed, manufactured, distributed, marketed, sold,
25 and/or leased the Class Vehicles. Defendants sold, directly or indirectly, through
26 dealers and other retail outlets, thousands of Class Vehicles in California and
27 nationwide. Defendants warrant and service the Class Vehicles through their
28 nationwide network of authorized dealers and service providers.

92.     Defendants provided all purchasers or lessees of the Class Vehicles with a New Vehicle Limited Warranty ("NVLW"). The terms of these warranties are non-negotiable and Defendants exercise sole authority in determining whether and to what extent a particular repair is covered under the warranties they offers.

93.     The NVLW provided by KMA includes basic warranty coverage and Power Train coverage, stated in relevant part:

**Basic Warranty Coverage**

Except as limited or excluded below, all components of your new Kia Vehicle are covered for 60 months/60,000 miles from the Date of First Service, whichever comes first (Basic Limited Warranty Coverage). This Warranty does not cover wear and maintenance items, or those items excluded elsewhere in the Manual.

**Power Train Coverage**

For Original Owners (defined below), the Power Train Limited Warranty begins upon expiration of the 60 month/60,000 mile Basic Limited Warranty Coverage, and will continue to cover the following components up to 120 months or 100,000 miles from the Date of First Service, whichever comes first. It does not cover normal wear and tear, maintenance, or those items excluded elsewhere in this manual.

**To Get Warranty Service**

You must take your Kia Vehicle, along with this manual, to an Authorized Kia Dealer in the United States during its normal service hours. While any Authorized Kia Dealer will perform warranty service, Kia recommends that when possible you return to the dealership where you purchased your Kia Vehicle in order to ensure continuity in service and maintenance.

**Other Terms**

The warranty coverage is "applicable to Kia Vehicles registered and normally operated in the United States."[3]

94.     KMA further warrants that "it will arrange for an Authorized Kia dealer at locations of its choice to provide for the repair of your vehicle if it fails to function properly during normal use. Authorized service facilities will remedy such failures to function properly at Kia's expense..."[4]

95.     HMA provides a similar NVLW for the Class Vehicles, which states in relevant part:

**WHAT IS COVERED**

Repair or replacement of any component originally manufactured or installed by Hyundai Motor Company, Hyundai Motor Group, Hyundai Motor Manufacturing Alabama (HMMA), Kia Manufacturing Mexico (KMM), Kia Motors Manufacturing Georgia (KMMG) or Hyundai Motor America (HMA) that is found to be defective in material or workmanship under normal use and maintenance, expect any item specifically referred to in the section "What is not Covered."  Towing expense to the nearest Hyundai Dealership or Authorized Service Facility is covered when the vehicle is inoperable due to a warrantable defect. Repairs will be made using new Hyundai Genuine Parts or Hyundai authorized remanufactured parts.

**WARRANTY PERIOD**

The warranty period is limited to 5 years from the date or original retail delivery or date of first use, or 60,000 miles, whichever occurs first.

**OBTAINING WARRANTY SERVICE**

---

[3] *Id.*

[4] *Id.*

Warranty service will be provided by an authorized Hyundai Dealership without charge for parts or labor. This warranty will not apply to warranty service performed by those other than an authorized Hyundai Dealership.[5]

96.     Headlights are important and necessary safety equipment on all motor vehicles. "Vehicle headlamps primarily satisfy two safety needs: Visibility and glare prevention. Headlamps illuminate the area ahead of the vehicle and provide forward visibility. . . . Visibility and glare are both related to motor vehicle safety. . . . Visibility has an obvious, intuitive relation to safety: The better drivers can see the road, the better they can react to road conditions and obstacles to avoid crashes. . . . [e]vidence suggests that diminished visibility likely increases the risk of crashes, particularly crashes at higher speeds involving pedestrians, animals, trains, and parked cars."[6]

97.     In 2019, Kia released its all-new flagship SUV, the 2020 Kia Telluride, while touting its capabilities and safety: "Telluride is engineered to be capable in a variety of driving conditions and provide a driving experience that is enjoyable and confidence-inspiring."[7] All Kia Telluride models LS, X, and EX, through present, come standardly quipped with halogen headlights. Kia Telluride LX models come standardly equipped with LED headlights. For reference, Figure 1 shows the Kia Telluride's headlight assembly.

---

[5]
https://www.hyundaiusa.com/content/dam/hyundai/us/com/pdf/assurance/2020_Owners_Handbook_Warranty_r2.pdf

[6] Federal Register. "Federal Motor Vehicle Safety Standards; Lamps, Reflective Devices, and Associated Equipment, Adaptive Driving Beam Headlamps" February 2, 2022, available at: https://www.federalregister.gov/documents/2022/02/22/2022-02451/federal-motor-vehicle-safety-standards-lamps-reflective-devices-and-associated-equipment-adaptive#citation-3-p9918 (last accessed November 11, 2022).

[7] "All-New 2020 Kia Telluride Offers Rugged Luxury," January 4, 2019, available at: https://www.kiamedia.com/us/en/media/pressreleases/14874/all-new-2020-kia-telluride-offers-rugged-luxury (last accessed November 11, 2022).

| Part Code | Part Description |
|-----------|------------------|
| 92102A | Lamp Assy-Head, RH |
| 92197A | Bracket-H/Lamp MTG Supt, LH |
| 92198 | Bracket-H/Lamp MTG Supt, RH |
| 92197B | Bracket-H/Lamp MTG Supt, LH |
| 98681D | Tube-Rubber |
| 92101A | Lamp Assy-Head, LH |
| 92125C | Moisture Absorbent |
| 18643D | Bulb |
| 92190G | L.E.D Driver Module-Headlamp |
| 1125GA | Bolt(W/Washer) |
| 92198D | Bracket-H/Lamp MTG Supt, RH |

**Fig. 1. Kia Telluride Headlight Assembly**

98.    Also in 2019, Hyundai released its all-new flagship SUV, the 2020 Hyundai Palisade, while touting its capabilities and safety: "All-New 2020 Hyundai Palisade Flagship SUV Brings Exceptional Comfort, Technology and Safety in a Bold Midsize SUV."[8]  As with Kia, all Hyundai Palisade models SE and SEL, through present, come standardly equipped with halogen headlights. Hyundai Palisade Limited models come standardly equipped with LED headlights. For reference, Figure 2 shows the Hyundai Palisade's headlight assembly.

---

[8] "All-New 2020 Hyundai Palisade Mid-size SUV Makes its Global Debut at the 2018 Los Angeles Auto Show," November 28, 2018, available at https://www.hyundainews.com/en-us/releases/2658 (last accessed November 14, 2022).



| Part Code | Part Description |
|-----------|------------------|
| 92102A | Lamp Assy-Head, RH |
| 92170J | Bracket-Head Lamp LH |
| 92131 | Bracket Assy-Head Lamp Mtg, LH |
| 92128C | Cartridge-Moisture Absorbent |
| 92191D | Clip-Head Lamp Mtg |
| 92125B | Moisture Absorbent |
| 92208 | Lamp Assy-Day Running Light, RH |
| 92207 | Lamp Assy-Day Running Light, LH |
| 1125GA | Bolt(W/Washer) |
| 92198 | Bracket-H/Lamp Mtg Suport, RH |
| 92197A | Bracket-H/Lamp Mtg Suport, LH |

**Fig. 2. Hyundai Palisade Headlight Assembly**

99.    All headlights and headlight assemblies are expected to absorb some moisture and still operate safely. However, discovery will show that the Headlights installed in the Class Vehicles have insufficient sealing and improper wiring, causing the Headlight Assemblies, including the high beams, low beams, daytime running lights (DRL), and fog lamps (FL), to absorb too much moisture and begin to dim, become improperly aimed, and ultimately and often suddenly, fail.

100.    The Class Vehicles Headlights are defective because they are designed, manufactured, and/or installed in a manner that does not seal out moisture and humidity to a sufficient degree, which causes the Headlight assemblies' internal components, including the wiring and wiring connections, to fail, thereby causing a drastic reduction in light output, an unintentional change to aim calibration, and an inability to operate or function at all. Figure 3 shows a Class Vehicle headlight with improper water moisture and humidity intrusion that will require replacement.



**Fig. 3. Class Vehicle Headlight Assembly with Improper Moisture Intrusion**

101.   The wiring and wiring connections are housed inside the headlight assembly and are vulnerable to improper moisture and humidity intrusion, which can cause the wiring and wiring connections to quickly degrade, thereby causing the Headlights, including the low beams, to not operate. For reference, Figures 4.1 through 4.3 show the location of the wiring and connections inside the headlight assembly of the Class Vehicles.



F**ig. 4.1. Class Vehicle Headlight Assembly**

1
2
3
4
5
6
7
8
9
10



**Fig. 4.2. Inside of Headlight Assembly with Circular Seal in Upper Right Corner**

11
12
13
14
15
16
17
18
19
20
21
22

**Fig. 4.3. Wiring and Headlight Connections Inside Circular Seal within Headlight Assembly**

23
24
25
26
27
28

102.   The aim of the Class Vehicle's Headlights is also controlled by internal components of the Headlight assembly. Discovery will show that the aiming components are also degraded by abnormal moisture and humidity intrusion, causing the Headlights' output to be mis-aimed and mis-directed, resulting in a failure to illuminate in front of the vehicle. For reference, Figure 5

shows the low beam and high beam aim adjusters' location inside the Class Vehicles' headlight assembly.



**Fig. 5. Low and High-Beam Aim Adjusters Inside Class Vehicle Headlight Assembly**

103. Discovery will show that all Class Vehicles' Headlights and Headlight Assemblies are designed, manufactured, and installed by Defendants in substantially the same manner.

104. Discovery will confirm that the Headlight Defect in all Class Vehicles is caused by improperly designed, manufactured, and/or installed headlight assemblies in the Class Vehicles.

105. The Headlight Defect alleged is inherent in, and the same for, all Class Vehicles.

106. Discovery will show that Defendants was aware of material facts regarding the Headlight Defect, particular as a result of pre-production testing, manufacturing quality control audits, and the early post-sale complaints by consumers who purchased the Class Vehicles and experienced the Defect. Despite this knowledge, Defendants failed to disclose the Defect and its associated safety risk to consumers. As a result of this failure, Plaintiffs and Class Members have been damaged.

**The Headlight Defect Poses an Unreasonable Safety Hazard**

107.   The Headlight Defect poses an unreasonable safety hazard. The Defect causes drivers to have low or no visibility in the front of their Class Vehicles, which in turn increases the likelihood of collision with pedestrians, animals, inanimate objects, and road hazards.[9] For this reason, functioning headlights are required safety devices in all passenger automobiles. *See* 49 CFR § 238.443 (2018).

108.   Federal law requires automakers like Defendants to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See TREAD Act,* Pub. L. No. 106-414, 114 Stat.1800 (2000).

109.   Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.* Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including those which are safety related. *Id.* Discovery will show that HMA and KMA are the agents of HMC and KMC respectively for the purpose of monitoring the NHTSA complaint database and for communication with NHTSA regarding safety defects, as manufacturers are required to do by federal law. Thus, Defendants knew or should have known of the many complaints about the Headlight Defect logged by NHTSA Office of Defects Investigation (ODI). The content, consistency, and disproportionate

---

[9] *See* Federal Register. "Federal Motor Vehicle Safety Standards; Lamps, Reflective Devices, and Associated Equipment, Adaptive Driving Beam Headlamps" February 2, 2022, available at: https://www.federalregister.gov/documents/2022/02/22/2022-02451/federal-motor-vehicle-safety-standards-lamps-reflective-devices-and-associated-equipment-adaptive#citation-3-p9918 (last accessed November 11, 2022).

number of those complaints alerted, or should have alerted, Defendants to the Headlight Defect.

110.   With respect solely to the Class Vehicles, the following are but a few examples of the many complaints concerning the Headlight Defect which are available through NHTSA's website, www.safercar.gov. Many of the complaints reveal that Defendants, through their network of dealers and repair technicians, have been made aware of the Headlight Defect. In addition, the complaints indicate that despite having knowledge of the Headlight Defect and even armed with knowledge of the exact vehicles affected, Defendants often refused to diagnose the defect or otherwise attempt to repair it while Class Vehicles were still under warranty.

**2020 Kia Telluride**

a.  **DATE OF INCIDENT:** September 14, 2019
**DATE COMPLAINT FILED:** September 16, 2019
**NHTSA/ODI ID:** 11255716
**SUMMARY:** THE HEADLIGHTS AT NIGHT ARE POOR. THEY DO NOT ILLUMINATE TRAFFIC SIGNS SUCH AS: SPEED LIMIT, STOP, STREET/HIGHWAY INFO, YIELD, WARNING, ETC. WHEN YOU APPROACH A THE UPSIDE OF A HILL, VISIBILITY IS LIMITED TO 30-50 FEET. SIDE VISION WHEN TURNING IS NON-EXISTENT. THIS OCCURS AT NIGHT WHEN IN MOTION AND STOPPED.

b.  **DATE OF INCIDENT:** November 10, 2019
**DATE COMPLAINT FILED:** November 14, 2019
**NHTSA/ODI ID:** 11280024
**SUMMARY:** THE TELLURIDE EX HAS AN ISSUE WITH IT'S HEADLIGHTS, ESPECIALLY IN A DIMLY LIT AREA. WHEN THE HEADLIGHTS ARE IN NORMAL MODE (NOT HIGH BEAM) ON A STREET THAT DOES NOT HAVE STREETLIGHTS (NO AMBIENT LIGHTS) OR YOU ARE GOING AROUND A TURN, OR YOU ARE GOING SLIGHTLY UPHILL, THERE IS VERY LITTLE VISIBILITY ON THE ROAD. YOU CAN SEE A DISTINCT CUT OFF OF THE HEAD LIGHT AND YOU CANNOT SEE BEYOND IT. THIS MAKES IT VERY

VERY DIFFICULT TO DRIVE IN A LOW LIGHT ENVIRONMENT. IF I AM ON A HIGHWAY OR A WELL LIT ROAD, THERE IS NO ISSUE. MY OTHER CAR 2010 AUDI A4 DOES NOT HAVE THIS ISSUE AND THE HEADLIGHTS ILLUMINATE THE ROAD ADEQUATELY IN ANY CONDITION

c. **DATE OF INCIDENT:** November 19, 2019
**DATE COMPLAINT FILED:**    November 20, 2019
**NHTSA/ODI ID:**    11281250
**SUMMARY:** HALOGEN HEADLAMPS ON THE EX MODEL DO A POOR JOB OF ILLUMINATING THE ROAD AHEAD WHEN IN LOW BEAM MODE. I CAN HARDLY SEE A FEW FEET. I ALSO DRIVE A LEXUS WHOSE HEADLAMPS DO A FANTASTIC JOB OF ILLUMINATION IN LOW BEAM. I AM HAVING TO PERIODICALLY ALTERNATE BETWEEN HIGH BEAM AND LOW BEAM MODES (TO AVOID BLINDING OPPOSITE TRAFFIC) WHEN DRIVING THE TELLURIDE ON UNLIT ROADS OR POORLY LIT ROADS. WHY DIDN'T KIA PROVIDE LED HEADLIGHTS FOR ALL TRIM LEVELS? THIS IS A SERIOUS SAFETY ISSUE.

d. **DATE OF INCIDENT:** August 3, 2019
**DATE COMPLAINT FILED:** November 21, 2019
**NHTSA/ODI ID:** 11281548
**SUMMARY:** THIS IS A NEW VEHICLE, PURCHASED 8/2019. IT IS MY BELIEF THAT THE HEADLIGHTS (BOTH HIGH AND LOW BEAM), AS EQUIPPED, ARE DANGEROUSLY DEFICIENT AND DO NOT PROVIDE NEARLY ADEQUATE ILLUMINATION. I AM HESITANT TO DRIVE THE VEHICLE AT NIGHT. I CONSIDER THIS HAZARDOUS AND WORTHY OF CORRECTION BY THE MANUFACTURER. KIA TELLURIDE EX AWD.

e. **DATE OF INCIDENT:** October 1, 2019
**DATE COMPLAINT FILED:** December 29, 2019
**NHTSA/ODI ID:** 11291891
**SUMMARY:** I HAVE A 2020 TELLURIDE AND THE HEADLIGHTS PROVIDE SO LITTLE LIGHT THAT IT'S DANGEROUS TO DRIVE AT NIGHT. THE NORMAL BEAMS ARE SO DIFFUSE THEY PROVIDE INSUFFICIENT LIGHT FORWARD TO SEE THE ROAD CLEARLY AND PROVIDE NO

LIGHT TO THE SIDES, SO YOU CAN'T SEE WHAT YOU ARE TURNING INTO WHEN YOU TURN. I CALLED KIA AND TWO LOCAL KIA DEALERS; THEY ARE AWARE OF THE PROBLEM BUT SAY THEY HAVE NO WAY TO FIX IT. GOOD HEADLIGHTS ARE FUNDAMENTAL AND, REALLY, AFTER 100 YEARS OF CARS WITH HEADLIGHTS, YOU'D THINK THEY COULD GET THIS RIGHT. PLEASE FORCE KIA TO RECALL THE CARS AND FIX THE HEADLIGHTS AS SOON AS POSSIBLE. THANK YOU. SANDRA THANK YOU. SANDRA

f.  **DATE OF INCIDENT:** November 26, 2019
**DATE COMPLAINT FILED:** January 24, 2020
**NHTSA/ODI ID:** 11301584
**SUMMARY:** THIS IS AN ONGOING ISSUE. THE HEADLIGHTS ON MY EX MODEL ARE SERIOUSLY DEFICIENT AND DANGEROUS, ESPECIALLY DURING DRIVING IN LOW LIGHT AREA DURING TURNS. AT MY OWN EXPENSE I'VE PURCHASED LED BULBS, WHICH HAVE IMPROVED VISIBILITY AHEAD OF ME, INCLUDING BEING, NOW, ABLE TO SEE THE SIDES OF THE ROAD, HOWEVER, VISIBILITY DURING TURNS IS NON-EXISTENT. AFTER 30 + YEARS OF DRIVING I HAVE NEVER BEEN SO UNCOMFORTABLE DRIVING AT NIGHT.

g.  **DATE OF INCIDENT:** January 26, 2020
**DATE COMPLAINT FILED:** January 27, 2020
**NHTSA/ODI ID:** 11302348
**SUMMARY:** THE HEADLIGHTS ON THIS CAR ARE DANGEROUS AT NIGHT ON STREETS WITH NO LIGHTING AND ESPECIALLY DANGEROUS WHEN ITS RAINING. THE LIGHTS DO NO ILLUMINATE SPEED LIMIT SIGNS, STOP SIGNS, CAUTION SIGNS, YIELD SIGNS ETC. THEY DO NOT ILLUMINATE OVERHEAD INTERSTATE SIGNS. I HAVE TAKEN THE CAR TO THE DEALER AND THEY SAID THE LIGHTS ARE WORKING AS DESIGNED. THE INSURANCE INSTITUTE FOR HIGHWAY SAFETY ALSO GIVES A POOR RATING TO THESE LIGHTS. SOMETHING NEEDS TO BE DONE BEFORE SOMEONE GETS KILLED.

h.  **DATE OF INCIDENT:** January 24, 2020
**DATE COMPLAINT FILED:** January 27, 2020

**NHTSA/ODI ID:** 11302241
**SUMMARY:** HEADLIGHTS ON LX TRIM ARE EXTREMELY DIM. INSUFFICIENT FOR NIGHT DRIVING, CURVY/HILLY ROADS, RAINY CONDITIONS. LANE MARKERS ARE NEARLY IMPOSSIBLE TO SEE.

i.   **DATE OF INCIDENT:** January 10, 2020
**DATE COMPLAINT FILED:** February 5, 2020
**NHTSA/ODI ID:** 11307230
**SUMMARY:** HALOGEN BULBS IN HEADLIGHTS ON S TRIM ARE SUBOPTIMAL FOR ROADWAY ILLUMINATION DURING NIGHTTIME DRIVING REGARDLESS OF TERRAIN, ENVIRONMENT, OR DIRECRION. UPGRADE TO LED BULBS SHOULD RESULT IN IMPROVED VISIBILITY.

j.   **DATE OF INCIDENT:** April 26, 2019
**DATE COMPLAINT FILED:** February 4, 2020
**NHTSA/ODI ID:** 11306967
**SUMMARY:** THE HEADLIGHTS ON THIS CAR ARE DANGEROUS AT NIGHT AND ARE ESPECIALLY DANGEROUS WHEN IT'S RAINING. THE LIGHTS DO NO ILLUMINATE SPEED LIMIT SIGNS, STOP SIGNS, CAUTION SIGNS, YIELD SIGNS ETC... THE HEADLIGHTS DO NOT ILLUMINATE FAR ENOUGH AHEAD ON THE ROADS. IF YOUR GOING UP OR DOWN A HILL TO SEE A SAFE DRIVING DISTANCE AHEAD.

k.   **DATE OF INCIDENT:** November 30, 2019
**DATE COMPLAINT FILED:** February 4, 2020
**NHTSA/ODI ID:** 11306971
**SUMMARY:** THE HEADLIGHTS ON MY EX MODEL ARE SERIOUSLY DEFICIENT AND DANGEROUS, ESPECIALLY DURING DRIVING IN LOW LIGHT AREA DURING TURNS. AT MY OWN EXPENSE I'VE PURCHASED LED BULBS, WHICH HAVE IMPROVED VISIBILITY AHEAD OF ME. HOWEVER, THE LIGHT IS BLOCKED BY THE PROJECTOR TYPE HOUSING FROM ILLUMINATING THE LEFT AND RIGHT SIDES OF THE FRONT OF THE VEHICLE. VISIBILITY DURING TURNS IS NON-EXISTENT. THIS NEEDS TO BE ADDRESSED ASAP.

l.   **DATE OF INCIDENT:** February 3, 2020

**DATE COMPLAINT FILED:** February 4, 2020
**NHTSA/ODI ID:** 11307078
**SUMMARY:** EXTERIOR LIGHTING (HEADLIGHTS) IS TERRIBLE ON MY EX MODEL. STANDARD OE HEADLIGHTS ARE FAR TOO INADEQUATE FOR SAFE DRIVING AT NIGHT. SIDE CUTOFF OF THE HEADLIGHTS MAKES READING STREET SIGNS DIFFICULT WHEN THERE IS NO SUPPLEMENTAL LIGHT OUTSIDE OF THE CAR HEADLIGHTS. THESE HEADLIGHTS SHOULD BE LED (IT?S 2020 FOR [XXX] SAKE) AND NOT SO CONCENTRATED LIKE A SPOT LIGHT. INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6). *TR.

m. **DATE OF INCIDENT:** February 2, 2020
**DATE COMPLAINT FILED:** February 2, 2020
**NHTSA/ODI ID:** 11306611
**SUMMARY:** WHEN DRIVING AT NIGHT IN THE EX TRIM, THE HALOGEN LIGHTBULBS ARE INEFFECTIVE FOR LIGHTING THE ROADWAY AHEAD. OUTSIDE OF CITY DRIVING WHERE OUTSIDE LIGHTING IS MINIMAL, IT IS NEARLY IMPOSSIBLE TO SEE A SAFE DISTANCE AHEAD OF THE VEHICLE. IN ADDITION, BECAUSE OF THE CUTOFF DESIGN OF THE PROJECTOR HOUSING, STREET SIGNS SUCH AS STOP SIGNS AND SPEED LIMIT SIGNS ARE BARELY ILLUMINATED AT ALL.

n. **DATE OF INCIDENT:** May 14, 2020
**DATE COMPLAINT FILED:** May 19, 2020
**NHTSA/ODI ID:** 11325091
**SUMMARY:** THE HEADLIGHTS IN THE KIA TELLURIDE ARE SIGNIFICANTLY DEFICIENT IN ILLUMINATING THE FRONT CORNERS OF THE VEHICLE DURING TURNS IN LOW OR NON-LIT AREAS. DRIVING IN MY NEIGHBORHOOD AND ON THE ROADS THAT GET ME THERE FEELS EXTREMELY DANGEROUS WHILE DRIVING AT NIGHT. VISIBILITY WHEN TURNING CORNERS IS DANGEROUSLY LOW. THIS SCARES ME NOT ONLY AS A TELLURIDE OWNER BUT AS A PEDESTRIAN AND A PARENT WITH TWO SMALL CHILDREN. AS THE TELLURIDE'S POPULARITY CONTINUES TO GROW SO DOES THE SAFETY HAZARD THESE POORLY DESIGNED HEADLIGHTS POSE. CORRECTIVE ACTION TO

ADEQUATELY AND SAFELY ILLUMINATE THE ROAD WHILE MAKING TURNS IS ESSENTIAL AND NEEDS TO BE ADDRESSED IMMEDIATELY. PLEASE DO THE RESPONSIBLE THING AND PROTECT FAMILIES AND COMMUNITIES BY RECALLING THE TELLURIDE AND MAKE A SIMPLE DESIGN CHANGE THAT WOULD NOT ONLY IMPROVE OWNER SATISFACTION, BUT ALSO PROTECT A POTENTIALLY UNSEEN PEDESTRIAN, JOGGER, BICYCLIST OR PET. A VEHICLE'S SAFETY SHOULD BE PARAMOUNT BOTH DAY AND NIGHT. IF NOTHING ELSE, PLEASE PROVIDE THE OPTION FOR TELLURIDE OWNERS TO WIDEN THE HEADLIGHT BEAM AT OUR OWN EXPENSE SO WE CAN CHOOSE TO PROTECT OURSELVES AND OUR NEIGHBORS BY PAYING FOR IT OUT-OF-POCKET. *TR.

o.  **DATE OF INCIDENT:** March 1, 2020
**DATE COMPLAINT FILED:** March 3, 2020
**NHTSA/ODI ID:** 11315912
**SUMMARY:** NIGHT DRIVING IS HORRIBLE ON THE EX TRIM WHERE VISIBILITY ON EITHER SIDE IS DANGEROUS. I ALMOST HIT A PEDESTRIAN BECAUSE THE VISIBILITY IS SO POOR. THIS NEEDS TO BE ADDRESSED. PLEASE DON'T WAIT FOR SOMEONE TO BE FATALLY INJURED. THIS IS UNACCEPTABLE!

p.  **DATE OF INCIDENT:** February 29, 2020
**DATE COMPLAINT FILED:** March 2, 2020
**NHTSA/ODI ID:** 11315718
**SUMMARY:** LIGHTING FAILS TO ILLUMINATE TO THE SIDES OF THE VEHICLE ON THE EX TRIM SO THAT THERE ARE SPOTS OF NO LIGHTING. THIS IS EXTREMELY DANGEROUS WHEN DRIVING AT NIGHT AND PARTICULARLY WHEN TURNING CORNERS. THIS SHOULD BE REMEDIED AND A RECALL ISSUED TO CORRECT THE CONCERN AS IT IS A SERIOUS SAFETY HAZARD.

q.  **DATE OF INCIDENT:** March 1, 2020
**DATE COMPLAINT FILED:** February 26, 2020
**NHTSA/ODI ID:** 11311596
**SUMMARY:** BLIND SPOT COLLISION WARNING SYSTEM IS MALFUNCTIONS WHENEVER IT RAINS. VEHICLE HAS 3000 MILES ON IT AND FOR THE 5TH TIME IN 2 MONTHS THE

BLIND SPOT SYSTEM ALARM SYSTEM GOES OFF WHILE DRIVING IN THE RAIN. DEALERSHIPS REFUSING TO LOOK AT THE PROBLEM UNLESS THE ENGINE LIGHT IS ON, WHICH IT TURNS OFF ONCE THE SENSORS DRY OFF LOW BEAM LIGHTS ARE TOO BRIGHT... POLICE HAVE STOPPED ME TWICE THINKING THEY ARE HIGH BEAMS.. ALSO ONCOMING TRAFFIC CONTINUES TO BLAST THERE HIGH BEAMS AT OUR VEHICLE THINKING OUR HIGH BEAMS ARE ON CAUSING A DANGEROUS DRIVING SITUATION.. LOCAL DEALERSHIPS REFUSE TO FIX WARRANTY PROBLEMS BECAUSE CAR WAS NOT PURCHSAED FROM THEM

r.  **DATE OF INCIDENT:** February 15, 2020
**DATE COMPLAINT FILED:** February 17, 2020
**NHTSA/ODI ID:** 11309673
**SUMMARY:** THE HEADLIGHTS HAVE BLIND SPOTS ON THE SIDES. WHEN GOING AROUND CURVES YOU LOOSE THE SIDE OF THE ROAD. NO VISIBILITY AT ALL AT NIGHT. THIS IS VERY DANGEROUS. I HAVE TALKED TO COMPANYS THAT INSTALLS HEADLIGHTS AND OTHER MECHANICAL PARTS TO VEHICLES AND WAS TOLD THAT ADDING FOG LIGHTS WILL NOT HELP BECAUSE THE HEADLIGHTS ARE ONLY PROJECTING FORWARD LIGHTS. WAS TOLD THAT ADDING FOG LIGHTS WOULD ONLY PROJECT FORWARD ALSO BECAUSE OF THE WAY THEY WOULD HAVE TO SET. THIS NEEDS TO BE CORRECTED!!!

**2021 Kia Telluride**

s.  **DATE OF INCIDENT:** January 3, 2022
**DATE COMPLAINT FILED:** January 11, 2022
**NHTSA/ODI ID:** 11447121
**SUMMARY:** Optional LED headlight buckets fog up and will not dry out. Kia has a service bulletin out regarding this issue, it was performed and the situation has not improved. Recently, in minus 20-30 degree F weather, the condensation inside the housing frosted up the entire inside of the housing. The LED headlights do not generate enough heat to adequately melt the frost creating decreased headlight performance. The vehicle has been into the dealer multiple times and the service bulletin was performed once and the desiccant packs were replaced the second time. The frost issue occurred after

both had been done. Kia states that this is normal operation for their LED headlight bucket and the dealership, claiming to be under orders from Kia will not dedicate any more time to the investigation of my issue.

t.  **DATE OF INCIDENT:** December 8, 2020
**DATE COMPLAINT FILED:** December 8, 2021
**NHTSA/ODI ID:** 11443178
**SUMMARY:** Kia has been on notice of the Telluride's deficient headlights with the ES model since at least 2019 and have done nothing. The highest end model has LED lights so Kia is more than capable of fixing this problem. I know that dozens of consumers like myself have filed complaints with the NHTSA and other organizations and nothing has been done. I have called Kia headquarters at least 3 times to complain. The headlights do not provide enough light to safely drive at night. I'm not an engineer (I'm a lawyer) but I know that the design is faulty. Now that it's wintertime and dark at 5:00, I am unable to drive the car at night for fear of killing myself, my family, a pedestrian, or pet. Why hasn't NHTSA done anything to investigate these numerous complaints? Why have years gone on with resolution or recall? Is Kia (or the NHSTA) waiting for someone to actually die before they do something? (It seems so based on the below questions). I guess it's not enough that consumers like myself can't use our cars at night. I CAN'T BE ANY CLEARER: SOMEONE IS GOING TO GET KILLED. YOU ARE ON NOTICE. Please let me know the results of your investigation into this matter because this has gone on long enough. Conduct an investigation and get to the bottom on this please.

u.  **DATE OF INCIDENT:** July 1, 2021
**DATE COMPLAINT FILED:** July 20, 2021
**NHTSA/ODI ID:** 11425646
**SUMMARY:** This car is very dangerous to drive at night particularly when making turns. There is a total blackout when turning on darker roads. Obviously test drives are done during the day so you wouldn't notice this problem. After reviewing a Telluride Forum this was apparently a problem on the 2020 vehicles that has not been addressed by Kia. Some members of forum have suggested switching front headlights out to LED but that is not a good option as I live in an area where visibility can be made worse with LED when snowing. Had I been aware of this problem never would have

First Amended Class Action Complaint

purchased this car. Very scary to drive at night.

v.  **DATE OF INCIDENT:** October 15, 2020
**DATE COMPLAINT FILED:** November 19, 2020
**NHTSA/ODI ID:** 11315912
**SUMMARY:** I RECENTLY DROVE MY NEW 2021 TELLURIDE SX TO MY CABIN IN GA. AND FOUND A MAJOR ISSUE WITH THE HEADLIGHTS WHILE DRIVING THROUGH THE BACKWOODS. THE VISIBILITY USING THE LED HEADLIGHTS AND HIGH BEAMS ARE TERRIBLE AND POSE A DANGER. IF YOU ARE DRIVING DOWNHILL AND THE ROAD GOES UP OR TURNS YOU HAVE ZERO VISIBILITY, IT ACTUALLY CREATES A LINE AS IN MY PICTURE. I BROUGHT IT INTO MY KIA DEALER AND THEY SAID CORPORATE IS AWARE OF IT BUT THERE IS NO FIX AS OF YET SO THEY ADJUSTED THEM AS BEST THEY COULD. THIS IS EXTREMELY DANGEROUS AND PEOPLE WILL DIE IF THEY DO NOT GET A A FIX FOR THIS ISSUE.

**2022 Kia Telluride**

w. **DATE OF INCIDENT:** May 20, 2022
**DATE COMPLAINT FILED:** November 2, 2022
**NHTSA/ODI ID:** 11491918
**SUMMARY:** Headlights are NOT bright enough for night driving.

**2021 Hyundai Palisade**

x.  **DATE OF INCIDENT:** July 13, 2020
**DATE COMPLAINT FILED:** August 2, 2022
**NHTSA/ODI ID:** 11477157
**SUMMARY:** Head lights -When driving in mountains (curves and going up and down hills) at night the head lights produced a shadow effect, which gave the impression it was on the windshield sight line. This shadow effect varied from 1/3 to 2/3 of the windshield which caused a distorted view of the road ahead. There were 4 adults in the car and all agreed that it was making the road dangerous to drive on. We had to slow down well below the actual speed limit which would cause cars coming around a curve behind us to quickly slow down or run into us. - Took car to Bronco Motors in Boise Id and explained the headlight issue they told us that one other person had come in complaining about this same issue. Their mechanic told us that there

is no way to adjust the headlights. -No warnings

y.  **DATE OF INCIDENT:** December 22, 2021
**DATE COMPLAINT FILED:** March 2, 2021
**NHTSA/ODI ID:** 11444720
**SUMMARY:** The low beam headlights are too bright causing vehicles in the opposite direction to flash their high beams thinking that my high beams are on. This is a safety factor as I am often blinded by other drivers who flash their high beams and in many cases keep their high beams on. I've visited Palisade chat rooms and have found that other drivers have the same complaint. I have contacted Hyundai headquarters and reported the problem and have taken it to dealers three times to have the low beams lowered. I have been told that the low beam adjustment is correct and nothing can be done to fix my problem. I believe this low beam problem is a design defect and should be corrected. My vehicle is available for examination if necessary.

### Customer Complaints on Third-Party Websites

111.  Similarly, complaints posted by consumers in internet forums demonstrate that the defect is widespread and dangerous and that it can manifest without warning and/or suitable repair. The complaints also indicate Defendants' awareness of the problems with the Headlight and how potentially dangerous the defect is for consumers, not only to the extent such complaints reference contact with authorized dealerships and Defendants themselves, but also because HMA and KMA employ staff to monitor the perception of the brand. The following are a sample of consumer complaints (spelling and grammar mistakes remain as found in the original):

112.  On tellurideforum.org, a consumer of a 2021 Kia Telluride posted the following:

> I have had my Telluride S 2021 since August and I am very frustrated with the headlights at night. #1 I don't think the main headlights beam high enough. When I go up a hill I must have my brights on to adequately see in front of me. #2 I

noticed a complete blind spot when turning...At night if someone walked in front of my car while I am turning I could never see them. This is quite scary to me. Thought perhaps it is because I am short but now I am reading that this is a common complaint with this car. Now I read that the "fog lights" can help illuminate the car when turning. Of course now I found out I don't have fog lights in this car style. I hate to say this but if I had any inkling of this problem would never have bought this car. It is very dangerous.

113.   On tellurideforum.org.com, a consumer of a 2020 Kia Telluride posted the following:

Hi. My telluride is less than a year old. I noticed the other night that when I switch to high beams nothing changes. Low beams work like they always have. Are they separate bulbs? Is this a warranty issue? How hard is it to upgrade the lights. The original sucks. It's a LX if that matters.

114.   On tellurideforum.org.com, a consumer of a 2020 Kia Telluride posted the following:

We just got a Telluride EX a couple of weeks ago. We hadn't driven it at night on dark roads until last night. It was dangerous in our opinion. The light had a definite line that almost appeared like a dark screen on the windshield. Upon stopping and looking at the headlamps, I discovered that there is some kind of black deflector on the bottom and top of the headlamp bulb. This creates a "border" at the top of the light being shone on the road and surroundings. Normal headlamps allow some light to shine above this artificial border. I find this current lighting dangerous.

115.   On tellurideforum.org.com, a consumer of a 2020 Kia Telluride consumer posted the following:

> High beam headlights on Kia Telluride stopped working, plus when on low beam light projection is only about 20 yards. Safety issue. Suggest contacting NHSTA for this issue. Kia dealership cannot schedule appointment for a month.

116.   On carproblemzoo.com, a 2020 Kia Telluride consumer posted the following:

> High beams will not function. Replaced light bulbs. Did not fix the problm. Replaced relay and fuse. Did not fix the problem. Took to dealer. Service tech appeared to be befuddled. His only suggestion was to replace both headlight assemblies at a cost of over $2000. 00 or just wait until kia announced a recall as he could not determine exact cause of problem.

117.   On carproblemzoo.com, another consumer posted the following:

> I love this car. I replaced my 2016 Lexus gl 460 with the 2020 Telluride ex v6, a low milage previously owned car I found at a dealership because I felt it compared favorably in every way with the Lexus, which I had bought new. Unfortunately, like others who have complained about the same lighting issue, I did not do a night time test drive of this car, but when I did finally drive it at night - wow! the headlights on this vehicle are the absolute worst I have ever experienced as a driver. My first experience driving this kia after dark on a city street proved to be dangerous and scary. Lighting was so poor-especially the peripheral lighting and low beam height range - that I could not find my destination because the house

numbers on the mailboxes as well as the street sign were not lit well enough to read. But what was worse is that I very nearly hit a pedestrian who was walking on the side of the road. By the way, my vision is 20/20 and night driving has not preiously been a problem. I knew there had to be something wrong with the lighting system so the next day I took the car straight to the dealer who checked the bulbs and their placement; he found no problem. I am a widow so I drive myself everywhere I go, including at night. Bright, safe illumination is a must! I am not driving much at night these days because I feel it is way too risky considering the poor visibility after dark. I can tell you that kia will have a law suit (or multiple suits) on their hands when this poor headlight situation is the cause of a serious accident!

118.   On carproblemzoo.com, a 2021 Kia Telluride consumer posted the following:

I recently drove my new 2021 Telluride sx to my cabin in GA. And found a major issue with the headlights while driving through the backwoods. The visibility using the led headlights and high beams are terrible and pose a danger. If you are driving downhill and the road goes up or turns you have zero visibility, it actually creates a line as in my picture. I brought it into my kia dealer and they said corporate is aware of it but there is no fix as of yet so they adjusted them as best they could. This is extremely dangerous and people will die if they do not get a a fix for this issue.

119.   On carproblemzoo.com, a Hyundai Palisade consumer posted the following:

head lights -when driving in mountains (curves and going up and down hills) at night the head lights produced a shadow effect, which gave the impression it was on the windshield sight line. This shadow effect varied from 1/3 to 2/3 of the windshield which caused a distorted view of the road ahead. There were 4 adults in the car and all agreed that it was making the road dangerous to drive on. We had to slow down well below the actual speed limit which would cause cars coming around a curve behind us to quickly slow down or run into us. - took car to bronco motors in boise id and explained the headlight issue they told us that one other person had come in complaining about this same issue. Their mechanic told us that there is no way to adjust the headlights.

120.   On carproblemzoo.com, a Hyundai Palisade consumer posted the following:

The low beam headlights are too bright causing vehicles in the opposite direction to flash their high beams thinking that my high beams are on. This is a safety factor as I am often blinded by other drivers who flash their high beams and in many cases keep their high beams on. I've visited Palisade chat rooms and have found that other drivers have the same complaint. I have contacted Hyundai headquarters and reported the problem and have taken it to dealers three times to have the low beams lowered. I have been told that the low beam adjustment is correct and nothing can be done to fix my problem. I believe this low beam problem is a design defect and should be corrected. My vehicle is available for examination if necessary.

121.   On palisadeforums.org, a 2021 Hyundai Palisade consumer posted the following:

> The headlights on the 2021 Palisade are very dangerous at night! You have a black blob on the road at all times and can not see in the oncoming lane!
>
> Very Dangerous and a law suit waiting to happen. Sad Hyundai knows about this issue and has not changed their lighting!

**Defendants Had Superior and Exclusive Knowledge of the Headlight Defect**

122.   Defendants had superior and exclusive knowledge of the Headlight Defect and knew or should have known that the defect was not known or reasonably discoverable by Plaintiffs and Class Members before they purchased or leased the Class Vehicles.

123.   Discovery will show that before Plaintiffs purchased his Class Vehicle, and since at least 2019, Defendants knew about the Headlight Defect through sources not available to consumers, including pre-release testing data produced by HMC and KMC, early consumer complaints to HMA and KMA and their dealers who are their agents for vehicle repairs, consumer complaints regarding earlier model years equipped with the same Headlight on websites monitored by HMA and KMA, testing conducted   in response to those complaints, high failure rates and replacement part sales data, consumer complaints to NHTSA (which HMA and KMA monitor), by developing TSBs in an effort to address the Headlight Defect, and through other aggregate data from HMA and KMA's dealers about the problem. TSBs are issued exclusively to HMA and KMA's dealerships and service providers and are not disseminated to consumers, even if their vehicles receive services as outlined in the bulletins.

124.   HMC and KMC are experienced in the design and manufacture of consumer vehicles. As experienced manufacturers, HMC and KMC conducts

tests, including pre-sale durability testing, on incoming components, including the Headlight and Headlight Assembly, to verify the parts are free from defect and align with their specifications. As described above, Defendants all communicate with each other regarding technical information in components which are installed in both Hyundai and Kia-branded vehicles. Thus, Defendants knew or should have known the Headlight was defective and prone to putting drivers in a dangerous position due to the inherent risks of the Headlight Defect.

125. Additionally, discovery will show that Defendants knew of the impact of this defect from the sheer number of reports received from dealerships. HMA and KMA's customer relations departments, which interact with individual dealerships to identify potential common defects, have received numerous reports regarding the Headlight Defect. HMA and KMA have shared these complaints, as well as the associated technical data, with other affiliates, including HMC and KMC, which led to the release of TSBs and dealer communications drafted in conjunction with HMC and KMC. HMA and KMA's customer relations departments also collects and analyzes field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data.

126. HMA and KMA's warranty department similarly analyzes and collects data submitted by its dealerships to identify warranty trends in its vehicles. It is HMA and KMA's policy that when a repair is made under warranty the dealership must provide HMA or KMA with detailed documentation of the problem and a complete disclosure of the repairs employed to correct it. Dealerships have an incentive to provide detailed information to HMA or KMA, because they will not be reimbursed for any repairs unless the justification for reimbursement is sufficiently detailed.

127. Well before the first Class Vehicle was sold, as early as March

2010, Defendants knew or should have known that the Headlights were defective in design and/or manufacture and that the Defect would adversely affect the drivability of the Class Vehicles and cause safety hazards, including collisions. HMC and KMC first began using Headlight Assembly components that were vulnerable to improper moisture and humidity intrusion in its 2010 model year vehicles.[10]

128. Indeed, beginning in March 2010, KMA first issued TSB No. BOD055 for all Kia models, ostensibly providing "Information for Headlamp Condensation and Moisture." The TSB advises that "Headlamp assembly replacement WILL NOT be necessary in most cases." However, it directs authorized dealership personnel to replace the headlamp assembly where there is improper "water intrusion." This TSB was written in conjunction with KMC.

129. In January 2019, KMA began "a Product Improvement Campaign to adjust the headlamp aim" for certain Class Vehicles. This product improvement campaign was conducted "to more precisely focus the headlamps on the correct position on the roadway and reduce the glare from the headlamps to oncoming traffic." The communication to "All Kia Dealer Principals" regarding the product improvement campaign states "The Insurance Institute for Highway Safety (IIHS) is a well-known organization that conducts supplemental testing to evaluate certain aspects of vehicle performance. As a result of such testing, Kia and IIHS have determined that improvements could be made to adjust the headlamp aim to improve the focus and reduce glare from the headlamps to oncoming traffic." The campaign was updated in January 2020 and designed and implemented in conjunction with KMC. Discovery will show that the problem persists despite this product improvement campaign and is a result of the Defect

---

[10] "Headlight Condensation TSB," March 12, 2010, available at: https://www.kia-forums.com/threads/headlight-condensation-tsb.57749/ (last accessed November 14, 2022).

as described herein.

130.   In April 2019, KMA issued a service action, TSB No. SA380, for "Telluride Headlamp Inspection." The service action was issued to address "intermittent or inoperative Daytime Running Lamp (DRL) at the headlamps due to an internal connection fault." The service action describes the headlight inspection procedure and states "Leave the DRLs on for twenty minutes. If one or both DRL(s) is/are not operating as designed, proceed to the Headlamp Replacement Procedure below." This TSB was written in conjunction with KMC. Discovery will show that the problem persists despite headlight and headlight assembly replacement and is a result of the Defect as described herein.

131.   In June 2021, KMA issued TSB No. ELE242, regarding "Headlamp Soft Connection Inspection." The service action was issued to address "inoperative/intermittently inoperative. . . low/sub-low beam on Telluride." The service action describes the headlight inspection procedure and states "If headlamp does NOT operate normally (low beam or sub-low beam), replace the headlamp with a new part." This TSB was written in conjunction with KMC. Discovery will show that the problem persists despite headlight and headlight assembly replacement and is a result of the Defect as described herein.

132.   In September 2021, KMA issued a significantly revised TSB No. BOD055 (Rev 1) for certain Class Vehicles. The TSB was still titled "Information for Headlamp Condensation and Moisture." Specifically, the TSB was issued to correct "failed headlamp assembly seals or gaskets," resulting in excessive "water intrusion." The TSB directs dealership personnel to "locate the area of failure and determine if it is repairable. In some cases, headlamp replacement will be necessary." This TSB was written in conjunction with KMC. Discovery will show that the problem persists despite headlight and headlight assembly replacement and is a result of the Defect as described herein.

133.   Similarly, in July 2017, HMA first issued a TSB for all Hyundai

models, ostensibly providing "Information for Lamp Condensation." TSB No. 17-BD-01 provided "information regarding headlamp and rear combination lamp condensation related to moisture accumulation in the lens assembly." The TSB advises that, if moisture remains inside the headlight assembly after the directed drying procedures, "further repairs need to be performed on the lamp to address the condition." This TSB was written in conjunction with HMC.

134.   In July 2019, HMA superseded TSB No. 17-BD-01 with TSB No. 19-BD-003H for certain Class Vehicles. The TSB was titled "Information for Headlamp and Rear Combination Lamp Condensation." Specifically, the TSB was issued to correct headlight problems caused by "water leak[s]."  The TSB stated that, "If water is collecting at the bottom of the headlamp assembly or the condensation remains after the headlamps have been on for 30 minutes or more, there may be a water leak in the assembly. The leak may be caused by a poor seal between the headlamp housing and lens, cracks in the headlamp assembly, or poor fitment. The condition should be diagnosed and repaired as necessary." The only repair procedure prescribed by the TSB for this condition was "replacement of the head lamp assembly." This TSB was written in conjunction with HMC. Discovery will show that the problem persisted despite the advised repairs and TSB No. 20-BD-014H, issued in July 2020 for certain Class Vehicles, updated this TSB with additional service information, and is a result of the Defect as described herein.

135. Discovery will show that each TSB, product improvement campaign, and service action issued by HMA and KMA was approved by managers, directors, and/or executives at HMC and KMC. Therefore, discovery will show that Defendants' managers, directors, and/or executives knew, or should have known, about the Headlight Defect, but refused to disclose the Headlight Defect to prospective purchasers and owners, and/or actively concealed the Headlight Defect.

136.   The existence of the Headlight Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle. Had Plaintiffs and other Class Members known of the Headlight Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

137.   Reasonable consumers, like Plaintiffs, expect that a vehicle's Headlights are safe, will function in a manner that will not pose a safety risk and will illuminate the area in front of the vehicle adequately, and are free from defects. Plaintiffs and Class Members further reasonably expect that Defendants will not sell or lease vehicles with known safety defects, such as the Headlight Defect, and will disclose any such defects to its consumers when it learns of them. They did not expect Defendants to conceal and fail to disclose the Headlight Defect to them, and to then continually deny its existence.

### Defendants Have Actively Concealed the Headlight Defect

138.   Despite their knowledge of the Headlight Defect in the Class Vehicles, Defendants actively concealed the existence and nature of the defect from Plaintiffs and Class Members. Specifically, Defendants failed to disclose or actively concealed at and after the time of purchase, lease, or repair:

(a)     any and all known material defects or material nonconformity of the Class Vehicles, including the defects pertaining to the Headlights;

(b)     that the Class Vehicles, including the Headlight, were not in good working order, were defective, and were not fit for their intended purposes; and

(c)     that the Class Vehicles and their Headlights were defective, despite the fact that Defendants learned of such defects as early as 2019, if not earlier.

139.   Discovery will show that when consumers present their Class Vehicles to an authorized HMA and KMA's dealer for Headlight repairs, rather

than repair the problem under warranty, their dealers either inform consumers that their vehicles are functioning properly or conduct repairs that merely mask the Headlight Defect such as attempting to reposition the lights even when the headlights are dim rather than out of position.   This includes Kia's Product Improvement Campaign in 2019, designed and implemented in conjunction with HMC and KMC which attempted to deflect from the root causes of the Defect, namely defective seals which allow moisture and condensation to intrude on the headlight assembly causing dim and failed headlights.

140.   Defendants have caused Plaintiffs and Class Members to expend money and/or time at their dealerships to diagnose, repair or replace the Class Vehicles' Headlights and/or related components, despite Defendants' knowledge of the Headlight Defect.

### Defendants Have Unjustly Retained a Substantial Benefit

141.   Discovery will show that Defendants unlawfully failed to disclose the alleged defect to induce Plaintiffs and other putative Class Members to purchase or lease the Class Vehicles.

142.   Plaintiffs further allege that Defendants thus engaged in deceptive acts or practices pertaining to all transactions involving the Class Vehicles, including Plaintiffs.'

143.   Specifically, Plaintiffs purchased their vehicles and/or parts needed to attempt repairs to their vehicles from authorized dealerships. Those dealerships purchased those vehicles and/or components from HMA or KMA. In order, HMA and KMA purchase their vehicles and components which are sold to dealerships from HMC or KMC.

144.   As discussed above, therefore, Plaintiffs allege that Defendants unlawfully induced them to purchase their Class Vehicles and/or components for their Class Vehicles by concealing a material fact (the defective Headlight) and that they would have paid less for the Class Vehicle, or not purchased it at all, had

1   they known of the defect.

2       145.   Moreover, because Plaintiffs are likely to need further replacements

3   of the headlight assemblies in the future, they will be forced to purchase more

4   defective components from Defendants absent some relief which forces the

5   Defendants to correct the defective components.

6       146.   Accordingly, Defendants' ill-gotten gains, benefits accrued in the

7   form of increased sales and profits resulting from the material omissions that did -

8   and likely will continue to - deceive consumers, should be disgorged.

9       **The Agency Relationship regarding the Vehicle Warranties Between**
10  **Defendants HMA and KMA and their Authorized Dealers With Regard to**
    **Warranty Service and Repairs**
11

12      147.   In order to sell vehicles to the general public, Defendants HMA and

13  KMA enter into agreements with their networks of authorized dealerships to

14  engage in retail sales with consumers such as Plaintiffs while also advertising the

15  warranties provided by HMA and KMA directly to consumers when they

16  purchase a Kia or Hyundai-branded vehicle from the authorized dealership.

17  These agreements specifically authorize the dealerships to act in HMA and

18  KMA's stead to provide repairs under the warranties HMA and KMA provide

19  directly to consumers.   Accordingly, discovery will show, particularly the

20  dealership agreements between Defendant HMA and KMA and third-party

21  dealerships, that Defendants HMA and KMA have authorized these dealerships to

22  be their agents for the purposes of warranty repairs, including diagnosis of

23  whether warranty repairs are required, and as such, the consumers are third-party

24  beneficiaries of these dealership agreements because they benefit from being able

25  to purchase and receive warranty repairs locally.   Discovery will show that

26  because Plaintiffs and members of the Class are third-party beneficiaries of the

27  dealership agreement which create an implied warranty of merchantability of the

28  goods being sold by these authorized dealerships, they may avail themselves of

the implied warranty against Defendants.  This is true because third-party beneficiaries to contracts between other parties that create an implied warranty of merchantability may avail themselves of the implied warranty. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1185 (C.D. Cal. 2010).

148.  Further, Plaintiffs and each of the members of the Class are the intended beneficiaries of the express and implied warranties which accompany each Class Vehicle.  The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by HMA or KMA.  These warranties were designed for and intended to benefit the consumers only.  The consumers are the true intended beneficiaries of the express and implied warranties, and the consumers may therefore avail themselves of those warranties.

149.  HMA and KMA issued the express warranty to Plaintiffs and the Class members.  HMA and KMA also developed and disseminated the owner's manuals and warranty booklets, in conjunction with HMC and KMC, which direct consumers to take their vehicles to authorized dealerships for diagnosis and repair.  HMA and KMA also developed and disseminated the advertisements, in conjunction with HMC and KMC, such as vehicle brochures and television commercials, and other promotional materials relating to the Class Vehicles and promoting the terms of the warranties that they issue with the sale of each Class Vehicle.  HMA and KMA are also responsible for the content of the Monroney Stickers on their vehicles using information from HMC and KMC.  These stickers are also drafted in conjunction with HMC and KMC.  Because they issue the express warranties directly to the consumers, the consumers are in direct privity with HMA and KMA with respect to the warranties.

150.  In promoting, selling, and repairing their defective vehicles, Defendants act through numerous authorized dealers who act as, and represent

themselves to the public as exclusive Kia and Hyundai representatives and agents, particularly for the purpose of providing repairs that are the responsibility of HMA and KMA to provide under their respective warranties. That the dealers act as Defendants' agents for this purpose is demonstrated by the following facts:

(a)     The authorized dealerships complete all service and repair according to instructions disseminated directly to them by HMA and/or KMA, including service manuals, technical service bulletins ("TSBs"), technical tips ("TT"), and other documents drafted with HMC and/or KMC;

(b)     Technicians at Defendants dealerships are required to go to at least yearly KMA and HMA-given trainings in order to remain certified to work on Kia and Hyundai-branded vehicles, at which they receive training on proprietary systems, which provides guided, step-by-step instructions on diagnosing and repairing Kia and Hyundai-branded vehicles;

(c)     Consumers are able to receive services under Kia and Hyundai's issued New Vehicle Limited Warranties only at authorized dealerships, and they are able to receive these services because of the agreements between HMA and KMA and the authorized dealers. These agreements provide HMA and/or KMA with a significant amount of control over the actions of the authorized dealerships;

(d)     The warranties provided by HMA and/or KMA for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services;

(e)     HMA and KMA control the way in which their authorized dealers can respond to complaints and inquiries concerning defective vehicles, and the dealerships are able to perform repairs under warranty only with HMA or KMA's authorization;

(f)     HMA and KMA have entered into agreements and

understandings with their authorized dealers pursuant to which they authorize and exercise substantial control over the operations of their dealers and the dealers' interaction with the public, particularly the advertising of the Class Vehicles, specifically the terms and conditions of the express warranties, as well as how consumers may avail themselves of the remedies under those express warranties; and

(g)   HMA and KMA implemented their express and implied warranties as they relate to the defects alleged herein by instructing authorized Kia and Hyundai dealerships to address complaints of the Defect by prescribing and implementing the relevant TSBs cited herein.

151.  Indeed, HMA's and KMA's warranty booklets make it abundantly clear that only their authorized dealerships are their agents for warranty service. The booklets, which are plainly written for the consumers, not the dealerships, tell consumers that to obtain warranty service, "You must take your Kia Vehicle, along with this manual, to an Authorized Kia Dealer in the United States during its normal service hours.," (Kia Warranty); and "[w]arranty service will be provided by an authorized Hyundai Dealership without charge for parts or labor." (Hyundai Warranty).

152.  Accordingly, as the above paragraphs demonstrate, the authorized dealerships are agents of HMA or KMA for the purposes of the warranties, which are direct contracts between HMA, KMA, and the purchasers of their branded vehicles. Plaintiffs and each of the members of the Class have had sufficient direct dealings with either HMA, KMA, or their agent dealerships to establish privity of contract between HMA or KMA, on one hand, and Plaintiffs and each of the members of the Class, on the other hand. This establishes privity with respect to the express and implied warranty between Plaintiffs and Defendants. It also establishes that Plaintiffs were dealing with HMA and KMA through their authorized agent dealerships when they were given the New Vehicle Limited

Warranty associated with their vehicles, without any ability to negotiate the terms of that Warranty.

**Defendants' Warranties were Unconscionable**

153.   Plaintiffs signed contracts for sale with Defendants' authorized dealers, and with that sale, was presented with a separate Warranty as drafted by KMA and/or HMA. While Plaintiffs have some ability to negotiate price of the vehicle, they have no ability to negotiate the terms of the Warranty. Plaintiffs had no bargaining power with respect to the Warranty, were presented with it as a *fait accompli*, and had to accept it in the exact form in which it was presented to them, which occurred after the vehicle purchase transaction was completed. Plaintiffs had no meaningful choice regarding any aspect of the Warranty or its terms, including durational limitations of time and mileage. The terms of the warranty unreasonably favored HMA or KMA over Plaintiffs and the members of the Class; a gross disparity in bargaining power existed as between HMA and KMA and Class members; and HMA and KMA knew or should have known that the Headlight Defect would manifest in the Class Vehicles both before and after the Warranty, thereby rendering the time and mileage limitations insufficient, inadequate, and unconscionable.

154.   HMA and KMA drafted the terms of the Warranty in part by using their exclusive, superior knowledge of the existence and likely manifestation of the Defect. Plaintiffs and Class Members were entirely ignorant of the Defect when purchasing their Vehicles and when presented with the Warranty. Plaintiffs' acceptance of the Warranty and its terms, including any disclaimers or durational limits, was neither knowing nor voluntary. HMA and KMA knew or should have known at the time of sale that the Class Vehicles were defective and would fail prematurely solely because of a defect in design, materials, and workmanship, to wit, the Headlight Defect. Plaintiffs and Class Members, on the other hand, had no notice of or ability to detect the Defect prior to purchasing the Class Vehicles.

For this reason, the terms of the Warranty unreasonably favored HMA and KMA over Plaintiffs and Class Members, and Plaintiffs' and Class Members' acceptance of the Warranty's durational limitations, to the extent they are found to apply so as to exclude instances where the Defect manifested outside of them, was neither knowing nor voluntary, thereby rendering such limitation unconscionable and ineffective.

155. Defendants' exclusive superior knowledge of the existence of the Defect and when it would manifest influenced its analysis of the Defect and whether it should pay for a recall (*i.e.,* if a defect is more likely to manifest within the durational limits, a recall is only fractionally more expensive than warranty repairs; if it is more likely to manifest outside those limits, a recall is exponentially more expensive than warranty repairs.)

156. Plaintiffs were also not aware and could not have been aware that HMA and KMA would willfully not inform them of the Defect which affects the safety of their vehicles and that the Defect could manifest outside of the durational limit of the Warranty, despite Defendants' knowledge of this. *See Carlson v. Gen. Motors Corp*., 883 F.2d 287 (4th Cir. 1989), cert. denied, 495 U.S. 904 (1990) (""proof that GM knew of and failed to disclose major, inherent product defects would obviously suggest that its imposition of the challenged 'durational limitations' on implied warranties constituted 'overreaching,' and that the disclaimers themselves were therefore 'unconscionable.'")

## TOLLING OF THE STATUTES OF LIMITATIONS

157. Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of the Headlight Defect and misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiffs and members of the Class were deceived regarding the Class Vehicles and could not reasonably discover the Defect or Defendants' deception with respect to the Defect. Defendants and their agents continue to deny the existence and extent of

the Defect, even when questioned by Plaintiffs and members of the Class.

158.   Plaintiffs and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants were concealing a defect and/or the Class Vehicles contained the Headlight Defect and the corresponding safety risk. As alleged herein, the existence of the Headlight Defect was material to Plaintiffs and members of the Class at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiffs and members of the Class could not have discovered through the exercise of reasonable diligence the existence of the Defect or that the Defendants were concealing the Defect.

159.   At all times, Defendants are and were under a continuous duty to disclose to Plaintiffs and members of the Class the true standard, quality, and grade of the Class Vehicles and to disclose the Headlight Defect and corresponding safety risk due to their exclusive and superior knowledge of the existence and extent of the Headlight in Class Vehicles.

160.   Defendants knowingly, actively, and affirmatively concealed the facts alleged herein. Plaintiffs and members of the Class reasonably relied on Defendants' knowing, active, and affirmative concealment.

161.   For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendants' fraudulent concealment, and Defendants are estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

162.   Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

163.   The Class and Sub-Classes are defined as:

> **Class**:   All persons and entities in the United States who purchased or leased a Class Vehicle (the "Nationwide Class" or "Class").
>
> **Illinois Sub-Class**:   All persons and entities who purchased or leased a Class Vehicle in the State of Illinois.
>
> **Maryland Sub-Class**:   All persons and entities who purchased or leased a Class Vehicle in the State of Maryland.
>
> **Minnesota Sub-Class**:   All persons and entities who purchased or leased a Class Vehicle in the State of Minnesota.
>
> **South Carolina Sub-Class**:   All persons and entities who purchased or leased a Class Vehicle in the State of South Carolina.

164.   Excluded from the Class and Sub-Classes are:  (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserves the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Class and Sub-Classes should be expanded or otherwise modified.

165.   <u>Numerosity</u>:   Although the exact number of Class Members is uncertain, and can only be ascertained through appropriate discovery, the number is significant enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in Defendants' possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

166.   <u>Typicality</u>:  Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by Defendants. The representative Plaintiffs, like all Class Members, has been damaged by Defendants' misconduct in that they have incurred or will incur the cost of repairing or replacing the defective Headlight and/or its components. Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread resulting in injury to the Class.

167.   <u>Commonality</u>:   There are numerous questions of law and fact common to Plaintiffs and the Class that predominate over any question affecting Class Members individually. These common legal and factual issues include the following:

(a)   Whether Class Vehicles suffer from defects relating to the Headlight;

(b)   Whether the defects relating to the Headlight constitute an unreasonable safety risk;

(c)   Whether Defendants knew about the defects pertaining to the Headlight and, if so, how long Defendants have known of the defect;

(d)   Whether the defective nature of the Headlight constitutes a material fact;

(e)   Whether Defendants have had an ongoing duty to disclose the defective nature of the Headlight to Plaintiffs and Class Members;

(f)   Whether Plaintiffs and the other Class Members are entitled to equitable relief, including a preliminary and/or a permanent injunction;

(g)   Whether Defendants knew or reasonably should have known of the defects pertaining to the Headlight before they sold and

leased Class Vehicles to Class Members;

(h)   Whether Defendants should be declared financially responsible for notifying the Class Members of problems with the Class Vehicles and for the costs and expenses of repairing and replacing the defective Headlight and/or its components;

(i)   Whether Defendants are obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace their defective Headlight and/or its components;

(j)   Whether Defendants breached the implied warranty of merchantability pursuant to the Magnuson-Moss Warranty Act;

(k)   Whether Defendants breached the implied warranty of merchantability under Illinois, Maryland, Minnesota, and South Carolina law;

(l)   Whether Defendants breached their express warranties under Illinois, Maryland, Minnesota, and South Carolina law; and

(m)  Whether Defendants breached express warranties pursuant to the Magnuson-Moss Warranty Act.

168.   <u>Adequate Representation</u>:   Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs has retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intends to vigorously prosecute this action.

169.   <u>Predominance and Superiority</u>:  Plaintiffs and Class Members have all suffered, and will continue to suffer, harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Because of the relatively small size of the individual Class Members'

claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue unabated without remedy or relief. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that it will conserve the resources of the courts and the litigants and promote consistency and efficiency of adjudication.

### **FIRST CAUSE OF ACTION**

**Breach of Express Warranty**

**810 ILL. COMP. STAT. §§ 5/2-313 AND 5/2A-210**

**(On Behalf of the Illinois Sub-Class Against KMA)**

170.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

171.   Plaintiff Terri Sue Holliday ("Illinois Plaintiff") brings this count on behalf of herself and the Illinois Sub-Class against KMA.

172.   KMA is and was at all relevant times a "merchant" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under § 5/2-103(1)(d).

173.   With respect to leases, KMA is and was at all relevant times a "lessor" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

174.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

175.   The Headlights were manufactured and/or installed in the Class Vehicles by KMC and are covered by the express warranty issued by KMA.

176.   KMA provided all purchasers and lessees of the Class Vehicles with the Kia express warranty described herein, which became a material part of the bargain.

177.   KMA provided all purchasers and lessees of Kia-branded Class

Vehicles with the Kia Warranty.

178.   KMA sold and leased the Class Vehicles with a written express warranty covering the Vehicles for six years or 60,000 miles, whichever comes first (Kia Warranty.

179.   Kia's New Vehicle Limited Warranty expressly states that KMA "warrants that it will arrange for an Authorized Kia dealer at locations of its choice to provide for the repair of your vehicle if it fails to function properly during normal use." The warranty further provides that "Authorized service facilities will remedy such failures to function properly at Kia's expense[.]" (Kia Warranty).

180.   KMC designed, manufactured and/or installed the Headlights and the Headlights' component parts in the Class Vehicles, and the Headlights and their component parts are covered by the express Warranties issued by KMA.

181.   The Headlight Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Illinois Plaintiff and the Illinois Sub-Class Members.

182.   Illinois Plaintiff and the Illinois Sub-Class Members relied on KMA's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

183.   Under the express Warranties, KMA was obligated to correct the Headlight Defect in the vehicles owned or leased by Illinois Plaintiff and the Illinois Sub-Class Members.

184.   Although KMA were obligated to correct the Headlight Defect, none of the attempted fixes to the Headlights are adequate under the terms of the Warranties, as they did not cure the defect.

185.   KMA breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, KMA, via their authorized dealerships, falsely informed Illinois Sub-Class

Members that there was no problem with their Class Vehicles, performed ineffective procedures, and/or replaced defective components in the Headlights with equally defective components, without actually repairing the Class Vehicles.

186.   KMA and their agent dealers have failed and refused to conform the Headlights to the express Warranties. Defendants' conduct, as discussed throughout this Complaint, has voided any attempt on their part to disclaim liability for their actions.

187.   Moreover, KMA's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, KMA's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

188.   The time limits contained in KMA's warranty period were also unconscionable and inadequate to protect Illinois Plaintiff and the Illinois Sub-Class Members. Among other things, Illinois Plaintiff and the Illinois Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored KMA. A gross disparity in bargaining power existed between KMA and the Class members, and KMA knew or should have known that the Class Vehicles were defective at the time of sale.

189.   Illinois Plaintiff and the Illinois Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

190.   Illinois Plaintiff and the Illinois Sub-Class Members were not required to notify KMA of the breach because affording KMA a reasonable opportunity to cure their breach of written warranty would have been futile. KMA was also on notice of the Headlight Defect from the complaints and

service requests they received from Plaintiffs and the Class Members, from repairs and/or replacements of the Headlights or components thereof, and through other internal and external sources as described herein. Regardless, Illinois Plaintiff informed KMA of its breaches of express warranty via letter dated February 28, 2023.

191. Because KMA, through its conduct and exemplified by their own service bulletins, have covered repairs of the Headlight Defect if KMA determine the repairs are appropriately covered under the Warranties, KMA cannot now deny that the Warranties cover the Headlight Defect.

192. Because KMA has not been able to remedy the Headlight Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

193. As a direct and proximate cause of KMA's breach, Illinois Plaintiff and the Illinois Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Illinois Plaintiff and the Illinois Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

194. As a direct and proximate result of KMA's breach of express warranties, Illinois Plaintiff and the Illinois Sub-Class Members have been damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### Breach of the Implied Warranty of Merchantability

### 810 ILL. COMP. STAT. §§ 5/2-314 and 5/2A-212

### (On Behalf of the Illinois Sub-Class Against KMA and KMC)

195. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

196. Illinois Plaintiff brings this count on behalf of herself and the

Illinois Sub-Class against KMA and KMC ("Defendants" for the purposes of this Cause of Action).

197.   Defendants are and were at all relevant times "merchants" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and "sellers" of motor vehicles under § 5/2-103(1)(d).

198.   With respect to leases, Defendants were and are at all relevant times "lessors" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

199.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

200.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under 810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212.

201.   Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Defendants directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Illinois Plaintiff and members of the Illinois Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Defendants knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Illinois Plaintiff and members of the Illinois Sub-Class, with no modification to the defective Class Vehicles.

202.   Defendants provided Illinois Plaintiff and members of the Illinois Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their Headlights suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

203.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

204.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Defendants knew of this defect at the time these sale or lease transactions occurred as described herein.

205.   As a result of Defendants' breach of the applicable implied warranties, Illinois Plaintiff and members of the Illinois Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Headlight Defect, Illinois Plaintiff and members of the Illinois Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

206.   Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

207.   Illinois Plaintiff and members of the Illinois Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

208.   Privity is not required here because Illinois Plaintiff and members of the Illinois Sub-Class are intended third-party beneficiaries of contracts between

Defendants and its distributors and dealers, and specifically, of KMA's express Warranties and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

209.   Illinois Plaintiff and members of the Illinois Sub-Class were not required to notify Defendants of the breach because affording Defendants a reasonable opportunity to cure its breach of warranty would have been futile. Defendants was also on notice of the Headlight Defect from the complaints and service requests they received from Illinois Plaintiff and the Class Members and through other internal sources as described herein

210.   Nonetheless, Illinois Plaintiff and members of the Illinois Sub-Class provided notice to Defendants of the breach of implied warranties when they took their vehicles to KMA's-authorized provider of warranty repairs. Illinois Plaintiff also provided notice to Defendants of its breach of implied warranty by letter dated February 28, 2023.

211.   As a direct and proximate cause of Defendants' breach, Illinois Plaintiff and members of the Illinois Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Illinois Plaintiff and members of the Illinois Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

212.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Illinois Plaintiff and members of the Illinois Sub-Class have been damaged in an amount to be proven at trial.

# **THIRD CAUSE OF ACTION**

**Violations of the Illinois Consumer Fraud and**

**Deceptive Business Practices Act**

**815 ILCS 505/1,** *et seq***.**

**(On Behalf of the Illinois Sub-Class Against KMA and KMC)**

213.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

214.   Illinois Plaintiff brings this cause of action on behalf of herself and on behalf of the members of the Illinois Sub-Class against KMA and KMC ("Defendants" for the purposes of this Cause of Action.

215.   Defendants are "persons" as that term is defined in 815 ILCS 505/1(c).

216.   Illinois Plaintiff and the Illinois Sub-Class members are "consumers" as that term is defined in 815 ILCS 505/1(e).

217.   The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely upon the concealment, suppression, or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2. Defendants engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Illinois CFA.

218.   Defendants participated in unfair or deceptive trade practices that violated the Illinois CFA. As described below and alleged throughout the Complaint, by failing to disclose the Headlight Defect, by concealing the Headlight Defect, by marketing their vehicles as safe, reliable, well-engineered, and of high quality, and by presenting themselves as reputable manufacturers

that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Defendants knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Headlight Defect in the course of their business.

219. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

220. Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

221. Defendants knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

222. Defendants knew or should have known that their conduct violated the Illinois CFA.

223. Defendant was under a duty to Illinois Plaintiff and the Illinois Sub-Class Members to disclose the defective nature of the Class Vehicles because:

a)      Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

b)      Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c)      Defendants actively concealed the defective nature of the Class Vehicles from Illinois Plaintiff and the Illinois Sub-Class Members at the time of

1    sale and thereafter.

2    224.   By failing to disclose the Headlight Defect, Defendants knowingly

3    and intentionally concealed material facts and breached their duty not to do so.

4    225.   The facts concealed or not disclosed by Defendants to Illinois

5    Plaintiff and the Illinois Sub-Class Members are material because a reasonable

6    person would have considered them to be important in deciding whether or not to

7    purchase or lease Defendants' Class Vehicles, or to pay less for them. Had Illinois

8    Plaintiff and the Illinois Sub-Class Members known that the Class Vehicles

9    suffered from the Headlight Defect described herein, they would not have

10   purchased or leased the Class Vehicles or would have paid less for them.

11   226.   Illinois Plaintiff and the Illinois Sub-Class Members are reasonable

12   consumers who do not expect that their vehicles will suffer from the Headlight

13   Defect. That is the reasonable and objective consumer expectation for vehicles.

14   227.   As a result of Defendants' misconduct, Illinois Plaintiff and the

15   Illinois Sub-Class Members have been harmed and have suffered actual damages

16   in that the Class Vehicles are defective and require repairs or replacement.

17   228.   As a direct and proximate result of Defendants' unfair or deceptive

18   acts or practices, Illinois Plaintiff and the Illinois Sub-Class Members have

19   suffered and will continue to suffer actual damages.

20   229.   Defendants' violations present a continuing risk to Illinois Plaintiff

21   and the Illinois Sub-Class Members as well as to the general public.  Defendants'

22   unlawful acts and practices complained of herein affect the public interest.

23   230.   Illinois Plaintiff provided notice of her claims to Defendants by

24   letter dated February 28, 2023.

25   231.   Pursuant to 815 ILCS 505/10a(a), Illinois Plaintiff and the Illinois

26   Sub-Class Members seek monetary relief against Defendants in the amount of

27   actual damages, as well as punitive damages because Defendants acted with fraud

28   and/or malice and/or were grossly negligent.

232.   Illinois Plaintiff and the Illinois Sub-Class Members also seek attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. § 505/1, *et seq*.

### **FOURTH CAUSE OF ACTION**

**Breach of Express Warranty**

**Md. Com. Law §§ 2-313 and 2A-210**

**(On Behalf of the Maryland Sub-Class Against HMA)**

233.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

234.   Plaintiff Alma Jones ("Maryland Plaintiff") brings this count on behalf of herself and the Maryland Sub-Class against Defendant HMA.

235.   HMA is and was at all relevant times "merchants" with respect to motor vehicles under Md. Com. Law §§ 2-104(1) and 2A-103(3), and "sellers" of motor vehicles under § 2-103(1)(d).

236.   With respect to leases, HMA is and was at all relevant times "lessors" of motor vehicles under Md. Com. Law § 2A-103(1)(p).

237.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Com. Law §§ 2-105(1) and 2A-103(1)(h).

238.   HMA provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

239.   HMA provided all purchasers and lessees of Hyundai-branded Class Vehicles with the Hyundai Warranty.

240.   HMA sold and leased the Class Vehicles with a written express warranty covering the Vehicles five years or 60,000 miles, whichever comes first (Hyundai Warranty).

241.   Hyundai's New Vehicle Limited Warranty expressly states that Hyundai covers "repair or replacement of any component originally

manufactured or installed by Hyundai Motor Company, Hyundai Motor Group, Hyundai Motor Manufacturing Alabama, Kia Manufacturing Mexico, Kia Motors Manufacturing Georgia or Hyundai Motor America that is found to be defective in material or workmanship, under normal use and maintenance[.]" The warranty further provides that "Warranty service will be provided by an authorized Hyundai dealership without charge for parts or labor." (Hyundai Warranty).

242.   HMC designed, manufactured and/or installed the Headlights and the Headlights' component parts in the Class Vehicles, and the Headlights and their component parts are covered by the express Warranties issued by HMA.

243.   The Headlight Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Maryland Plaintiff and the Maryland Sub-Class Members.

244.   Maryland Plaintiff and the Maryland Sub-Class Members relied on HMA's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

245.   Under the express Warranties, HMA was  obligated to correct the Headlight Defect in the vehicles owned or leased by Maryland Plaintiff and the Maryland Sub-Class Members.

246.   Although HMA was obligated to correct the Headlight Defect, none of the attempted fixes to the Headlights are adequate under the terms of the Warranties, as they did not cure the defect.

247.   HMA breached the express Warranties by performing illusory repairs via its authorized dealerships. Rather than repairing the vehicles pursuant to the express Warranties, HMA, via its authorized dealerships, falsely informed Maryland Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures, and/or replaced defective components in the Headlights with equally defective components, without

actually repairing the Class Vehicles.

248.   HMA and its agent dealers have failed and refused to conform the Headlights to the express Warranties. Defendants' conduct, as discussed throughout this Complaint, has voided any attempt on their part to disclaim liability for their actions.

249.   Moreover, HMA's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, HMA's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

250.   The time limits contained in HMA's warranty period were also unconscionable and inadequate to protect Maryland Plaintiff and the Maryland Sub-Class Members. Among other things, Maryland Plaintiff and the Maryland Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored HMA. A gross disparity in bargaining power existed between HMA and the Class members, and HMA knew or should have known that the Class Vehicles were defective at the time of sale.

251.   Maryland Plaintiff and the Maryland Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of HMA's conduct described herein.

252.   Maryland Plaintiff and the Maryland Sub-Class Members were not required to notify HMA of the breach because affording HMA a reasonable opportunity to cure their breach of written warranty would have been futile. HMA was also on notice of the Headlight Defect from the complaints and service requests they received from Plaintiffs and the Class Members, from repairs and/or replacements of the Headlights or components thereof, and

through other internal and external sources as described herein. Regardless, Maryland Plaintiff provided notice to HMA of its breach of express warranty via letter dated January 25, 2023.

253.   Because HMA, through their conduct and exemplified by their own service bulletins, have covered repairs of the Headlight Defect if HMA determine the repairs are appropriately covered under the Warranties, HMA cannot now deny that the Warranties cover the Headlight Defect.

254.   Because HMA have not been able to remedy the Headlight Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

255.   As a direct and proximate cause of HMA's breach, Maryland Plaintiff and the Maryland Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Maryland Plaintiff and the Maryland Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

256.   As a direct and proximate result of HMA's breach of express warranties, Maryland Plaintiff and the Maryland Sub-Class Members have been damaged in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**

**Breach of the Implied Warranty of Merchantability**

**Md. Com. Law §§ 2-314 and 2A-212**

**(On Behalf of the Maryland Sub-Class Against HMA and HMC)**

257.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

258.   Maryland Plaintiff brings this count on behalf of herself and the Maryland Sub-Class against Defendants HMA and HMC ("Defendants" for the purposes of this Cause of Action).

259.   Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Md. Com. Law §§ 2-104(1) and 2A-103(3), and "sellers" of motor vehicles under § 2-103(1)(d).

260.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Md. Com. Law § 2A-103(1)(p).

261.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Com. Law §§ 2-105(1) and 2A-103(1)(h).

262.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Md. Com. Law §§ 2-314 and 2A-212.

263.   Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Defendants directly sold and marketed Class Vehicles to customers through HMA's authorized dealers, like those from whom Maryland Plaintiff and members of the Maryland Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Defendants knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Maryland Plaintiff and members of the Maryland Sub-Class, with no modification to the defective Class Vehicles.

264.   Defendants provided Maryland Plaintiff and members of the Maryland Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their Headlights suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

265.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold

by Defendants were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

266.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Defendants knew of this defect at the time these sale or lease transactions occurred.

267.   As a result of Defendants' breach of the applicable implied warranties, Maryland Plaintiff and members of the Maryland Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Headlight Defect, Maryland Plaintiff and members of the Maryland Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

268.   Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

269.   Maryland Plaintiff and members of the Maryland Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

270.   Privity is not required here because Maryland Plaintiff and members of the Maryland Sub-Class are intended third-party beneficiaries of contracts between Defendants and their distributors and dealers, and specifically, of HMA's express warranties, including the Warranties and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate

consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

271.   Maryland Plaintiff and members of the Maryland Sub-Class were not required to notify Defendants of the breach because affording Defendants a reasonable opportunity to cure their breach of warranty would have been futile. Defendants were also on notice of the Headlight Defect from the complaints and service requests they received from Maryland Plaintiff and the Class Members and through other internal sources as described herein.

272.   Nonetheless, Maryland Plaintiff and members of the Maryland Sub-Class provided notice to Defendants of the breach of express warranties when they took their vehicles to Defendants-authorized provider of warranty repairs. Maryland Plaintiff also provided notice to Defendants of their breach of implied warranty by letter dated January 25, 2023.

273.   As a direct and proximate cause of Defendants' breach, Maryland Plaintiff and members of the Maryland Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Maryland Plaintiff and members of the Maryland Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

274.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Maryland Plaintiff and members of the Maryland Sub-Class have been damaged in an amount to be proven at trial.

## <u>SIXTH CAUSE OF ACTION</u>

**Violations of the Maryland Consumer Protection Act,**

**Md. Code Ann., Com. Law § 13-101, *et seq.***

**(On Behalf of the Maryland Sub-Class Against HMA and HMC)**

275.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

276.   Maryland Plaintiff brings this cause of action on behalf of herself and on behalf of the members of the Maryland Sub-Class against Defendants HMA and HMC ("Defendants" for the purposes of this Cause of Action).

277.   Defendants, Maryland Plaintiff, and the Maryland Sub-Class Members are "persons" within the meaning of Md. Code Ann., Com. Law § 13-101(h).

278.   The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair and deceptive trade practice in the sale or lease of any consumer good, including representing that goods are of a particular standard, quality, or grade if they are not, advertising goods without intent to sell or lease them as advertised, selling goods knowing that a service, replacement or repair was needed, "failure to state a material fact if the failure deceives or tends to deceive," and "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same," Md. Code Ann., Com. Law § 13-301, regardless of whether the consumer is actually deceived or damaged, Md. Code Ann., Com. Law § 13-302.   Defendants engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Maryland CPA.

279.   Defendants participated in unfair or deceptive trade practices that violated the Maryland CPA. As described below and alleged throughout the Complaint, by failing to disclose the Headlight Defect, by concealing the Headlight Defect, by marketing their vehicles as safe, reliable, well-engineered, and of high quality, and by presenting themselves as reputable manufacturers that valued safety, performance and reliability, and stood behind their vehicles after they were sold, Defendants knowingly and intentionally misrepresented and

omitted material facts in connection with the sale or lease of the Class Vehicles. Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Headlight Defect in the course of their business.

280.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

281.   Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

282.   Defendants knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

283.   Defendants knew or should have known that their conduct violated the Maryland CPA.

284.   Defendants were under a duty to Maryland Plaintiff and the Maryland Sub-Class Members to disclose the defective nature of the Class Vehicles because:

a.   Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

b.   Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c.   Defendants actively concealed the defective nature of the Class Vehicles from Maryland Plaintiff and the Maryland Sub-Class Members at the time of sale and thereafter.

285.   By failing to disclose the Headlight Defect, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

286.   The facts concealed or not disclosed by Defendants to Maryland Plaintiff and the Maryland Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendants' Class Vehicles, or to pay less for them. Whether a vehicle's Headlight is defective is a material safety concern. Had Maryland Plaintiff and the Maryland Sub-Class Members known that the Class Vehicles suffered from the Headlight Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

287.   Maryland Plaintiff and the Maryland Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Headlight Defect. That is the reasonable and objective consumer expectation for vehicles.

288.   As a result of Defendants' misconduct, Maryland Plaintiff and the Maryland Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

289.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Maryland Plaintiff and the Maryland Sub-Class Members have suffered and will continue to suffer actual damages.

290.   Defendants' violations present a continuing risk to Maryland Plaintiff and the Maryland Sub-Class Members as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

291.   Maryland Plaintiff provided notice of her claims to Defendants by letter dated January 25, 2023.

FIRST AMENDED CLASS ACTION COMPLAINT

292.   Pursuant to Md. Code Ann., Com. Law § 13-408, Maryland Plaintiff and members of the Maryland Sub-Class seek monetary relief against Defendants in the amount of actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

### SEVENTH CAUSE OF ACTION

**Violation of the Minnesota Prevention of Consumer Fraud Act,**

**Minn. Stat.§ 325F.68,** *et seq.*

**(On Behalf of the Minnesota Sub-Class Against HMA and HMC)**

293.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

294.   Plaintiff Maranda ("Minnesota Plaintiff") brings this cause of action individually and on behalf of the Minnesota Sub-Class against Defendants HMA and HMC ("Defendants" for the purposes of this Cause of Action).

295.   The Class Vehicles constitute "merchandise" within the meaning of Minn. Stat. § 325F.68.

296.   The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby …." Minn. Stat. § 3 25F.69(1). Defendants engaged in unfair and deceptive practices that violated the Minnesota CFA as described above.

297.   Defendants participated in and engaged in deceptive business or trade practices prohibited by the Minnesota CFA by failing to disclose and actively concealing that the Class Vehicles contained the Headlight Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as reputable manufacturers that valued safety and stood behind their vehicles after they were sold.

298.   Defendants knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles by, among other things, failing to disclose the Headlight Defect; concealing the Headlight Defect; promoting and selling or leasing Class Vehicles they knew were defective, including by marketing their vehicles as safe, reliable, easily operable, efficient, and of high quality; presenting themselves as reputable manufacturers that valued safety, reliability, performance and efficiency, and stood behind their vehicles after they were sold; failing to make repairs or making repairs and providing replacements that caused Minnesota Plaintiff and the Minnesota Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and minimizing the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers. Defendants misrepresented and omitted such material facts with the intent to mislead Minnesota Plaintiff and the Minnesota Sub-Class Members about the true nature of the Class Vehicles.

299.   Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Headlight Defect in the course of their business.

300.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

301.   Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

302.   Defendants knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

303.   Defendants knew or should have known that their conduct violated the Minnesota CFA.

304.   Minnesota Plaintiff and the Minnesota Sub-Class Members reasonably relied on Defendants' misrepresentations and omissions of material facts in their advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

305.   Minnesota Plaintiff and the Minnesota Sub-Class Members had no way of discerning that Defendants' misrepresentations were false and misleading when they acquired their Class Vehicles because Minnesota Plaintiff and the Minnesota Sub-Class Members did not have access to Defendants' exclusive and superior knowledge about the Class Vehicles' design and the Headlight Defect.

306.   Had Minnesota Plaintiff and the Minnesota Sub-Class Members known that the Class Vehicles would contain and/or exhibit the Headlight Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

307.   Defendants owed Minnesota Plaintiff and the Minnesota Sub-Class Members a duty to disclose the truth about the Headlight Defect because Defendants:

a.     possessed exclusive and superior knowledge of the design and manufacture of the Class Vehicles and the Headlight Defect;

b.     intentionally concealed the foregoing from Minnesota Plaintiff and the Minnesota Sub-Class Members; and/or

c.     made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts

from Minnesota Plaintiff and the Minnesota Sub-Class Members that contradicted these representations.

308. Due to Defendants' specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Headlight Defect, their false representations regarding the increased durability of the Class Vehicles, and reliance by Minnesota Plaintiff and the Minnesota Sub-Class Members on these material representations, Defendants had a duty to disclose to Class members that the Headlight Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Minnesota Plaintiff and the Minnesota Sub-Class Members, Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Minnesota Plaintiff and the Minnesota Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Defendants consumers. Defendants represented to Minnesota Plaintiff and the Minnesota Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Headlight Defect.

309. Minnesota Plaintiff and the Minnesota Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Defendants' conduct, Minnesota Plaintiff and the Minnesota Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

310.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Minnesota Plaintiff and the Minnesota Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

311.   Defendants' violations present a continuing risk to Minnesota Plaintiff and the Minnesota Sub-Class Members as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

312.   As a proximate and direct result of Defendants' unfair and deceptive trade practices, Minnesota Plaintiff and members of the Minnesota Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. These ascertainable losses include, among other things, overpayment at the time of purchase or lease, the cost to repair the Headlight Defect, replacement of the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

313.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices alleged herein, Minnesota Plaintiff and other members of the Minnesota Sub-Class suffered and will continue to suffer actual damages and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial. In addition, Minnesota Plaintiff and the putative Class seek equitable and injunctive relief against Defendants on terms that the Court considers reasonable, and reasonable attorneys' fees.

314.   Minnesota Plaintiff provided notice of his claims by letter dated December 1, 2022.

315.   Pursuant to Minn. Stat. § 8.31(3a), Minnesota Plaintiff and the Minnesota Sub-Class Members seek damages in an amount to be proven at trial, including but not limited to actual damages and attorneys' fees, under the Minnesota CFA.

316.   Minnesota Plaintiff and the Minnesota Sub-Class Members also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that Defendants' acts show deliberate disregard for the rights or safety of others.

### **EIGHTH CAUSE OF ACTION**

**Violations of the Minnesota Deceptive Trade Practices Act,**

**Minn. Stat. § 325D.43-48, *et seq.***

**(On Behalf of the Minnesota Sub-Class Against HMA and HMC)**

317.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

318.   Minnesota Plaintiff brings this cause of action individually and on behalf of the Minnesota Sub-Class against Defendants HMA and HMC ("Defendants" for the purposes of this Cause of Action).

319.   The Class Vehicles constitute "merchandise" within the meaning of Minn. Stat. § 325F.68.

320.   The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices, which occur when a person "(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "(7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and "(9) advertises goods or services with intent not to sell them as advertised." Minn. Stat. § 325D.44. Defendants engaged in unfair and deceptive practices that violated the Minnesota DTPA as described above.

321.   Defendants participated in and engaged in deceptive business or trade practices prohibited by the Minnesota DTPA by failing to disclose and actively concealing that the Class Vehicles contained the Headlight Defect, by

marketing their Class Vehicles as safe and of high quality, and by presenting themselves as reputable manufacturers that valued safety and stood behind their vehicles after they were sold.

322.   Defendants knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles by, among other things, failing to disclose the Headlight Defect; concealing the Headlight Defect; promoting and selling or leasing Class Vehicles they knew were defective, including by marketing their vehicles as safe, reliable, easily operable, efficient, and of high quality; presenting themselves as reputable manufacturers that valued safety, reliability, performance and efficiency, and stood behind their vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Minnesota Plaintiff and the Minnesota Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and minimizing the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers. Defendants misrepresented and omitted such material facts with the intent to mislead Minnesota Plaintiff and the Minnesota Sub-Class Members about the true nature of the Class Vehicles.

323.   Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Headlight Defect in the course of their business.

324.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

325.   Defendants' unfair and deceptive acts or practices occurred

repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

326. Defendants knew that the Class Vehicles and their Headlights suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

327. Defendants knew or should have known that their conduct violated the Minnesota DTPA.

328. Minnesota Plaintiff and the Minnesota Sub-Class Members reasonably relied on Defendants' misrepresentations and omissions of material facts in their advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

329. Minnesota Plaintiff and the Minnesota Sub-Class Members had no way of discerning that Defendants' misrepresentations were false and misleading when they acquired their Class Vehicles because Minnesota Plaintiff and the Minnesota Sub-Class Members did not have access to Defendants' exclusive and superior knowledge about the Class Vehicles' design and the Headlight Defect.

330. Had Minnesota Plaintiff and the Minnesota Sub-Class Members known that the Class Vehicles would contain and/or exhibit the Headlight Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

331. Defendants owed Minnesota Plaintiff and the Minnesota Sub-Class Members a duty to disclose the truth about the Headlight Defect because Defendants:

    a. possessed exclusive and superior knowledge of the design and manufacture of the Class Vehicles and the Headlight Defect;

    b. intentionally concealed the foregoing from Minnesota Plaintiff

and the Minnesota Sub-Class Members; and/or

c. made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Minnesota Plaintiff and the Minnesota Sub-Class Members that contradicted these representations.

332. Due to Defendants' specific and superior knowledge that the Headlights in the Class Vehicles will fail due to the Headlight Defect, their false representations regarding the increased durability and safety of the Class Vehicles, and reliance by Minnesota Plaintiff and the Minnesota Sub-Class Members on these material representations, Defendants had a duty to disclose to Class members that the Headlight Defect will cause Headlight failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles, that failure of the Headlights will cause damage to Class Vehicles, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Minnesota Plaintiff and the Minnesota Sub-Class Members, Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Minnesota Plaintiff and the Minnesota Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Defendants consumers. Defendants represented to Minnesota Plaintiff and the Minnesota Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, and of high quality as alleged throughout this Complaint, when in fact it is only a matter of time before the Headlights fail due to the Headlight Defect.

333. Minnesota Plaintiff and the Minnesota Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Defendants' conduct, Minnesota Plaintiff and the Minnesota Sub-Class Members were harmed and

suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

334.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Minnesota Plaintiff and the Minnesota Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

335.   Defendants' violations present a continuing risk to Minnesota Plaintiff and the Minnesota Sub-Class Members as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

336.   As a proximate and direct result of Defendants' unfair and deceptive trade practices, Minnesota Plaintiff and members of the Minnesota Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. These ascertainable losses include, among other things, overpayment at the time of purchase or lease, the cost to attempt to repair the Headlight Defect, replacement of the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

337.   Minnesota Plaintiff provided notice of his claims by letter dated December 1, 2022.

338.   Pursuant to Minn. Stat. §§ 8.31(3a) and 325D.45, Minnesota Plaintiff and the Minnesota Sub-Class Members seek damages in an amount to be proven at trial, including but not limited to actual damages and attorneys' fees, under the Minnesota DTPA.

339.   Minnesota Plaintiff and the Minnesota Sub-Class Members also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that Defendants' acts show deliberate disregard for the rights or safety of others.

## **NINTH CAUSE OF ACTION**

**Violations of the Minnesota False Statement in Advertising Act,**

**Minn. Stat. § 325F.67, *et seq.***

**(On Behalf of the Minnesota Sub-Class Against HMA and HMC)**

340.   Plaintiffs incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

341.   Minnesota Plaintiff brings this cause of action individually and on behalf of the Minnesota Sub-Class against Defendants HMA and HMC ("Defendants" for the purposes of this Cause of Action.

342.   The Minnesota False Statement in Advertising Act ("Minnesota FSAA") prohibits "any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading" in connection with the disposition of merchandise or services. Minn. Stat. Ann. § 325F.67. Defendants engaged in unfair and deceptive practices that violated the Minnesota FSAA as described above.

343.   Defendants participated in and engaged in deceptive business or trade practices prohibited by the Minnesota FSAA by failing to disclose and actively concealing that the Class Vehicles contained the Headlight Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind their vehicles after they were sold.

344.   Defendants knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles by, among other things, failing to disclose the Headlight Defect; concealing the Headlight Defect; promoting and selling or leasing Class Vehicles it knew were defective, including by marketing their vehicles as safe, reliable, easily operable, efficient, and of high quality; presenting themselves as reputable manufacturers that valued safety, reliability, performance and efficiency, and stood behind their

vehicles after they were sold; failing to make repairs or making repairs and providing replacements that caused Minnesota Plaintiff and the Minnesota Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and minimizing the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers. Defendants misrepresented and omitted such material facts with the intent to mislead Minnesota Plaintiff and the Minnesota Sub-Class Members about the true nature of the Class Vehicles.

345.   Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Headlight Defect in the course of their business.

346.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

347.   Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

348.   Defendants knew that the Class Vehicles and their Headlights suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

349.   Defendants knew or should have known that their conduct violated the Minnesota FSAA.

350.   Minnesota Plaintiff and the Minnesota Sub-Class Members reasonably relied on Defendants' misrepresentations and omissions of material

facts in their advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

351.   Minnesota Plaintiff and the Minnesota Sub-Class Members had no way of discerning that Defendants' misrepresentations were false and misleading when they acquired their Class Vehicles because Minnesota Plaintiff and the Minnesota Sub-Class Members did not have access to Defendants' exclusive and superior knowledge about the Class Vehicles' design and the Headlight Defect.

352.   Had Minnesota Plaintiff and the Minnesota Sub-Class Members known that the Class Vehicles would contain and/or exhibit the Headlight Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

353.   Defendants owed Minnesota Plaintiff and the Minnesota Sub-Class Members a duty to disclose the truth about the Headlight Defect because Defendants:

a.   possessed exclusive and superior knowledge of the design and manufacture of the Class Vehicles and the Headlight Defect;

b.   intentionally concealed the foregoing from Minnesota Plaintiff and the Minnesota Sub-Class Members; and/or

c.   made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Minnesota Plaintiff and the Minnesota Sub-Class Members that contradicted these representations.

354.   Due to Defendants' specific and superior knowledge that the Headlights in the Class Vehicles will fail due to the Headlight Defect, their false representations regarding the increased durability of the Class Vehicles, and reliance by Minnesota Plaintiff and the Minnesota Sub-Class Members on these material representations, Defendants had a duty to disclose to Class members

that the Headlight Defect will cause Headlight failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor Headlights, that failure of the Headlights will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Minnesota Plaintiff and the Minnesota Sub-Class Members, Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Minnesota Plaintiff and the Minnesota Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Defendants consumers. Defendants represented to Minnesota Plaintiff and the Minnesota Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, and of high quality, when in fact it is only a matter of time before the Headlights fail due to the Headlight Defect.

355.   Minnesota Plaintiff and the Minnesota Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Defendants' conduct, Minnesota Plaintiff and the Minnesota Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

356.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Minnesota Plaintiff and the Minnesota Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

357.   Defendant's violations present a continuing risk to Minnesota Plaintiff and the Minnesota Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

358.   As a proximate and direct result of Defendants' unfair and deceptive

trade practices, Minnesota Plaintiff and members of the Minnesota Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. These ascertainable losses include, among other things, overpayment at the time of purchase or lease, the cost to repair the Headlight Defect, replacement of the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

359.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices alleged herein, Minnesota Plaintiff and other members of the Minnesota Sub-Class suffered and will continue to suffer actual damages and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial. In addition, Minnesota Plaintiff and the putative Class seek equitable and injunctive relief against Defendants on terms that the Court considers reasonable, and reasonable attorneys' fees.

360.   Minnesota Plaintiff provided notice of his claims by letter dated December 1, 2022.

361.   Pursuant to Minn. Stat. § 8.31(3a), Minnesota Plaintiff and the Minnesota Sub-Class Members seek damages in an amount to be proven at trial, including but not limited to actual damages and attorneys' fees, under the Minnesota CFA.

362.   Minnesota Plaintiff and the Minnesota Sub-Class Members also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that Defendants' acts show deliberate disregard for the rights or safety of others.

## TENTH CAUSE OF ACTION

### Breach of Express Warranty

### Minn. Stat. §§ 336.2-313 and 336.2A-210

### (On behalf of the Minnesota Sub-Class Against HMA)

363.   Plaintiffs incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

364.   Minnesota Plaintiff brings this cause of action individually and on behalf of the members of the Minnesota Sub-Class against Defendant HMA.

365.   HMA is and was at all relevant times "merchants" with respect to motor vehicles under Minn. Stat. §§ 336.2-104(1) and "sellers" of motor vehicles under § 336.2-103(1)(d).

366.   With respect to leases, HMA is and was at all relevant times "lessors" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

367.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

368.   HMA provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

369.   HMA provided all purchasers and lessees of Hyundai-branded Class Vehicles with the Hyundai Warranty.

370.   HMA sold and leased the Class Vehicles with a written express warranty covering the Vehicles for five years or 60,000 miles, whichever comes first (Hyundai Warranty).

371.   Hyundai's New Vehicle Limited Warranty expressly states that Hyundai covers "repair or replacement of any component originally manufactured or installed by Hyundai Motor Company, Hyundai Motor Group, Hyundai Motor Manufacturing Alabama, Kia Manufacturing Mexico, Kia Motors Manufacturing Georgia or Hyundai Motor America that is found to be defective in material or workmanship, under normal use and maintenance[.]" The warranty further provides that "Warranty service will be provided by an authorized Hyundai dealership without charge for parts or labor." (Hyundai Warranty).

372.   HMC designed, manufactured and/or installed the Headlights and the Headlights' component parts in the Class Vehicles, and the Headlights and their component parts are covered by the express Warranties provided by HMA.

373.   The Headlight Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Minnesota Plaintiff and the Minnesota Sub-Class Members.

374.   Minnesota Plaintiff and the Minnesota Sub-Class Members relied on HMA's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

375.   Under the express Warranties, HMA was obligated to correct the Headlight Defect in the vehicles owned or leased by Minnesota Plaintiff and the Minnesota Sub-Class Members.

376.   Although HMA was obligated to correct the Headlight Defect, none of the attempted fixes to the Headlights are adequate under the terms of the Warranties, as they did not cure the defect.

377.   HMA breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, HMA, via its authorized dealerships and otherwise, falsely informed Minnesota Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures, and/or replaced defective components in the Headlights with equally defective components, without actually repairing the Class Vehicles.

378.   HMA and their agent dealers have failed and refused to conform the Headlights to the express Warranties. HMA's conduct, as discussed throughout this Complaint, has voided any attempt on their part to disclaim liability for their actions.

379.   Moreover, HMA's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the

circumstances here. Specifically, HMA's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

380. The time limits contained in HMA's warranty period were also unconscionable and inadequate to protect Minnesota Plaintiff and the Minnesota Sub-Class Members. Among other things, Minnesota Plaintiff and the Minnesota Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between HMA and the Class members, and HMA knew or should have known that the Class Vehicles were defective at the time of sale.

381. Minnesota Plaintiff and the Minnesota Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of HMA's conduct described herein.

382. Minnesota Plaintiff and the Minnesota Sub-Class Members were not required to notify HMA of the breach because affording HMA a reasonable opportunity to cure their breach of written warranty would have been futile. HMA were also on notice of the Headlight Defect from the complaints and service requests they received from Plaintiffs and the Class Members, from repairs and/or replacements of the Headlights or components thereof, and through other internal and external sources as described herein. Regardless, Minnesota Plaintiff also provided notice to HMA via letter dated December 1, 2022.

383. Because HMA, through its conduct and exemplified by its own service bulletins written in conjunction with HMC, have covered repairs of the Headlight Defect if HMA determine the repairs are appropriately covered under the Warranties, HMA cannot now deny that the Warranties cover the Headlight

Defect.

384.   Because HMA have not been able to remedy the Headlight Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

385.   As a direct and proximate cause of HMA's breach, Minnesota Plaintiff and the Minnesota Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Minnesota Plaintiff and the Minnesota Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

386.   As a direct and proximate result of HMA's breach of express warranties, Minnesota Plaintiff and the Minnesota Sub-Class Members have been damaged in an amount to be determined at trial.

## ELEVENTH CAUSE OF ACTION

### Breach of the Implied Warranty of Merchantability

### Minn. Stat. §§ 336.2-314 and 336.2A-212

### (On behalf of the Minnesota Sub-Class Against HMA and HMC)

387.   Plaintiffs incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

388.   Minnesota Plaintiff brings this cause of action individually and on behalf of the members of the Minnesota Sub-Class against Defendants HMA and HMC ("Defendants" for the purposes of this Cause of Action).

389.   Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Minn. Stat. §§ 336.2-104(1) and "sellers" of motor vehicles under § 336.2-103(1)(d).

390.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

391.   The Class Vehicles are and were at all relevant times "goods" within

1    the meaning of Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

2        392.   A warranty that the Class Vehicles were in merchantable condition

3    and fit for the ordinary purpose for which vehicles are used is implied by law

4    under Minn. Stat. §§ 336.2-314 and 336.2A-212.

5        393.   Defendants knew or had reason to know of the specific use for

6    which the Class Vehicles were purchased or leased. Defendants directly sold and

7    marketed vehicles equipped with the Headlights to customers through authorized

8    dealers, like those from whom Minnesota Plaintiff and the Minnesota Sub-Class

9    Members bought or leased their vehicles, for the intended purpose of consumers

10   purchasing or leasing the vehicles. Defendants knew that the Class Vehicles

11   would and did pass unchanged from Defendants to the authorized dealers to

12   Minnesota Plaintiff and the Minnesota Sub-Class Members, with no modification

13   to the defective Headlights.

14       394.   Defendants provided Plaintiffs and Class Members with an implied

15   warranty that the Class Vehicles and their components and parts are

16   merchantable and fit for the ordinary purposes for which they were sold.

17       395.   This implied warranty included, among other things: (i) a warranty

18   that the Class Vehicles and their Headlights that were manufactured, supplied,

19   distributed, and/or sold by Defendants were safe and reliable for providing

20   transportation; and (ii) a warranty that the Class Vehicles and their Headlights

21   would be fit for their intended use while the Class Vehicles were being operated.

22       396.   Contrary to the applicable implied warranties, the Class Vehicles

23   and their Headlights, at the time of sale and thereafter, were not fit for their

24   ordinary and intended purpose of providing Plaintiffs and Class Members with

25   reliable, durable, and safe transportation. Instead, the Class Vehicles are

26   defective, including, but not limited to, the defective design, installation, and

27   manufacture of their Headlights and the existence of the Headlight Defect at the

28   time of sale or lease and thereafter. Defendants knew of this defect at the time

1  these sale or lease transactions occurred.

2      397.  As a result of Defendants' breach of the applicable implied

3  warranties, Minnesota Plaintiff and the Minnesota Sub-Class Members suffered

4  an ascertainable loss of money, property, and/or value of their Class Vehicles.

5  Additionally, as a result of the Headlight Defect, Minnesota Plaintiff and the

6  Minnesota Sub-Class Members were harmed and suffered actual damages in that

7  the Class Vehicles' Headlight components are substantially certain to fail before

8  their expected useful life has run.

9      398.  Defendants' actions, as complained of herein, breached the implied

10 warranty that the Class Vehicles were of merchantable quality and fit for such

11 use in violation of Minn. Stat. §§ 336.2-314 and 336.2A-212.

12     399.  Minnesota Plaintiff and the Minnesota Sub-Class Members have

13 complied with all obligations under the warranty, or otherwise have been

14 excused from performance of said obligations as a result of Defendants' conduct

15 described herein.

16     400.  Minnesota Plaintiff and the Minnesota Sub-Class Members were not

17 required to notify Defendants of the breach because affording Defendants a

18 reasonable opportunity to cure their breach of implied warranty would have been

19 futile. Defendants were also on notice of the Headlight Defect from the

20 complaints and service requests they received from Plaintiffs and the Class

21 Members, from repairs and/or replacements of the Headlights or components

22 thereof, and through other internal sources.

23     401.  In addition, on or about December 1, 2022, Minnesota Plaintiff gave

24 notice to Defendants that he intended to pursue his warranty claims on behalf of

25 a class of similarly situated consumers.

26     402. Because Minnesota Plaintiff purchased his vehicle from an

27 authorized Defendants dealer, he is in privity with Defendants since, (1) an

28 agency relationship establishes privity for purposes of the breach of implied

warranty claims, and (2) privity is not required where plaintiffs are intended third-party beneficiaries of a defendant's implied warranties and the contracts between HMA and its authorized dealers.

403.   As a direct and proximate cause of Defendants' breach, Minnesota Plaintiff and the Minnesota Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Minnesota Plaintiff and the Minnesota Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

404.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Minnesota Plaintiff and the Minnesota Sub-Class Members have been damaged in an amount to be proven at trial.

<u>**TWELFTH CAUSE OF ACTION**</u>

**Violation Of The South Carolina Unfair Trade Practices Act**

**S.C. Code Ann. § 39-5-10, *et seq.***

**(On behalf of the South Carolina Sub-Class Against KMA and KMC)**

405.   Plaintiffs incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

406.   Plaintiff Robert Ewing ("South Carolina Plaintiff") brings this cause of action on his own behalf and on behalf of the members of the South Carolina Sub-Class against Defendants KMA and KMC ("Defendants" for the purpose of this Cause of Action).

407.   Defendants are "persons" under S.C. Code Ann. § 39-5-10.

408.   The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code Ann. § § 39-5-20(a). Defendants' conduct and acts were offensive to public policy or immoral, unethical, or oppressive, thus unfair; indeed, to manufacture, distribute, and promote the Class Vehicles with a

Defect known to cause failure while the Class Vehicle is in motion is surely detrimental to the public at large. Defendants' unfair or deceptive acts or practices were prohibited by the South Carolina UTPA.

409. Defendants participated in unfair or deceptive trade practices that violated the South Carolina UTPA as described below and alleged throughout the Complaint. By failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as reputable manufacturers that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, Defendants knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Defect in the course of its business.

410. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

411. Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

412. Defendants knew that the Class Vehicles and their Headlights suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

413. Defendants knew or should have known that their conduct violated the South Carolina UTPA.

414.   South Carolina Plaintiff and the South Carolina Sub-Class Members reasonably relied on Defendants' misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

415.   Had South Carolina Plaintiff and the South Carolina Sub-Class Members known that the Class Vehicles would exhibit the Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

416.   Defendants owed South Carolina Plaintiff and the South Carolina Sub-Class Members a duty to disclose the truth about the Defect because Defendants: (a) possessed exclusive knowledge of the design of the Class Vehicles and the Defect; (b) intentionally concealed the foregoing from South Carolina Plaintiff and the South Carolina Sub-Class Members; and/or (c)  made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from South Carolina Plaintiff and the South Carolina Sub-Class Members that contradicted these representations.

417.   Due to Defendants' specific and superior knowledge that the Headlights in the Class Vehicles will fail due to the Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by South Carolina Plaintiff and the South Carolina Sub-Class Members on these material representations, Defendants had a duty to disclose to Class members that the Class Vehicles' Headlights will fail, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles, and that Class members would be required to bear the cost of the Defect in their vehicles. Having volunteered to provide information to South Carolina Plaintiff and the South Carolina Sub-Class Members, Defendants had the duty to disclose

not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by South Carolina Plaintiff and the South Carolina Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Defendants' consumers. Defendants represented to South Carolina Plaintiff and the South Carolina Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing safe Headlights as alleged throughout this Complaint, when in fact it is only a matter of time before the Headlights fail due to the Defect.

418.   South Carolina Plaintiff provided notice of his claims to Defendants via letter dated December 2, 2022.

419.   South Carolina Plaintiff and the South Carolina Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Defendants' conduct, South Carolina Plaintiff and the South Carolina Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

420.   As a result of Defendants' conduct, South Carolina Plaintiff and the South Carolina Sub-Class Members were harmed and suffered actual damages as a result of Defendants' misrepresentations and omissions with regard to their Class Vehicles' Headlights because they purchased vehicles which do not perform as advertised.

421.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices, South Carolina Plaintiff and the South Carolina Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

422.   Defendants' violations present a continuing risk to South Carolina Plaintiff and the South Carolina Sub-Class Members as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the

public interest. Specifically: (1) the number of consumers affected by Defendants' deceptive practices are in the hundreds of thousands nation-wide; (2) Defendants have significantly high sophistication and bargaining power with respect to the manufacture and sale of the Class Vehicles to Plaintiffs and individual Class members; and (3) so long as the Class Vehicles continue to be sold and distributed with the defective Headlights, the likelihood of continued impact on other consumers is significant.

423.   Pursuant to S.C. Code Ann. § 39-5-140(a), South Carolina Plaintiff and the South Carolina Sub-Class Members seek monetary relief against Defendant to recover for economic losses, reasonable attorney's fees, and costs. Because Defendants' actions were willful and knowing, Plaintiffs' damages should be trebled.

424.   South Carolina Plaintiff and the South Carolina Sub-Class Members further allege that Defendant's malicious and deliberate conduct warrants an assessment of punitive damages because Defendant carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs and the Class to cruel and unjust hardship as a result.

**THIRTEENTH CAUSE OF ACTION**

**Breach of Express Warranty**

**S.C. Code Ann. §§ 36-2-313 and 36-2A-210**

**(On Behalf of the South Carolina Sub-Class Against KMA)**

425.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

426.   South Carolina Plaintiff brings this cause of action on his own behalf and on behalf of the members of the South Carolina Sub-Class against Defendant KMA.

427.   KMA is and was at all relevant times a  "merchant" with respect to

motor vehicles under S.C. Code Ann. §§ 36-2-104(1) and 36-2A-103(1)(t), and a "seller" of motor vehicles under § 36-2-103(1)(d).

428.   With respect to leases, KMA is and was at all relevant times a "lessor" of motor vehicles under S.C. Code Ann. § § 36-2A-103(1)(p).

429.   The Class Vehicles are and were at all relevant times "goods" within the meaning of S.C. Code Ann. § §§ 36-2-105(1) and 36-2A-103(1)(h).

430.   KMA provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

431.   KMA provided all purchasers and lessees of Kia-branded Class Vehicles with the Kia Warranty.

432.   KMA sold and leased the Class Vehicles with a written express warranty covering the Vehicles for six years or 60,000 miles, whichever comes first (Kia Warranty).

433.   Kia's New Vehicle Limited Warranty expressly states that Kia "warrants that it will arrange for an Authorized Kia dealer at locations of its choice to provide for the repair of your vehicle if it fails to function properly during normal use." The warranty further provides that "Authorized service facilities will remedy such failures to function properly at Kia's expense[.]" (Kia Warranty).

434.   KMC designed, manufactured and/or installed the Headlights and the Headlights' component parts in the Class Vehicles, and the Headlights and their component parts are covered by the express Warranties provided by KMA.

435.   The Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to South Carolina Plaintiff and the South Carolina Sub-Class Members.

436.   Plaintiffs relied on KMA's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

437.   Under the express Warranties, KMA was  obligated to correct the Defect in the vehicles owned or leased by South Carolina Plaintiff and the South Carolina Sub-Class Members.

438.   Although KMA was obligated to correct the Defect, none of the attempted fixes to the Headlights are adequate under the terms of the Warranties, as they did not cure the defect.

439.   KMA breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties via its authorized dealerships, KMA, via its dealerships and otherwise, falsely informed South Carolina Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures, and/or replaced defective components in the Headlight Assembly with equally defective components, without actually repairing the Class Vehicles.

440.   KMA and their agent dealers have failed and refused to conform the Headlights to the express Warranties. KMA's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for their actions.

441.   Moreover, KMA's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, KMA's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

442.   The time limits contained in KMA's warranty period were also unconscionable and inadequate to protect South Carolina Plaintiff and the South Carolina Sub-Class Members. Among other things, South Carolina Plaintiff and the South Carolina Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored KMA. A gross disparity in bargaining power existed between KMA and the Class members, and

KMA knew or should have known that the Class Vehicles were defective at the time of sale.

443.   South Carolina Plaintiff and the South Carolina Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of KMA's conduct described herein.

444.   South Carolina Plaintiff and the South Carolina Sub-Class Members were not required to notify KMA's of the breach because affording KMA a reasonable opportunity to cure their breach of written warranty would have been futile. KMA were also on notice of the Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the Headlights or components thereof, and through other internal and external sources as described herein. Regardless, South Carolina Plaintiff provided KMA notice of the breaches of express warranty by letter dated December 2, 2022.

445.   Because KMA, through their conduct and exemplified by their own service bulletins, have covered repairs of the Defect if KMA determines the repairs are appropriately covered under the Warranties, KMA cannot now deny that the Warranties cover the Defect.

446.   Because KMA have not been able to remedy the Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

447.   As a direct and proximate cause of KMA's breach, South Carolina Plaintiff and the South Carolina Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, South Carolina Plaintiff and the South Carolina Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of

1  repair.

2      448.   As a direct and proximate result of KMA's breach of express

3  warranties, South Carolina Plaintiff and the South Carolina Sub-Class Members

4  have been damaged in an amount to be determined at trial.

5                    **FOURTEENTH CAUSE OF ACTION**

6            **Breach of The Implied Warranty Of Merchantability**

7                  **S.C. Code Ann. §§ 36-2-314 and 36-2A-212**

8       **(On Behalf of the South Carolina Sub-Class Against KMA and KMC)**

9      449.   Plaintiffs incorporate by reference the preceding paragraphs of this

10  Complaint.

11     450.   South Carolina Plaintiff brings this cause of action on his own

12  behalf and on behalf of the members of the South Carolina Sub-Class against

13  Defendants KMA and KMC ("Defendants" for the purposes of this Cause of

14  Action).

15     451.   Defendants are and were at all relevant times "merchants" with

16  respect to motor vehicles under S.C. Code Ann. § §§ 36-2-104(1) and 36-2A-

17  103(1)(t), and "sellers" of motor vehicles under § 36-2-103(1)(d).

18     452.   With respect to leases, Defendants are and were at all relevant times

19  "lessors" of motor vehicles under S.C. Code Ann. § § 36-2A-103(1)(p).

20     453.   The Class Vehicles are and were at all relevant times "goods" within

21  the meaning of S.C. Code Ann. § §§ 36-2-105(1) and 36-2A-103(1)(h).

22     454.   A warranty that the Class Vehicles were in merchantable condition

23  and fit for the ordinary purpose for which vehicles are used is implied by law

24  under S.C. Code Ann. § §§ 36-2-314 and 36-2A-212.

25     455.   Defendants knew or had reason to know of the specific use for

26  which the Class Vehicles were purchased or leased. Defendants directly sold and

27  marketed vehicles equipped with Headlights to customers through KMA

28  authorized dealers, like those from whom South Carolina Plaintiff and the South

Carolina Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Defendants knew that the Class Vehicles would and did pass unchanged from the authorized dealers to South Carolina Plaintiff and the South Carolina Sub-Class Members, with no modification to the defective Headlights.

456.  Defendants provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

457.  This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their Headlights that were manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their Headlights would be fit for their intended use while the Class Vehicles were being operated.

458.  Contrary to the applicable implied warranties, the Class Vehicles and their Headlights at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their Headlights and the existence of the Defect at the time of sale or lease and thereafter. Defendants knew of this defect at the time these sale or lease transactions occurred.

459.  As a result of Defendants' breach of the applicable implied warranties, South Carolina Plaintiff and the South Carolina Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, South Carolina Plaintiff and the South Carolina Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' Headlights are substantially certain to fail before their expected useful life has run.

460.   Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of S.C. Code Ann. § §§ 36-2-314 and 36-2A-212.

461.   South Carolina Plaintiff and the South Carolina Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

462.   South Carolina Plaintiff and the South Carolina Sub-Class Members were not required to notify Defendants of the breach because affording Defendants a reasonable opportunity to cure their breach of written warranty would have been futile. Defendants were also on notice of the Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the Headlights or components thereof, and through other internal sources as described herein. Regardless, South Carolina Plaintiff provided notice of the breaches of implied warranty to Defendants via letter dated December 2, 2022.

463.   As a direct and proximate cause of Defendants' breach, South Carolina Plaintiff and the South Carolina Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, South Carolina Plaintiff and the South Carolina Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

464.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, South Carolina Plaintiff and the South Carolina Sub-Class Members have been damaged in an amount to be proven at trial.

1

### FIFTEENTH CAUSE OF ACTION

**(Breach of Express Warranty under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2303 *et seq.*)**

**(On Behalf of the Nationwide Class, or, in the Alternative, on Behalf of All Sub-Classes Against Defendants HMA and KMA)**

465.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

466.   Plaintiffs bring this cause of action on behalf of themselves and on behalf of the Nationwide Class, or alternatively on behalf of the Sub-Classes, or on behalf of themselves individually against Defendants HMA and KMA ("Defendants" for the purposes of this Cause of Action).

467.   Defendants provided all purchasers and lessees of the Class Vehicles with an express warranty described *infra*, which became a material part of the bargain.

468.   The Headlight assembly and its component parts were manufactured and/or installed in the Class Vehicles by HMC or KMC and are covered by the express warranties issued by HMA or KMA.

469.   In a section entitled "New Vehicle Limited Warranty," Kia's express warranty provides, in relevant part, that Kia "warrants that it will arrange for an Authorized Kia dealer at locations of its choice to provide for the repair of your vehicle if it fails to function properly during normal use." The warranty further provides that "Authorized service facilities will remedy such failures to function properly at Kia's expense[.]" (Kia Warranty).

470.   In a section entitled "New Vehicle Limited Warranty," Hyundai's express warranty provides, in relevant part, that Hyundai covers "repair or replacement of any component originally manufactured or installed by Hyundai Motor Company, Hyundai Motor Group, Hyundai Motor Manufacturing Alabama, Kia Manufacturing Mexico, Kia Motors Manufacturing Georgia or

Hyundai Motor America that is found to be defective in material or workmanship, under normal use and maintenance[.]" The warranty further provides that "Warranty service will be provided by an authorized Hyundai dealership without charge for parts or labor." (Hyundai Warranty).

471.   Defendants breached the express warranties by selling and leasing Class Vehicles with Headlights that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the Headlight and its component parts. Defendants have failed to "repair" the defects as alleged herein.

472.   Plaintiffs was not required to notify Defendants of the breach or was not required to do so because affording Defendants a reasonable opportunity to cure its breach of written warranty would have been futile. Defendants were also on notice of the defect from complaints and service requests they received from Class Members, from repairs and/or replacements of the Headlight, and from other internal sources.

473.   Plaintiffs also provided notice to Defendants of their breach of warranty claims under the MMWA by letters dated December 1, 2022 (Plaintiff Maranda), December 2, 2022 (Plaintiff Ewing), January 25, 2023 (Plaintiff Jones), and February 23, 2023 (Plaintiff Holliday).

474.   As a direct and proximate cause of Defendants' breach, Plaintiffs and the other Class members have suffered, and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, Plaintiffs and the other Class members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

475.   Plaintiffs and the other Class members are entitled to legal and equitable relief against Defendants, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as

1  appropriate.

2  ## SIXTEENTH CAUSE OF ACTION

3  **(Breach of Implied Warranty under the Magnuson-Moss Warranty Act,**

4  **15 U.S.C. § 2303 *et seq.*)**

5  **(On Behalf of the Nationwide Class, or, in the Alternative, on Behalf of All**

6  **Sub-Classes Against All Defendants)**

7  476.    Plaintiffs incorporate by reference the allegations contained in the

8  preceding paragraphs of this Complaint.

9  477.    Plaintiffs bring this cause of action on behalf of themselves and on

10  behalf of the Nationwide Class, or alternatively on behalf of the Sub-Classes, or

11  on behalf of themselves individually against all Defendants.

12  478.    The Class Vehicles are a "consumer product" within the meaning of

13  the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

14  479.    Plaintiffs and Class Members are "consumers" within the meaning

15  of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

16  480.    Defendants are "suppliers" and "warrantors" within the meaning of

17  the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

18  481.    Defendants impliedly warranted that the Class Vehicles were of

19  merchantable quality and fit for use. This implied warranty included, among

20  other things: (i) a warranty that the Class Vehicles and their Headlights

21  manufactured, supplied, distributed, and/or sold by Defendants would provide

22  safe and reliable transportation; and (ii) a warranty that the Class Vehicles and

23  their Headlights would be fit for their intended use while the Class Vehicles were

24  being operated.

25  482.    Contrary to the applicable implied warranties, the Class Vehicles

26  and their Headlights at the time of sale and thereafter were not fit for their

27  ordinary and intended purpose of providing Plaintiffs and Class members with

28  reliable, durable, and safe transportation. Instead, the Class Vehicles are

defective, including the defective design and materials of their Headlights.

483.    Defendants' breach of implied warranties has deprived Plaintiffs and Class members of the benefit of their bargain.

484.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25,000. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

485.    Defendants have been afforded a reasonable opportunity to cure their breach, including when Plaintiffs and Class members brought their vehicles in for diagnoses and Headlight repair.

486.    As a direct and proximate cause of Defendants' breach of implied warranties, Plaintiffs and Class members sustained and incurred damages and other losses in an amount to be determined at trial. Defendants' conduct damaged Plaintiffs and Class members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

487.    As a result of Defendants' violations of the Magnuson-Moss Warranty Act as alleged herein, Plaintiffs and Class members have incurred damages.

488.    Plaintiffs also provided notice to Defendants of its breach of warranty claims under the MMWA by letters dated December 1, 2022 (Plaintiff Maranda), December 2, 2022 (Plaintiff Ewing), January 23, 2023 (Plaintiff Jones), and February 23, 2023 (Plaintiff Holliday).

## SEVENTEENTH CAUSE OF ACTION

### (For Fraud by Omission or Fraudulent Concealment)

### (On Behalf of the Nationwide Class, or, in the Alternative, on Behalf of All Sub-Classes Against All Defendants)

489.    Plaintiffs incorporate by reference the allegations contained in the

1   preceding paragraphs of this Complaint.

2      490.   Plaintiffs bring this cause of action on behalf of themselves and the

3   Class or, alternatively, on behalf of all Sub-Classes against all Defendants.

4      491.   Defendants knew that the Class Vehicles suffered from an inherent

5   Headlight Defect, were defectively designed and/or manufactured, and were not

6   suitable for their intended use.

7      492.   Defendants concealed from and failed to disclose to Plaintiffs and

8   Class Members the defective nature of the Class Vehicles.

9      493.   Defendants were under a duty to Plaintiffs and Class Members to

10  disclose the defective nature of the Class Vehicles because:

11         a. Defendants were in a superior position to know the true state of

12            facts about the safety defect contained in the Class Vehicles;

13         b. The omitted facts were material because they directly impact the

14            safety of the Class Vehicles;

15         c. Defendants knew the omitted facts regarding the Headlight

16            Defect were not known to or reasonably discoverable by

17            Plaintiffs and Class Members;

18         d. Defendants made partial disclosures about the quality of the

19            Class Vehicles without revealing their true defective nature; and,

20         e. Defendants actively concealed the defective nature of the Class

21            Vehicles from Plaintiffs and Class Members.

22     494.   The facts concealed or not disclosed by Defendants to Plaintiffs and

23  the other Class Members are material in that a reasonable person would have

24  considered them to be important in deciding whether to purchase or lease

25  Defendants' Class Vehicles or pay a lesser price for them. Whether a vehicle's

26  Headlight is defective, which can suddenly cause lights to fail, dim, or

27  malfunction during night driving or inclement weather, thereby causing the

28  inability to see pedestrians, animals, and road hazards, is a material safety

1   concern. Had Plaintiffs and Class Members known about the defective nature of

2   the Class Vehicles, they would not have purchased or leased the Class Vehicles

3   or would have paid less for them.

4       495.   Defendants concealed or failed to disclose the true nature of the

5   design and/or manufacturing defects contained in the Class Vehicles to induce

6   Plaintiffs and Class Members to act thereon. Plaintiffs and the other Class

7   Members justifiably relied on Defendant's omissions to their detriment. This

8   detriment is evident from Plaintiffs and Class Members' purchase or lease of

9   Defendants' defective Class Vehicles.

10      496.   Defendants continued to conceal the defective nature of the Class

11  Vehicles even after Class Members began to report the problems. Indeed,

12  Defendants continue to cover up and conceal the true nature of the problem

13  today.

14      497.   As a direct and proximate result of Defendants' misconduct,

15  Plaintiffs and Class Members have suffered and will continue to suffer actual

16  damages. Plaintiffs and the Class reserve their right to elect either to (a) rescind

17  their purchase or lease of the defective Vehicles and obtain restitution or (b)

18  affirm their purchase or lease of the defective Vehicles and recover damages.

19      498.   Defendants' acts were done maliciously, oppressively, deliberately,

20  with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's

21  rights and well-being to enrich Defendants. Defendants' conduct warrants an

22  assessment of punitive damages in an amount sufficient to deter such conduct in

23  the future, which amount is to be determined according to proof

24  **<u>EIGHTEENTH CAUSE OF ACTION</u>**

25  **(For Unjust Enrichment)**

26  **(On Behalf of the Nationwide Class, or, in the Alternative, on Behalf of All**

27  **Sub-Classes Against All Defendants)**

28      499.   Plaintiffs incorporate by reference the allegations contained in the

1    preceding paragraphs of this Complaint.

2        500.   Plaintiffs bring this cause of action on behalf of themselves and the

3    Class or, alternatively, on behalf of all Sub-Classes against all Defendants.

4        501.   Defendants have received and retained a benefit from Plaintiffs and

5    the members of the Class, and inequity has resulted.

6        502.   As a direct and proximate result of Defendants' failure to disclose

7    known defects, Defendants have profited through the sale and lease of the Class

8    Vehicles, the value of which was artificially inflated by Defendants'

9    concealment of and omissions regarding the Headlight Defect. Defendants

10   charged higher prices for the vehicles than the vehicles' true value, and Plaintiffs

11   and Class Members thus overpaid for the Class Vehicles. Although these

12   vehicles are purchased through Defendants' authorized dealers and distributors,

13   the money from the vehicle sales flows directly back to Defendants.

14       503.   Additionally, as a direct and proximate result of Defendants' failure

15   to disclose known defects in the Class Vehicles, Plaintiffs and Class Members

16   have vehicles that require repeated, high-cost repairs that can and therefore have

17   conferred an unjust substantial benefit upon Defendants.

18       504.   Defendants have been unjustly enriched due to the known defects in

19   the Class Vehicles through the use of money paid that earned interest or

20   otherwise added to Defendants' profits when said money should have remained

21   with Plaintiffs and Class Members.

22       505.   Plaintiffs and Class Members were not aware of the true facts

23   regarding the Defect in the Class Vehicles and did not benefit from Defendants'

24   unjust conduct.

25       506.   As a result of the Defendants' unjust enrichment, Plaintiffs and

26   Class Members have suffered damages.

27       507.   Plaintiffs do not seek restitution under their unjust enrichment

28   claim. Rather, Plaintiffs and Class Members seek non-restitutionary

FIRST AMENDED CLASS ACTION COMPLAINT

disgorgement of the financial profits that Defendants obtained as a result of its unjust conduct.

508.   Additionally, Plaintiffs seek injunctive relief to compel Defendants to offer, under warranty, remediation solutions that Defendant identifies. Plaintiffs also seek injunctive relief enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, enjoining Defendants from selling the Class Vehicles with the misleading information; compelling Defendants to provide Class members with a replacement components that do not contain the defects alleged herein; and/or compelling Defendants to reform their warranties, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranties have been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

## RELIEF REQUESTED

509.   Plaintiffs, on behalf of themselves and all others similarly situated, request the Court enter judgment against Defendants, as follows:

(a) An order certifying the proposed Class and Sub-Classes, designating Plaintiffs as named representatives of the Class, and designating the undersigned as Class Counsel;

(b) A declaration that Defendants are financially responsible for notifying all Class Members about the defective nature of the Headlight, including the need for periodic maintenance;

(c) An order enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling Defendants to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling Defendants to repair and eliminate the Headlight Defect from every Class Vehicle; enjoining Defendants from selling the

Class Vehicles with the misleading information; and/or compelling Defendants to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed;

(d) An award to Plaintiffs and the Class for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

(e) Any and all remedies provided pursuant to the Magnuson-Moss Warranty Act;

(f) A declaration that Defendants must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale or lease of the Class Vehicles or make full restitution to Plaintiffs and Class Members;

(g) An award of attorneys' fees and costs, as allowed by law;

(h) An award of pre-judgment and post-judgment interest, as provided by law;

(i) Leave to amend the Complaint to conform to the evidence produced at trial; and

(j) Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

510. Pursuant to Federal Rule of Civil Procedure 38(b) and Central District of California Local Rule 38-1, Plaintiffs hereby demand a trial by jury of all issues in this action so triable.

FIRST AMENDED CLASS ACTION COMPLAINT

Dated:  May 3, 2023

Respectfully submitted,

**Capstone Law APC**


By: /s/ Laura E. Goolsby
_____
Tarek H. Zohdy
Cody R. Padgett
Laura E. Goolsby

**BERGER MONTAGUE PC**
Russell D. Paul
(*pro hac vice*)
Amey J. Park
(*pro hac vice*)
Abigail J. Gertner
(*pro hac vice*)
1818 Market Street
Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
rpaul@bm.net
apark@bm.net
agertner@bm.net

Attorneys for Plaintiffs

FIRST AMENDED CLASS ACTION COMPLAINT